UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

MARY BASILE LOGAN, individually and on behalf
of those similarly situated, *Pro-Se*;

                         Plaintiff,

NED LAMONT, in his official capacity as Governor
of Connecticut;

JOHN CARNEY, in his official capacity as Governor
of Delaware;

CHARLIE BAKER, in his official capacity as Governor
of Massachusetts;

WES MOORE, in his official capacity as Governor
of Maryland;

LAWRENCE J. HOGAN, in his former capacity as
Governor of Maryland and in his capacity as Chair, for
the National Governors Association (NGA);

PHIL MURPHY, in his official capacity as Governor
of New Jersey, and as former Chair of the National
Governors Association (NGA);

TAHESHA WAY, in her former capacity as Secretary
of State, as former President of the National Association
of Secretaries of State, and her current capacity as
Lt. Governor, New Jersey;

JUDITH PERSICHILLI, in her official capacity as then-
Commissioner of Health for the State of New Jersey;

SEJAL HATHI, in her official capacity as Deputy
Commissioner for Public Health Services;

MATTHEW PLATKIN, in his official capacity as
Attorney General of the State of New Jersey;

DOCKET NO.: _____

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
2023 OCT 13  P 3: 51

KATHY HOCHUL, in her official capacity as Governor
of New York;

ANDREW CUOMO, in his former capacity as Governor
of New York and his capacity as Vice-Chair of the National
Governors Association;

LETITIA JAMES, in her capacity as Attorney General of
the State of New York;

TOM WOLF, in his official capacity as Governor
of Pennsylvania;

DAN MCKEE, in his official capacity as Governor
of Rhode Island;

KRISTEN CLARKE, in her official capacity as Assistant
Attorney General, Department of Justice, Civil Rights
Division;

MIGUEL CARDONA, in his official capacity as the
United States Secretary of Education;

THE DEMOCRATIC NATIONAL COMMITTEE;

THE REPUBLICAN NATIONAL COMMITTEE;

JOHN DOES (1-100)

JANE DOES (1-100)
                              Defendants.

## COMPLAINT AND PRAYER FOR DECLARATORY, EMERGENT AND PERMANENT INJUNCTIVE RELIEF

## **INTRODUCTION**

1.      Plaintiff brings this action on behalf of those similarly situated as to herself, a citizen of these

United States, familial immigrant lineage to those who sought a new way by traversing to these

United States and its promise of the American Dream, yoking to Sidney Oscar Logan, Spec. Deputy

Sheriff (LaSalle Cty.,IL), General John (Blackjack Logan) and Mary Logan, Jacob Drummond Logan

(MIA – Vietnam), Kenneth G. Basile (U.S. Navy), James D. Logan (U.S. Army), and Jack Torbitt

(U.S. Army – Korean War Veteran).  Plaintiff holds an Oath and Pledge to uphold the Constitution and

protect these United States against all enemies, foreign and domestic, her covenant attestation to God

and the People in January, 2021, an elected servant to the People of these United States.  Fear and

reprisal as to this plea on behalf of the People is dismissed altogether when weighed against the

righteous repugnance as to the facts disclosed herein, facts informed by God Almighty.

2.      Plaintiff sought to retain counsel, interviewing several attorneys of esteemed reputation;

however, non-profit entities including that of the former New Jersey Governor, Christine Todd

Whitman, who by way of States United Democracy Center, a 501c(3) entity, did knowingly seek to

impose on the People's First Amendment Rights when soliciting ethics violations be levied against a

principled counselor at law for actions taken to which Ms. Whitman may or may not have agreed

with.  The irony of these knowing actions is disclosed when consideration is given to the exacting

nature of the letter in content and the facts presented herein, "…Lawyers, particularly those who

represent elected and appointed officials, have a solemn duty to the public to advise their clients

within the four corners of the law, and to ensure that they do not allow themselves to become the tools

by which those officials seek to undermine democratic governance."[1]  The selected language of the

October 4, 2021 communication served a two-fold purpose, made exacting when the Court considers

actions taken against other Bar admitted members including the Texas Attorney General, Kenneth

Paxton;  (1) Occupy the time of John C. Eastman, Esq. who must now defend not only his vocational

capacity but also his person and reputation, and (2) to extinguish the People's right to remedy under

the First Amendment should facts of merit be disclosed that would warrant such undertaking, as

---

[1]Ambassador Norman Eisen (Ret.), et al., States United Democracy Center, *Request for Investigation of John C. Eastman, California State Bar No. 193726*.  October 4, 2021. Accessed July 4, 2023.  https://statesuniteddemocracy.org

setforth hereto; God had other plans.  The actions of Ms. Whitman and her associates unequivocally dismiss the magnitude of resulting human impact as irrelevant consequence, not dissimilar to the actions of the Defendants herein; the impact on the People as much the students of Mr. Eastman, so too extending to the body of precedent born of his distinguished legal career.  Ms. Whitman and her associates, under the guise of the States United Democracy Center, employed their personal political philosophies and will so as to impose themselves as much their 501c(3) entity established, to permeate the People's Rights, in direct conflict with their 501c3 tax exempt declaration[2], in a manner so egregious as to frame legal perceptions thus seek to use coercive tactics to influence elections in retaliation for ideological disenchantment resulting in usurpation to the People's rights and remedy.

3.      Respecting the Court's time, for the benefit of those who may avail themselves time to read this Complaint, Plaintiff seeks to recognize the vast body of volunteers, who are rightly, a composite of these United States, representing every walk of life, quite literally.  Through a distinct and God informed skill set, the Plaintiff trained persons in each State of this fine Nation on a distinct evidence model, the 7-Points of Evidence.  This plea as much birthed by their hands as that of Plaintiff's, but for disingenuous third-party actors imposing on such efforts, the Plaintiff's retained repository of records would have been replicated in each and every State across the Nation; God be with those who sought to dismantle and squander these efforts, Plaintiff will not diminish the integrity of this plea by including such names.  It is the human element, so often lost in translation among COVID-19 data points, medical charts and findings; a one-dimensional representation to that of a three-dimensional being, of and belonging to one-another in support, bereavement and companionship, facets of dignity which were deprived our veterans who died, in many cases ***ALONE, zipped into a non-descript bag***, in some cases to be stacked among others, an unacceptable closure after having served with

---

[2] States United Democracy Center Inc. *Return of Organization Exempt from Income Tax (990)*, 2021; page 3, declaration of same.  Accessed June 14, 2023.  https://projects.propublica.org/nonprofits/organizations/861704152/202233069349300203/full

4

distinction in retention of the sovereignty of this Nation.  The honor and integrity of the decedent's life stories would, thereafter, become an accounting for COVID-19/CARES Act and American Rescue Plan funding allocation and appropriation; their vote and voice having evidently lost its perceived value once the bag had been zipped; Plaintiff's plea resuscitates their life stories.  Amid this plea of the People, each decedent's voice gathers amid those of similar dignified life testimony; Dr. Martin Luther King, Jr., Harriet Tubman, and Cary Roque, individuals who *employed* their time gifted by God on this earth for the betterment of humanity in advocacy that ***all*** people regardless of pigment, race, origin, or creed be counted in whole among the inclusive Rights enumerated in the Constitution and, moreover that as citizens, each understands the weight of responsibility to its shared history as much the demand, regardless of personal cost, in its preservation.  The Voting Rights Act of 1964, the Housing Act of 1968 and our Nation's founding documents would become the surreptitious wall of separation by which the subject Defendants, having intimate knowledge of the protective statutes, whether State or Federal, skirted and contrived with utter malice and disregard under mask of COVID-19, compromising those in their charge, the Executive Branch and the balance of precedent long held as sacred tenons of these United States.

4.      On April 13, 2020, as announced by Andrew Cuomo, the Defendants, sharing common resident traverse of a transient citizen populous, created a collective leadership structure including Governors  - Ned Lamont (CT), John Carney (DE), Charlie Baker (MA), Lawrence Hogan (MD), Wes Moore (MD), Phil Murphy (NJ), Tahesha Way (serving as Secretary of State, NJ), Judith Persichilli (serving as Commissioner of Health, NJ), (Sejal Hathi, Depute Commissioner of PHS, NJ), Matthew Platkin (serving as Attorney General, NJ), Andrew Cuomo (NY), Kathy Hochul (NY), Tom Wolf (PA), and Dan McKee (RI).  Similarly, other State coalitions followed suit; WESTERN STATES PACT (Announced by Gavin Newsom, CA Governor) - California/Colorado/Nevada/Oregon/

Washington; <u>MIDWESTERN STATES PACT</u> (Announced by Gretchen Whitmer, MI Governor) -

Illinois/Indiana/Kentucky/Michigan/Minnesota/Ohio/Wisconsin; NORTHERN PACT (Announced by

Janet Mills, ME Governor) - Maine/Vermont/New Hampshire; <u>SOUTHERN STATES COALITION</u>

(Announced by Ron DeSantis, FL Governor) - Alabama/Florida/Georgia/South Carolina/Tennessee.[3]

Plaintiff reserves the right as to the foregoing parties to be called as co-Defendants in this matter.

5.      COVID-19 PRESS RECORDINGS.  The list below represents a component of the repository

of press recordings by date.

      a.  MASSACHUSETTS:  March 9, 2020 Coronavirus Press Conference with Governor
          Baker, Mayor Walsh, Massachusetts.[4]

      b.  NEW YORK:  March 24, 2020 Coronavirus press conference with Governor Andrew
          Cuomo, New York.[5]

      c.  MARYLAND:  March 17, 2020 Coronavirus press conference with Governor Larry
          Hogan, Maryland.[6]

      d.  COALITION ANNOUNCEMENT:  April 13, 2020 Joint coronavirus press conference
          with New York, New Jersey, Connecticut, Delaware, Massachusetts, Pennsylvania and
          Rhode Island.[7]

---

[3] Ballotpedia.org. *Multistate Agreement to Reopen After the Coronavirus (COVID-19) Pandemic, 2020.* Press Statements direct link by content.  Accessed January 10, 2022.
https://ballotpedia.org/Multistate_agreements_to_reopen_after_the_conoravirus_(COVID-19)_pandemic,)2020
[4] Baker, Governor; Walsh, Mayor.  March 9, 2020. *Coronavirus Press Conference.* Accessed January 10, 2022.
https://youtu.be/RLty_Yh-eic?si=LMsN6sT90Vh_S77U
[5] Cuomo, Governor.  March 24, 2020.  *New York Governor Andrew Cuomo Gives Coronavirus Update.*  Accessed January 10, 2022. https://www.youtube.com/live/S0k5k-6T1Bl?si=hzvChNfQMY3GnNZB
[6] Hogan, Governor.  March 17, 2020.  Maryland Governor Larry Hogan Gives Coronavirus Update.  Accessed January 10, 2022. https://www.youtube.com/live/lw0GKgzktxl?si-Holc3iNFQFbpxGAH
[7] Press Conference. *Governors from New York, New Jersey, Connecticut, Pennsylvania, Rhode Island and Delaware To Work Together to Begin Reopening Plan.* April 13, 2020  Accessed January 10, 2022. https://www.youtube.com/watch?v=71Du5aaSrk

e.  WHITE HOUSE:  March 19, 2020 Joint Presidential and Gubernatorial conference call at Federal Emergency Management Agency ("FEMA"), National Response Coordination Center ("NRCC")[8].

Joint Task Force Statement (excerpt):

Family First Act, waiving COVID-19 testing cost to end-users, resident citizens; public private partnership with commercial laboratories with high throughput for testing; private lab reporting to CDC; personal protective equipment ("PPE") industry coordination with donors including construction companies and private entities donating through area hospitals; ventilators and conversion protocol; FEMA emergency structure reiterated by way of the NRCC, such protocol introduced following the events arising from September 11, 2001 and subsequent Commission giving strategic insights into emergency response on a large scale.  President Trump reiterated Food and Drug Administration ("FDA") has approved "compassionate use for a significant number of patients we have a drug called chloroquine, a derivation would be hydroxychloroquine…(a) common malaria drug…(who's) safety level we understand very well, relatively safe shown very encouraging results…under the head of the FDA Dr. Stephen Hahn…its approved…we're encouraging you to take a look at it, we have ordered a lot of it and you can too, it's by prescription…prescribed for malaria and very serious forms of arthritis but we believe it has a very good impact on…with respect to the virus…to me that's a game changer.  The vaccines are fine, but it will be a while before you can test them…we are making tremendous progress on a vaccine, but it still takes a long while to test it.  We're also studying this and other promising therapies including…Gilead, called Remdesivir…and Regeneron…they are the ones that came up with a very successful solution to Ebola.[9]

6.     On April 5, 2017, Defendant, Letitia James, serving as Public Advocate was interviewed on a popular morning radio program. The interview detailed the Defendant's espoused views regarding the Executive's "illegitimacy" which she attributes to millions of people not having voted due to voter suppression, defining those voters as "individuals having voted based on their fears and economic anxiety,"[10] during the interview she would refer to then-President Trump as an "illegitimate idiot."[11]

---

[8] President, Donald J. Trump speaks with Governors on Coronavirus Response at FEMA Headquarters.  March 19, 2020.  CNBC TV.  Accessed October 1, 2023. www.youtube.com/live/MIUs08PZcdo?si=y9b1qqBgOmgtvxeR
[9] Ibid., 21:00/1:08:18.
[10] James, Letitia.  2017.  Interview by Ebro Darden, Ebro in the Morning, April 5, 2017.  Accessed October 5, 2023 https://youtu.be/7Ee-jG7uhdQ?si=ri293PiuSJ_INUSI

[11] Ibid. (28:32/43:15)

7.      Proclamation 9994 of March 13, 2020, "Declaring a National Emergency Concerning the Novel Coronavirus (COVID-19) Outbreak,"[12] the Executive action with inclusive authorizations, supplements and amendments remaining intact, in whole or in part to the present day, attached as EXHIBIT 1.  The foregoing extends to the inclusive federal partners, among them the Center for Disease Control ("CDC"), National Institutes of Health ("NIH"), etc.

8.      On August 26, 2020, Assistant Attorney General Eric Dreiband proffered a letter to Governor Murphy, New Jersey, citing the Civil Rights of Institutionalized Persons Act (CRIPA) (42 U.S.C. §1997), same attached as EXHIBIT 2.  The subject letter requested reply with provision of specific data and records,

> (concerning) Public Nursing Home residents, employees, other staff, guests and visitors who died of COVID-19…guidance, directives, advisories, or executive orders regarding admission of persons (with policy history)…persons admitted to a Public Nursing Home from a hospital or other facility, hospice, homecare or other location after testing positive for COVID-19 during the period the guidance or order were in effect.[13]

9.      October 27, 2020, Assistant Attorney General Eric Dreiband  and United States Attorney Craig Carpenito proffered a subsequent letter to Governor Phil Murphy, New Jersey, attached as EXHIBIT 3.  Citing the Governor's responsive records to the request insufficient, the Department of Justice ("DOJ") opened an investigation pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA) (42 U.S.C. §1997) specific to the New Jersey Veterans Memorial Home at Menlo Park and the New Jersey Veterans Memorial Home at Paramus.[14]  No further publicly disclosed

---

[12] Federal Register. March 18, 2020.  Presidential Documents. *Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak.*  Accessed January 10, 2022 https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronovirus-disease-covid-19-outbreak

[13] Dreiband, Eric, Assistant Attorney General Civil Rights Division, U.S. Department of Justice, Letter of August 26, 2020 *Request for documentation, Evaluative Notice -- Civil Rights of Institutionalized Persons Act (CRIPA).*  Accessed January 10, 2022. https://www.justice.gov/opa/press-release/file/1308986/download

[14] Dreiband, Eric S., Assistant Attorney General Civil Rights Division, and Carpenito, Craig, United States Attorney, District of New Jersey.  Letter to Governor Phil Murphy, *Investigation of New Jersey Veterans Memorial Home at Menlo Park and New Jersey Veterans Memorial Home at Paramus.* October 27, 2020 Accessed January 10, 2022. FOI/PA NO.22-001460-F.

communications regarding the cited investigation were provided until September 7, 2023, when the

DOJ released their investigative findings concerning the subject Veterans care facilities.[15]

10.     On January 30, 2020, the National Association of Secretaries of State held their winter

conference in Washington D.C.  The keynote session entitled, "Discussion on Election Security"[16]

featured speaker, Clint Watts, an author and lecturer with a background of vocational experience in

terrorism, counterterrorism and the Federal Bureau of Investigation ("FBI").[17]  Open source records

provided that Mr. Watts gave testimony to the Intelligence Committee on March 30, 2017 with

testimonial content expanded in a March, 2021 blog article which he co-authored, *Foreign*

*Interference in Elections 2022 and 2024: What Should We Be Prepare For?*, for the Foreign Policy

Research Institute.[18]  The blog post reiterates his projected beliefs concerning election interference,

> …Simultaneously, the U.S. government, Silicon Valley and the American mainstream media
> reassessed how to handle foreign interference in the information space targeting the 2020
> presidential election, and much of this new research into the misinformation/disinformation
> problem informed recalibrated methods for combating such attacks…the methods, mediums
> and messengers pushing propaganda, misinformation and disinformation have changed
> dramatically since 2016…future research into electoral interference should examine how
> dynamics between American tech and foreign governments in these countries as well as
> restrictions and barriers to content delivery shape perceptions and how these modification to
> the free flow of the Internet will result in new innovative work-arounds by the most advanced
> actors determined to interfere in elections…these recommendation for future research to stop
> align influence in Western elections bring a close to the FIE 2020 project.  Thanks to the
> support of the Foreign Policy Research Institute and the Democracy Fund…(amassing) more
> than 65 analyses on the 2020 election and interference efforts stemming from Russia, Iran, and
> China.  While state-backed media outlets, like those analyzed here in the FIE 2020 project, still
> provide a valuable avenue for examining narratives and disinformation stemming from foreign
> governments…[19]

---

[15] United States Department of Justice, Civil Rights Division, United States Attorney's Office, District of New Jersey, *Investigation of the New Jersey Veterans Memorial Homes at Menlo Park and Paramus*. September 7, 2023.  Accessed September 7, 2023, https://thehill.com/homenews/state-watch/4192639-doj-new-jersey-violated-constitution-with-veterans-covid-care
[16] National Association of Secretaries of State, January 31, 2020.  Session: Election Security – Clint Watts.  Accessed January 10, 2022 https://www.c-span.org/video/?468802-1/national-association-secretaries-state-discussion-election-security
[17] CSPAN, National Association of Secretaries of State, Winter Conference.  January 31, 2020, Washington, D.C.  Accessed January 10, 2022 https://www.c-span.org/video/?468802-1/national-association-secretaries-state-discussion-election-security
[18] Watts, Chris; Chernaskey, Rachel. *Foreign Interference in Elections 2022 and 2024: What Should We Prepare For?* March 15, 2021.  Accessed October 1, 2023  https://www.fpri.org/fie/future-election-research-misinformation-disinformation
[19] Ibid.

11.     On February 8, 2020, The National Governors Association met in Washington, D.C., with 44 Governors in attendance, the presentations focused primarily on State efficiency, economic development, infrastructure, and private sector engagement through public private partnerships ("P3").  The keynote speaker, then-Secretary of State Michael Pompeo with guest speaker, Speaker of the House of Representatives, Nancy Pelosi.  Other presenters included private industry, global entities, Canadian premiers with the inclusive presentations having a primary focus on P3, infrastructure and economic development areas with suggestions and examples provided to those in attendance.[20]

12.     The Impeachment proceeding against the sitting Executive of these United States, Donald John Trump, was held and televised commencing December 18, 2019, running concurrent with both the National Association of Secretaries of State as well the National Governors Association conferences. The principal weight of factors cited by the House of Representative involved foreign interference in elections by solicitation, final charges levied were (1) abuse of power and (2) obstruction of Congress (Article II); the President would be acquitted by the Senate, the Senate trial so too being televised commencing January 16, 2020 through February 5, 2020.

13.     On January 30, 2021, Attorney General Letitia James released findings report regarding the New York State nursing home response to COVID-19 pandemic.[21]

14.     On August 3, 2021, allegations of sexual harassment were levied against Governor Andrew Cuomo by Attorney General Letitia James, an investigation followed.[22]

---

[20] National Governors Association, 2020 Winter Meeting. February 8, 2020.  Accessed August 14, 2023 [CSPAN] https://www.c-span.org/video/?469104-101/national-governors-assocation-2020-winter-meeting
[21] Office of New York Attorney General, Letitia James. *Nursing Homes Report.*  January 30, 2021.  Accessed August 10, 2023. https://ag.ny.gov/sites/default/files/2021-nursinghomesreport-final.pdf
[22] Office of New York Attorney General, Letitia James. *Investigative Report.*  August 3, 2021.  Accessed August 10, 2023. https://ag.ny.gov/sites/default/files/2021.08.03_nyag_-_investigative_report.pdf

15.     On August 10, 2021, Andrew Cuomo announced his resignation following the release of the

sexual harassment investigative report from Attorney General James' office, his resignation would

take effect on August 24, 2021 with Lt. Governor Kathy Hochul stepping in as Governor through the

remainder of the current term, running for re-election in 2023.  Plaintiff provides excerpt from the

announcement of the Governor's resignation from the Associated Press:

> "I am a fighter, and my instinct is to fight through this controversy because I truly believe it is
> unfair and it is untruthful"…he didn't want "distractions" to consume the state government as
> it grapples with the pandemic and other problems…Cuomo's national popularity soared during
> the harrowing spring of 2020, when New York was the lethal epicenter of the nation's
> coronavirus outbreak and he became President Donald Trump's chief antagonist in the minds
> of many Americans…as he sternly warned people to stay home and wear masks while Trump
> often brushed off the virus.  Cuomo's briefings won an international Emmy Award, and he
> went on to write a book on leadership in a crisis.[23]

16.     On January 4, 2022, the Albany County District Attorney, David Soares announced that "the

woman's complaint was credible, but that 'after review of all the available evidence we have

concluded that we cannot meet our burden at trial…dropping (the) misdemeanor criminal charge filed

against former New York Governor Andrew Cuomo…(the announcement) came within weeks of the

District attorneys of Westchester and Nassau Counties saying they would not file criminal

charges…after investigating claims…our exhaustive investigation found the allegations credible,

deeply troubling, but not criminal under New York law."[24]

17.     In December, 2022, Attorney General Letitia James' office was accused of mishandling

allegations of sexual harassment made against her Chief of Staff while delaying transparency of public

disclosure.  The law firm of Littler Mendelson was retained on October 4, 2022.  From the period of

October 4th through the time leading up to the election in November, the Defendant, Ms. James was

---

[23] Villeneuve, Marina. *Gov. Andrew Cuomo Resigns Over Sexual Harassment Allegations.* August 10, 2021.  Accessed October
1, 2023.  https://apnews.com/article/andrew-cuomo-resigns-17161f546bb83c32a337036ecf8d2a34
[24] Mangan, Dan. *Criminal Charge Against Former NY Gov. Andrew Cuomo dropped.* January 4, 2022. (CNBC)  Accessed
October 9, 2023.  https://www.cnbc.com/2022/01/04/criminal-charge-against-former-ny-gov-andrew-cuomo-is-dropped.html

inaccessible including declining to debate her political opponent. The alleged perpetrator and focus of the harassment resigned his position as Chief of Staff for Ms. James' office.[25]

18.     On March 26, 2022, the New Jersey Senate rejected the formation of an oversight committee with subpoena power, Senate Resolution 48, to investigate the New Jersey Nursing Home Pandemic Response, the measure was tabled. The New Jersey Attorney General's office and the DOJ open and concurrent active investigations were cited as the Senate reasoning for the rejected measure.[26]

19.     Plaintiff analyzed the DOJ report issued September 7, 2023, which rightly identified CRIPA violations in the less than stellar care of Veterans at Menlo Park and Paramus during COVID-19 citing, "numerous failures, including poor communication and the lack of staff competency that allowed the virus to spread virtually unchecked through the facilities, (concluding that the two Veterans facilities) … face unreasonable risk and harm, citing poor infectious control practices and medical care."[27] According to the report, reinforcing investigative integrity, the DOJ retained outside experts having extensive clinical care and biostatistical proficiency.

20.     In September, 2023, The Department of Health and Human Services ("DHS"), Office of Inspector General, Christi A. Grimm, issued findings entitled, "New Jersey Could Better Ensure that Nursing Homes Comply with Federal Requirements for Life Safety, Emergency Preparedness, and Infection Control,"[28] Plaintiff analyzed the report which also provided reporting for multiple States with access to each associated report, same were likewise reviewed.

---

[25] Williams, Golding, Hogan; *NY AG Letitia James Blasted by Ex-Aide for Handling of Sex Harassment Complaint.* December 7, 2022. [NY Post] Accessed October 1, 2022. https://nypost.com/2022/12/07/ny-ag-letitia-james-blasted-by-ex-aide-for-sex-harassment-handling/
[26] Legiscan.com. New Jersey Senate Resolution 48, Vote List. Accessed June 1, 2022.
https://legiscan.com/NJ/rollcall/SR48/id/1209890
[27] Department of Justice, Civil Rights Division, United States Attorney's Office, District of New Jersey. *Investigation of the New Jersey Veterans Memorial Homes at Menlo Park and Paramus.* September 7, 2023. [The Hill] Accessed September 7, 2023. https://thehill.com/homenews/state-watch/4192639-doj-new-jersey-violated-constitution-with-veterans-covid-care
[28] Grimm, Christi A., *New Jersey Could Better Ensure That Nursing Homes Comply With Federal Requirements for Life Safety, Emergency Preparedness, and Infection Control.* September, 2023. Accessed October 3, 2023 public.affairs@oig.hhs.gov

21.     On October 3, 2023, the State of New Jersey Commission of Investigation released "An Investigation into the State of New Jersey's COVID-19 Response at the Veterans Memorial Homes,"[29] Plaintiff analyzed the report which detailed shortcomings in staffing, the complexities which were created and magnified related to sick leave rules for Civil Service and/or State employees citing COVID-19 absences, PPE access, COVID-19 testing as well as appreciative inadequacies in internal and external communication.

## JURISDICTION AND VENUE

22.     The Court has subject jurisdiction pursuant to 28 U.S.C. §§1331-1332, because the actions arose under the federal laws of these United States.  So too does this Court have jurisdiction under the Voting Rights Act of 1965, [Public Law 89–110, 79 Stat. 437] [As Amended Through P.L. 110–258, Enacted July 1, 2008], violations of the Voting Rights Act, 42 U.S.C. §§ 1971, et seq., Democratic National Committee v. Republican National Committee, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), aff'd, 673 F.3d 192 (3d Cir. 2012), cert. denied, 133 S. Ct. 931 (2013); and the 14th Amendment Protections.

23.     Declaratory and permanent injunctive relief is sought as authorized in 28 U.S.C. §§2201 and 2202 (Title 28 – Judiciary and Judicial Procedure Part VI - PARTICULAR PROCEEDINGS (§§2201-4105), Ch. 151 – Declaratory Judgment (§§2201 – 2202).

24.     Venue is proper in this Judicial District under 28 U.S.C. §§1391(b)(2) and (e)(1).  Defendants are United States federal agencies, State elected officers with suit brought in their official capacities, this Court having competent jurisdiction.  Plaintiff is a resident of this Judicial District, and where a

---

[29] State of New Jersey Commission of Investigation, *An Investigation Into The State of New Jersey's COVID-19 Response at the Veterans Memorial Homes.*  October, 2023.  Accessed October 3, 2023, https://newjerseymonitor.com/wp-content/uploads/2023/10/SCI-Final-Report.pdf

substantial part of the events or omissions occurred giving rise to this Complaint and are continuing to occur within the District Court of New Jersey as well these United States.

25.     Plaintiff gathers with voices in prayer over the Judiciary as to State Sovereign Immunity Doctrine (Eleventh Amendment); the State actors named herein having affirmed their solemn Oath to the Rights enumerated in the People's stead have evidenced their absence of moral reasoning.  The Book which felt the weight of each Defendant's hand in covenant by Oath was and remains an outward witness to their collective actions, it is by this Book that the People consulted in seeking justice embodied in this plea.  The Defendant's determination was made knowingly and expressly in an exacting effort to silence the Rights of the People so as to manifest *their* determinative outcome.; obliterating the United States Constitution and the Voting Rights Act, 52 U.S.C. § 10301.  To achieve these ends, the actors assembled in and among themselves, in some cases leveraging their schema as a form of currency in evading responsibility for their actions in and among one another, whether such emerging matters were birthed of unintended consequence or of those knowingly orchestrated, each would entrench new co-conspirators.   Plaintiff does not yield to Defendants manifest by conveyance of consent or subjugation; *natura appetit perfectum*, Plaintiff's allegiance tethers to those herein unnamed, denied death by natural cause at the knowing will of the named Defendants.  Given to the obligations of civility in human conduct, the magnitude of the herein claims cannot be understated; Plaintiff as well those unnamed have suffered severe injury to their most base Rights under the Constitution's representational form of government, same continuing to the present time and will continue unabated absent the deafening silence being broken.  Citing the present national security related events, this plea is of significant federal interest having ripened to the point of being putrid.

**PARTIES**

26.     Plaintiff, MARY BASILE LOGAN, is a resident of New Jersey and an elected official, authorized by the Constitution and her Oath of office, sworn to God, Almighty by pledge and allegiance to pursue this action.

27.     Defendant, NED LAMONT, serving in his capacity as Governor of Connecticut, having changed the voting protocol and structure in the State of Connecticut for the November 2020 election, citing COVID-19 Emergency Authorization, Judicial activism by extraneous third parties or state of emergency.  Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, and orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[30], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.  The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as

---

[30] *Ibid.* (12).

15

much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[31], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[32]; Executive Order 13977[33], Executive Order 13979[34], Executive Order 13848[35], violations of the Patriot Act, Title 52 U.S. Code §20702[36], 42 USC 4950, Ch.66[37], 18 U.S. Code § 2422(a), (b)[38], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Article III. S3.C1.1.2 Treason Clause[39]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of untimely human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

28.     Defendant, JOHN CARNEY, serving in his official capacity as Governor of the State of Delaware, having changed the voting protocol and structure in the State of Delaware for the

---

[31] *Democratic National Committee, et al. v. Republican National Committee, et al.* Case 2:81-cv-03876-DRD-MAS, Filed 01/19/2009. Accessed January 10, 2021. https://www.govinfo.gov/content/pkg/USCOURTS-njd-2_81-cv-03876/pdf/USCOURTS-njd-2_81-cv-03876-1.pdf
[32] Executive Order 12333, "United States Intelligence Activities" as amended by Executive Orders 13284 (2003), 13355 (2004) and 13480 (2008).
[33] Executive Order 13977, "Protecting Law Enforcement Officers, Judges, Prosecutors, and Their Families." Accessed May, 2021, the Federal Registry, Vol. 86, No. 13, January 22, 2021, Presidential Documents.
[34] Executive Order 13979, "Executive Order on Ensuring Democratic Accountability in Agency Rulemaking." Accessed May, 2021, Federal Registry, Vol. 86, No. 13, Friday, January 22, 2021, Presidential Documents.
[35] Executive Order 13848, September 12, 2018, extended September 7, 2021 – "Notice of the Continuation of the National Emergency with Respect to Foreign Interference in or Undermining Public Confidence in United States Elections." Accessed April 3, 2023 https://www.whitehouse.gov/briefing-room-presidential-actions/2021/09/09/notice-on-the-continuation....
[36] 52 U.S. Code §20702 – Willful concealment of records or paper required by section 20701. Pub. L. 86-449, title III, May 6, 1960, 74 Stat. 88. Accessed May 1, 2021, https://www.law.cornell.edu/uscode/text/52/20702
[37] 42 USC 4950: Volunteerism policy (The Public Health and Welfare, Ch. 66 – Domestic Volunteer Services). Accessed March, 2023, https://uscode.house.gov/view.xhtml?req=(title:42 section:4950 edition:prelim) OR (grauleid:USC-prelim-title42-section4950)&f=treesort&num=0&edit
[38] 18 U.S.C. § 2422 – Coercion and enticement. (June 25, 1948, ch. 645, 62 Stat. 812; Pub. L. 99-628 §5(b)(1), Nov. 7, 1986, 100 Stat. 3511; Pub. L. 100-690, title VII §7070, Nov. 18, 1988, 102 Stat. 4405; Pub. L. 104-104, title V, §508, Feb. 8, 1996, 110 Stat. 137; Pub. L. 105-314, title I, §102, Oct. 30, 1998, 112 Stat. 2975; Pub. L. 108-21, title I §103(a)(2)(A), (B), (b)(2)(A), Apr. 30, 2003, 117 Stat. 652, 653; Pub. L. 109-248, title II §203, July 26, 2006, 120 Stat. 613.) Accessed April 18, 2023, https://www.law.cornell.edu/uscode/text/18/2422.
[39] (Constitution. Art III, §3.C1.1.2)  U.S.C. at 18 U.S.C. §2381 Treason Against the United States.  Accessed September 10, 2023.  https://www.law.cornell.edu/uscode/text/18/2381

November 2020 election, citing COVID-19 Emergency Authorization, Judicial activism by extraneous third parties or state of emergency.  Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the Defendant was a primary actor among the parties having constructed, cultivated, and orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, President Donald John Trump, and those of his designation under Proclamation 9994[40], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.  The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[41], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[42]; Executive Order 13977[43], Executive Order 13979[44], Executive Order 13848[45], violations of the Patriot Act, Title 52 U.S. Code §20702[46], 42 USC 4950,

---

[40] *Ibid.* (12).
[41] *Ibid.* (3).
[42] *Ibid* (9).
[43] *Ibid.* (33).
[44] *Ibid.* (34).
[45] *Ibid.* (35).
[46] *Ibid.* (36).

Ch.66[47], 18 U.S. Code § 2422(a), (b)[48], the Civil Rights Act of 1964 – inclusive of the Commerce

Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III.

S3.C1.1.2 Treason Clause[49].  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's

culpability is evident, not only by his knowing action as a principal collaborator but also of his

passivity, the absence of corrective action withheld all the while observing the gravity of resulting

consequences, extending to the loss of untimely human life to which he participated in ending,

informs premeditated action of all presented allegations and claims.

29.      Defendant, CHARLIE BAKER, serving in his official capacity as Governor of Massachusetts,

having changed the voting protocol and structure in the State of Massachusetts for the November 2020

election, citing COVID-19 Emergency Authorization, Judicial activism by extraneous third parties or

state of emergency.  Plaintiff alleges that Defendant did knowingly breach his Oath of Office and

Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the

subject Defendant was a primary actor among the parties having constructed, cultivated, and

orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the

named co-Defendants; their playbook extending to other affiliate Governors by venue of the February

8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly

withhold facts in evidence while abetting a cover and overt scheme among his peers of the National

Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded

in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under

Proclamation 9994[50], later coalescing such schema in and among the Judicial and Legislative

branches, filtering to governmental Administrative offices, thereafter to the County and Municipal

---

[47] *Ibid.* (37).
[48] *Ibid.* (38).
[49] *Ibid. (39).*
[50] *Ibid. (12).*

levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL

BEYOND OUR NATION'S BOUNDARIES. Time has ripened the facts, now nearing irrefutability.

The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the

recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as

to cage voters[51], compromise their health and welfare, the integrity and intent of the Separation of

Church and State; Executive Order 12333[52]; Executive Order 13977[53], Executive Order 13979[54],

Executive Order 13848[55], violations of the Patriot Act, Title 52 U.S. Code §20702[56], 42 USC 4950,

Ch.66[57], 18 U.S. Code § 2422(a), (b)[58], the Civil Rights Act of 1964 – inclusive of the Commerce

Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III.

S3.C1.1.2 Treason Clause[59]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's

culpability is evident, not only by his knowing action as a principal collaborator but also of his

passivity, the absence of corrective action withheld all the while observing the gravity of resulting

consequences, extending to the loss of untimely human life to which he participated in ending,

informs premeditated action of all presented allegations and claims.

30.     Defendant, WES MOORE, serving in his official capacity as Governor of Maryland, his

predecessor having changed the voting protocol and structure in the State of Maryland for the

November 2020 election, citing COVID-19 Emergency Authorization, Judicial activism by extraneous

third parties or state of emergency. In accepting his Oath of office in January, 2023, and in the

proceeding period of time since, the Defendant has made no effort to disclose the truth concerning

---

[51] *Ibid. (3).*
[52] *Ibid (9).*
[53] *Ibid. (33)*
[54] *Ibid. (34).*
[55] *Ibid. (35)*
[56] *Ibid. (36)*
[57] *Ibid. (37)*
[58] *Ibid. (38).*
[59] *Ibid. (39).*

COVID-19 in the interest of the American people, nor has he taken any action to rescind the unprecedented election changes enacted and codified. Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same -- THE PEOPLE HAVING PAID THE PRICE FOR THE DEFENDANT'S PASSIVITY. Time has ripened the facts, now nearing irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent, with the outcome being so egregious and repugnant so as to cage voters[60], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[61]; Executive Order 13977[62], Executive Order 13979[63], Executive Order 13848[64], violations of the Patriot Act, Title 52 U.S. Code §20702[65], 42 USC 4950, Ch.66[66], 18 U.S. Code § 2422(a), (b)[67], the Civil Rights Act of 1964 -- inclusive of the §§ Commerce Clause of Article I, Sections I (Voting Rights); and VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[68].  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, by his knowing passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the ongoing usurpations of the Rights of the People, informs premeditated action of all presented allegations and claims.

31.     Defendant, LAWRENCE HOGAN, serving in his former capacity as Governor of Maryland, having changed the voting protocol and structure in the State of Maryland for the November 2020 election. Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the subject

---

[60] *Ibid. (3).*
[61] *Ibid* (9).
[62] *Ibid.* (33)
[63] *Ibid.* (34).
[64] *Ibid.* (35).
[65] *Ibid.* (36)
[66] *Ibid.* (37).
[67] *Ibid.* (38).
[68] *Ibid. (39).*

Defendant was a primary actor among the parties having constructed, cultivated, and orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[69], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[70], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[71]; Executive Order 13977[72], Executive Order 13979[73], Executive Order 13848[74], violations of the Patriot Act, Title 52 U.S. Code §20702[75], 42 USC 4950, Ch.66[76], 18 U.S. Code § 2422(a), (b)[77], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[78].  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident,

---

[69] *Ibid. (12).*
[70] *Ibid. (3).*
[71] *Ibid (9).*
[72] *Ibid.* (33)
[73] *Ibid.* (34).
[74] *Ibid.* (35).
[75] *Ibid.* (36).
[76] *Ibid.* (37).
[77] *Ibid.* (38).
[78] *Ibid. (39).*

not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of the untimely human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

32.     Defendant, PHIL MURPHY, serving in his capacity as Governor of New Jersey, Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, and orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[79], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[80], compromise their health and welfare, the integrity and intent of the Separation of Church and State;

---

[79] *Ibid. (12).*
[80] *Ibid. (3).*

Executive Order 12333[81]; Executive Order 13977[82], Executive Order 13979[83], Executive Order 13848[84], violations of the Patriot Act, Title 52 U.S. Code §20702[85], 42 USC 4950, Ch.66[86], 18 U.S. Code § 2422(a), (b)[87], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[88]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

33.    Defendant, TAHESHA WAY, serving in her official capacity as Lt. Governor, formerly as Secretary of State of New Jersey, having overseen the election protocol and structure in the State of New Jersey for the November, 2020 election, certifying same on December 9, 2020, Plaintiff alleges that Defendant did knowingly breach her Oath of Office, an absolute dereliction of her Pledge to uphold the Constitution, expressly eviscerating her attestation to same. It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Secretaries of State at the January, 2020 National Secretaries of State Conference. Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among her peers of the National

---

[81] *Ibid* (9).
[82] *Ibid*. (33).
[83] *Ibid*. (34).
[84] *Ibid*. (35).
[85] *Ibid*. (36).
[86] *Ibid*. (37).
[87] *Ibid*. (38).
[88] *Ibid. (39).*

Association of Secretaries of State surrounding COVID-19 in epic proportion, insodoing Defendant

co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his

designation under Proclamation 9994[89], later coalescing such schema in and among the Judicial and

Legislative branches, filtering to governmental Administrative offices, thereafter to the County and

Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING

WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing

irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent,

extending to the recruitment as much assemblage of parties with the outcome being so egregious and

repugnant so as to cage voters[90], compromise their health and welfare, the integrity and intent of the

Separation of Church and State; Executive Order 12333[91]; Executive Order 13977[92], Executive Order

13979[93], Executive Order 13848[94], violations of the Patriot Act, Title 52 U.S. Code §20702[95], 42 USC

4950, Ch.66[96], 18 U.S. Code § 2422(a), (b)[97], the Civil Rights Act of 1964 – inclusive of the

Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution

Art. III. S3.C1.1.2 Treason Clause[98].  Plaintiff alleges, citing the facts herein disclosed, that the

Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also

of his passivity, the absence of corrective action withheld all the while observing the gravity of

resulting consequences, extending to the loss of human life to which he participated in ending,

informs premeditated action of all presented allegations and claims.

---

[89] *Ibid. (12).*
[90] *Ibid. (3).*
[91] *Ibid (9).*
[92] *Ibid. (33).*
[93] *Ibid. (34).*
[94] *Ibid. (35).*
[95] *Ibid. (36).*
[96] *Ibid. (37).*
[97] *Ibid. (38).*
[98] *Ibid. (39).*

34.     Defendant, MATTHEW PLATKIN, in his official capacity as Attorney General, an appointment, for the State of New Jersey, Plaintiff alleges that the Defendant by knowing action has eviscerated his Oath of Office.  It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his co-Defendants surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[99], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[100], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[101]; Executive Order 13977[102], Executive Order 13979[103], Executive Order 13848[104], violations of the Patriot Act, Title 52 U.S. Code §20702[105], 42 USC 4950, Ch.66[106], 18 U.S. Code § 2422(a), (b)[107], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2

---

[99] *Ibid. (12).*
[100] *Ibid. (3).*
[101] *Ibid* (9).
[102] *Ibid.* (33).
[103] *Ibid.* (34).
[104] *Ibid.* (35).
[105] *Ibid.* (36).
[106] *Ibid.* (37).
[107] *Ibid.* (38).

Treason Clause[108]. Such actions compromised persons, creating extensive vulnerability while knowingly withholding accountability under the Rule of Law in the interest of her co-conspirator so as to assure *their* capacity retention at the *expense* of the People, weaponizing elections by process and autonomy, regardless of political ideology or subdivision in direct and irrefutable contradiction to the Voting Rights Act. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

35.   JUDITH PERSICHILLI, serving in her former capacity as the Commissioner of Health and Human Services for the State of New Jersey, in such capacity, the Defendant stood down her pledge in the interest of humanity as much in New Jersey as the other States of co-Defendants, disavowing her Nightingale Oath and medical ethics. Plaintiff contends that in her capacity the Defendant is no less culpable than her peer Defendants, having sought no course correction, statements, or actions in the interest of the People, to that end, Defendant eviscerated her pledge to the Constitution and to the People of these United States. The Defendant's actions in her official capacity subverted the Executive, Donald John Trump, and those of his designation under Proclamation 9994[109], compromising the People's health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[110]; Executive Order 13977[111], Executive Order 13979[112], Executive

---

[108] *Ibid. (39).*
[109] *Ibid. (12).*
[110] *Ibid* (9).
[111] *Ibid.* (33).
[112] *Ibid.* (34).

Order 13848[113], violations of the Patriot Act, Title 52 U.S. Code §20702[114], 42 USC 4950, Ch.66[115], 18 U.S. Code § 2422(a), (b)[116], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[117]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by her knowing action as a principal collaborator but also of her passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the untimely loss of human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

36.    SEJAL HATHI, serving in her capacity as the Deputy Commissioner for Health Services for the State of New Jersey, in such capacity, the Defendant stood down her pledge in the interest of humanity as much in New Jersey as the other States of co-Defendants, disavowing her Hippocratic Oath, medical ethics and pledge to the People. Plaintiff contends that in her capacity the Defendant is no less culpable than her peer Defendants, having sought no course correction, statements, or actions in the interest of the People, to that end, Defendant eviscerated her pledge to the Constitution and to the People of these United States. The Defendant's actions in her official capacity subverted the Executive Branch and those of his designation under Proclamation 9994[118], compromising the People's health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[119]; Executive Order 13977[120], Executive Order 13979[121], Executive Order 13848[122],

---

[113] *Ibid.* (35).
[114] *Ibid.* (36).
[115] *Ibid.* (37).
[116] *Ibid.* (38).
[117] *Ibid. (39).*
[118] *Ibid. (12).*
[119] *Ibid* (9).
[120] *Ibid.* (33).
[121] *Ibid.* (34).
[122] *Ibid.* (35).

violations of the Patriot Act, Title 52 U.S. Code §20702[123], 42 USC 4950, Ch.66[124], 18 U.S. Code §

2422(a), (b)[125], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections

I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[126].

Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only

by her knowing action as a principal collaborator but also of her passivity, the absence of corrective

action withheld all the while observing the gravity of resulting consequences, extending to the

untimely loss of human life to which he participated in ending, informs premeditated action of all

presented allegations and claims.

37.     Defendant, KATHY HOCHUL, serving in her official capacity as Governor of New York,

formerly as Lt. Governor, her predecessor having changed the voting protocol and structure in the

State of New York for the November 2020 election, citing COVID-19 Emergency Authorization or

state of emergency.  In accepting her Oath of office in August, 2021, and in the proceeding period of

time since, the Defendant has made no effort to disclose the truth concerning COVID-19 in the

interest of the American people, facts which the Plaintiff alleges the Defendant attempted to

surreptitiously conceal while advancing her political career while the People of New York and these

United States were made to suffer to no avail.  As Lt. Governor, Defendant co-colluded in a manner so

as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation

9994[127], later coalescing such schema in and among the Judicial and Legislative branches, filtering to

governmental Administrative offices, thereafter to the County and Municipal levels of government –

THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR

---

[123] *Ibid.* (36).
[124] *Ibid.* (37).
[125] *Ibid.* (38).
[126] *Ibid. (39).*
[127] *Ibid. (12).*

NATION'S BOUNDARIES, expressly eviscerating her attestation to her Oath of Office. Time has ripened the facts, now nearing irrefutability. The collective actions were absolutely conspiratorial in nature, dubious in intent, with the outcome being so egregious and repugnant so as to cage voters[128], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[129]; Executive Order 13977[130], Executive Order 13979[131], Executive Order 13848[132], violations of the Patriot Act, Title 52 U.S. Code §20702[133], 42 USC 4950, Ch.66[134], 18 U.S. Code § 2422(a), (b)[135], the Civil Rights Act of 1964 – inclusive of the §§ Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[136]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, by her knowing actions to advance codified policy, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the untimely loss of human life to which she participated in ending, informs premeditated action of all presented allegations and claims.

38.     Defendant, ANDREW CUOMO, serving in his former capacity as Governor of New York, Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same. It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors

---

[128] *Ibid. (3).*
[129] *Ibid* (9).
[130] *Ibid.* (33).
[131] *Ibid.* (34).
[132] *Ibid.* (35).
[133] *Ibid.* (36).
[134] *Ibid.* (37).
[135] *Ibid.* (38).
[136] *Ibid. (39).*

Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[137], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Plaintiff alleges that Defendant resigned to evade the culpability of his actions yet to be disclosed while capitulating to those of his co-conspirators, publicly professing actions of lesser degree, a coward in every sense of the word.  Time has ripened the facts, now nearing irrefutability.  The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[138], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[139]; Executive Order 13977[140], Executive Order 13979[141], Executive Order 13848[142], violations of the Patriot Act, Title 52 U.S. Code §20702[143], 42 USC 4950, Ch.66[144], 18 U.S. Code § 2422(a), (b)[145], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[146].  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also

---

[137] *Ibid. (12).*
[138] *Ibid. (3).*
[139] *Ibid* (9).
[140] *Ibid.* (33).
[141] *Ibid.* (34).
[142] *Ibid.* (35).
[143] *Ibid.* (36)
[144] *Ibid.* (37).
[145] *Ibid.* (38).
[146] *Ibid.* (39).

of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

39.     Defendant, LETITIA JAMES, serving in her official capacity as Attorney General of the State of New York, Plaintiff alleges that the Defendant by knowing action has eviscerated her Oath of Office.  It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, and orchestrated the covert schema under mask of COVID-19.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among her co-Defendants surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[147], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.  Plaintiff alleges that the Defendant's actions escalate in conspiratorial nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters,[148] compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[149]; Executive Order 13977[150], Executive Order 13979[151], Executive Order 13848[152], violations of the Patriot Act, Title 52 U.S. Code

---

[147] *Ibid.* (4).
[148] *Ibid. (3).*
[149] *Ibid* (9).
[150] *Ibid.* (33).
[151] *Ibid.* (34).
[152] *Ibid.* (35).

§20702[153], 42 USC 4950, Ch.66[154], 18 U.S. Code § 2422(a), (b)[155], the Civil Rights Act of 1964 –

inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections)

and Constitution Art. III. S3.C1.1.2 Treason Clause[156].  Plaintiff alleges, citing the facts herein

disclosed, that the Defendant's culpability is evident, acts of such atrocity and callousness as to exact

those in her charge to carry out same, all the while observing the gravity of resulting consequences,

extending to the loss of human life to which she participated in ending, informs premeditated action of

all presented allegations and claims.  The Defendant, dissatisfied with railroading the sitting United

States President, emboldened by undisclosed conspiratorial mapping, she employed the color of law to

exact personal gravitas for what amounts to political ego fulfillment by waging an overt scheme in an

attempt to forcibly bankrupt the former President, Donald John Trump; so intent on her systematic

legal crafting that, at her bequest, dissolution documents were filed on the first day of hearings,

October 2, 2023.  Such actions compromised the whole of New York including but not limited to

extraneous parties, creating vulnerability for other matters of legal consideration as well the economic

welfare of the citizen populous of New York.  In applying her legal craft by Oath in such a manner as

to threaten, obstruct and disenfranchise owners from sovereign enterprise, the Defendant sent a clear

and resounding message to every business owner in New York, regardless of political ideology.  The

foregoing allegations, on their own merit are reprehensible; however, Plaintiff asks that the Court

weigh these allegations against the coupled acts which simultaneously transpired.  The Defendant's

concealed knowledge when applied to her obligation to the Rule of Law became an inconvenient vex

in contrast to her autonomous interest and those of her co-conspirator so as to assure *their* capacity

retention at the *expense* of the People, weaponizing elections by process and autonomy, regardless of

---

[153] *Ibid.* (36).
[154] *Ibid.* (37).
[155] *Ibid.* (38).
[156] *Ibid. (39).*

political ideology or subdivision in direct and irrefutable contradiction to the Voting Rights Act. Plaintiff alleges that the Defendant, in the company of her co-Defendants, were not satisfied merely with influencing elections by public oration; but in determination of the outcome by weaponization of capacity, a capacity granted by Oath to the Constitution, insodoing, the Defendant has evidenced a determination to control the selection of the Executive branch of Government, dismissing the People of these United States, altogether.

40.     Defendant, TOM WOLF, serving in his official capacity as Governor of Pennsylvania, having changed the voting protocol and structure in the State of Pennsylvania for the November 2020 election, citing COVID-19 Emergency Authorization, Judicial activism by extraneous third parties or state of emergency.  Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same.  It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020, National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[157], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES.  Time has ripened the facts, now nearing irrefutability.   The collective

---

[157] *Ibid. (12).*

actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[158], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[159]; Executive Order 13977[160], Executive Order 13979[161], Executive Order 13848[162], violations of the Patriot Act, Title 52 U.S. Code §20702[163], 42 USC 4950, Ch.66[164], 18 U.S. Code § 2422(a), (b)[165], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[166]. Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences, extending to the loss of untimely human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

41.     Defendant, DAN MCKEE, serving in his official capacity as Governor of Rhode Island, having changed the voting protocol and structure in the State of Rhode Island for the November 2020 election, Plaintiff alleges that Defendant did knowingly breach his Oath of Office and Pledge to uphold the Constitution, expressly eviscerating his attestation to same. It is alleged that the subject Defendant was a primary actor among the parties having constructed, cultivated, orchestrated the covert schema under mask of COVID-19, among primary co-conspirators and the named co-Defendants; their playbook extending to other affiliate Governors by venue of the February 8, 2020,

---

[158] *Ibid. (3).*
[159] *Ibid* (9).
[160] *Ibid.* (33).
[161] *Ibid.* (34).
[162] *Ibid.* (35).
[163] *Ibid.* (36).
[164] *Ibid.* (37).
[165] *Ibid.* (38).
[166] *Ibid. (39).*

National Governors Association Conference.  Plaintiff alleges that Defendant did knowingly withhold facts in evidence while abetting a cover and overt scheme among his peers of the National Governors Association surrounding COVID-19 in epic proportion, insodoing Defendant co-colluded in a manner so as to subvert the Executive, Donald John Trump, and those of his designation under Proclamation 9994[167], later coalescing such schema in and among the Judicial and Legislative branches, filtering to governmental Administrative offices, thereafter to the County and Municipal levels of government – THE PEOPLE'S HARMS, INCALCULABLE AND EXTENDING WELL BEYOND OUR NATION'S BOUNDARIES. Time has ripened the facts, now nearing irrefutability.   The collective actions were absolutely conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant so as to cage voters[168], compromise their health and welfare, the integrity and intent of the Separation of Church and State; Executive Order 12333[169]; Executive Order 13977[170], Executive Order 13979[171], Executive Order 13848[172], violations of the Patriot Act, Title 52 U.S. Code §20702[173], 42 USC 4950, Ch.66[174], 18 U.S. Code § 2422(a), (b)[175], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[176].  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, not only by his knowing action as a principal collaborator but also of his passivity, the absence of corrective action withheld all the while observing the gravity of resulting consequences,

---

[167] *Ibid. (12).*
[168] *Ibid. (3).*
[169] *Ibid* (9).
[170] *Ibid.* (37).
[171] *Ibid.* (34).
[172] *Ibid.* (35).
[173] *Ibid.* (36).
[174] *Ibid.* (37).
[175] *Ibid.* (38).
[176] *Ibid. (39).*

extending to the loss of untimely human life to which he participated in ending, informs premeditated action of all presented allegations and claims.

42.      Defendant, MIGUEL CARDONA, serving in his official capacity as Director of the Department of Education, Plaintiff alleges that Defendant did knowingly breach his Oath to the whole of the American people and, specifically its children, permitting venue to policy and action which knowingly breaches their legal protections.  Such actions began immediately upon taking his Oath of Office and have continued, unabated, these include actions to perpetuate the COVID-19 schemas mandates while advancing a calculated and heinous flood of vulnerabilities among the protected[177] class of citizens, our Nation's children.  It is alleged that Defendant articulated exacting policy so as to diminish the academic viability of the protected class, colluding with the extraneous helpmates including third parties under guise of the COVID-19 crisis, including but not limited to the Central Intelligence Agency (CIA) who is the parent entity of Research Triangle International ("RTI"); RTI commenced mental health inreach in and among University, Collegiate and K-12 academia venues.  It is alleged that such actions have caused irreparable and lasting harm to the subject protected class. Plaintiff alleges that Defendant and the extraneous parties, whether by policy or directive, did knowingly collude in and among Defendant's knowing actions by willfully carrying out such impositions on these sovereign citizens while working in and among co-Defendants and third-party actors.  The collective actions fostered venue and opportunity for chaos where none otherwise existed, an orchestrated self-fulfilling prophesy, wherein parents and children alike would become rightly enraged, allowing for the exactment of Federal and State policy to be levied against them, so as to further impose on their 1st Amendment Rights; among them parental rights and entering into the sacred, sanctified area by origin of God, Almighty, those being of and between parent and child, by

---

[177] United States Department of Education, "Protection of Pupil Rights Amendment (PPRA)." Accessed June, 2022, via https://studentprivacy.ed.gov/faq/what-protection-pupil-rights-amendment-ppra

which legal tenons and extraneous 3rd party actors would, thereafter exploit through legal

encroachment of additional policy action.  Plaintiff further alleges that the foregoing actions were

orchestrated knowingly, willfully and premeditated in every State of these United States, once enacted

under the guise of national emergency continuity, co-Defendants took up the mantle so as to create

and enact legislative strongholds against the familial structure of the People of these United States and

the sovereign of Createds.  Plaintiff alleges, citing the facts herein, that the Defendant's culpability is

evident, knowing and premeditated as a principal collaborator in the COVID-19 schema, his passivity

to the evident harms and absence of corrective action taken since the inception of Constitutional

usurpations, the Defendant eviscerated his Oath and pledge to the People and children of these United

States.  The Defendant has contributed in compromising the People's health and welfare, the integrity

and intent of the Separation of Church and State; Executive Order 12333[178]; Executive Order

13977[179], Executive Order 13979[180], Executive Order 13848[181], violations of the Patriot Act, Title 52

U.S. Code §20702[182], 42 USC 4950, Ch.66[183], 18 U.S. Code § 2422(a), (b)[184], the Civil Rights Act of

1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal

Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[185].

43.     Defendant, KRISTEN CLARKE, acting in her capacity as the Assistant Attorney General,

Civil Rights Division, Department of Justice for the United States, Plaintiff alleges that Defendant did

knowingly breach her Oath of Office, a dereliction of her Pledge to uphold the Constitution.  It is

alleged that Defendant immediately upon taking office through the present day has sought to exploit

---

[178] *Ibid* (9).
[179] *Ibid.* (33).
[180] *Ibid.* (34).
[181] *Ibid.* (35).
[182] *Ibid.* (36).
[183] *Ibid.* (37).
[184] *Ibid.* (38).
[185] *Ibid. (39).*

situational circumstance, egregious in nature, in an effort to advance legal framework and a political career while breathing new life into voter caging with the aid and support of the Attorney General in the State of New Jersey[186] and among 23 other States, creating chaos and controversy within the election process where none otherwise existed.  The Defendant capitulated to political theatre solely for the purpose of self-effacing aggrandization to affect intent of election interference, at the expense of the inclusive People of these United States to exact a crevice by which the DOJ would reserve to knowingly exploit by pleading to effectuate precedent, holding the People's sovereign voice as expressed by vote, hostage - voter caging.  It is further alleged that the Defendant and those in her charge did knowingly mask the true and egregious actions of the co-Defendants herein named, in the DOJ investigation of the Veteran homes in Menlo Park and Paramus, perverting transparent public disclosure of the facts in evidence, facts knowingly withheld from the September 7, 2023[187] investigative report and, did knowingly delay such investigation so as to cage the voters of the State of New Jersey in the 2021 gubernatorial election, thus evidencing knowing malicious intent.  Plaintiff alleges that the foregoing omissions within the content and exploratory findings, compromise the DOJ's investigative integrity, in this case as much all others, the Defendant's directive to mask the true facts concerning COVID-19 and the culpability of co-Defendants herein named, evidence an sinister posture on the part of the DOJ.  Citing the facts herein disclosed, the Defendant's culpability is made evident, if not by knowing action as a principal collaborator in the COVID-19 schema, then by passivity; despite ample opportunity to take corrective action, the Defendant willfully chose to perpetuate her actions annulling her Oath and pledge to the People of these United States.  The

---

[186]Press Release, October 28, 2022, Office of the Attorney General Matthew J. Platkin, State of New Jersey, Department of Law and Public Safety.  Accessed December 5, 2022, https://www.njoag.gov
[187] United States Department of Justice, Civil Rights Division, United States Attorney's Office, District of New Jersey, "Investigation of the New Jersey Veterans Memorial Homes at Menlo Park and Paramus," September 7, 2023.  Accessed September 7, 2023, https://thehill.com/homenews/state-watch/4192639-doj-new-jersey-violated-constitution-with-veterans-covid-care

collective actions are unquestionably conspiratorial in nature, dubious in intent, extending to the recruitment as much assemblage of parties with the outcome being so egregious and repugnant as to compromise human health and welfare. Such actions compromised persons, creating extensive vulnerability while knowingly withholding accountability under the Rule of Law in the interest of her co-conspirator so as to assure *their* capacity retention at the *expense* of the People, weaponizing elections by process and autonomy, regardless of political ideology or subdivision in direct and irrefutable contradiction to the Voting Rights Act. Defendant expressly usurped Executive Order 12333[188]; Executive Order 13977[189], Executive Order 13979[190], Executive Order 13848[191], violations of the Patriot Act, Title 52 U.S. Code §20702[192], 42 USC 4950, Ch.66[193], 18 U.S. Code § 2422(a), (b)[194], the Civil Rights Act of 1964 – inclusive of the Commerce Clause of Article I, Sections I (Voting Rights); VIII (Equal Protections) and Constitution Art. III. S3.C1.1.2 Treason Clause[195]. Plaintiff alleges that the Defendant, in the company of her co-Defendants, is not satisfied merely with influencing elections by public oration; but through the weaponization of capacity, a capacity granted by Oath to the Constitution, insodoing, the Defendant has evidenced a determination to control the selection of the Executive branch of Government, dismissing the People of these United States, altogether.

44.    Defendant, the DEMOCRATIC NATIONAL COMMITTEE, in its organizational Charter capacity, Plaintiff alleges gross negligence of public trust, abandonment, and desertion of its foremost organizational pledge by Charter to itself and its members, "we pledge ourselves to open, honest

---

[188] *Ibid* (9).
[189] *Ibid.* (33).
[190] *Ibid.* (34).
[191] *Ibid.* (35)
[192] *Ibid.* (36)
[193] *Ibid.* (37).
[194] *Ibid.* (38).
[195] *Ibid* (39).

endeavor and to the conduct of public affairs in a manner worthy of a society of free people. Under God, and for these ends and upon these principles, we do establish and adopt this Charter of the Democratic Party of the United States of America."[196]  Plaintiff alleges that the Defendant stood down their Charter and obligations to the People, obviating their pledge by avowing to extreme ideology, policy formulation and organizational support which married to the culpability of the co-Defendants in eviscerating the People's sovereign rights.   It is further alleged that the Defendant, working in collaboration with the co-Defendants, provided venue to third party actors to participate in sacred areas unintended for such participation, the parties attach by donor capacity, placing superiority of *their* capacity and monetary advancement to that of the Rights and will of the People – caging their voice and their vote as folly for political aggrandizement.  Plaintiff alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, if not by knowing action as a principal collaborator in the COVID-19 schema, then by passivity; the Defendant's absence of corrective action taken since the inception of Constitutional usurpations, in either case, the Defendant annulled its Charter.

45.    Defendant, the REPUBLICAN NATIONAL COMMITTEE, in its organizational Charter capacity, Plaintiff alleges neglect of public trust in the abandonment and desertion of its foremost ideals and pledge by Charter to itself and its members, "Ours is the party of liberty, the party of equality, of opportunity for all, and favoritism for none. It is the intent and purpose of these rules to encourage and allow the broadest possible participation of all voters in Republican Party activities at all levels and to assure that the Republican Party is open and accessible to all Americans."[197]  It is further alleged that the Defendant, working in collaboration with the co-Defendants, provided venue

---

[196] The Charter and Bylaws of the Democratic Party of the United States, as amended by the Democratic National Committee, September 10, 2022, accessed August 15, 2023, https://democrats.org/wp-content/uploads/2022/09/DNC-Charter-Bylaws-09.10.1022-1.pdf
[197]The Rules of the Republican Party, As adopted by the 2020 Republic National Convention, August 24, 2020, Amended April 14, 2022, accessed August 15, 2023, https://prod-cdn-static.gop.com/docs/Rules_Of_The_Republican_Party.pdf

to third party actors to participate in sacred areas unintended for such participation, the parties attach

by donor capacity, placing superiority of *their* capacity and monetary advancement to that of the

Constitutional Rights and will of the People. Plaintiff alleges that the Defendant shares culpability

with co-Defendants having not disclosed the truth but rather fell in line with the will of the status quo

amid the myriad of complex societal change, the Defendant lost its way placing an emphasis on

capacity retention in lieu of foundational tenons and continues in such traverse, unabated. Plaintiff

alleges, citing the facts herein disclosed, that the Defendant's culpability is evident, if not by knowing

action as a principal collaborator in the COVID-19 schema, then by passivity; the Defendant's

absence of corrective action taken since the inception of Constitutional usurpations, in either case, the

Defendant annulled its Charter on behalf and in the interest of the People.

## FACTUAL ALLEGATIONS

### COUNT I

### I. ADENOVIRUS AND RELATED PRE-EXISTING FACTS.

46.   In 2012, the New Jersey Senate and Assembly enacted S782 supplementing the existing

disclosure requirements under P.L. 1971, c.136 (C.26:2H-1 *et seq.*) concerning general hospital

licensure for profit entities disclosure of fiscal statements.   P.L. 1971, c.136 (C.26:CH-1 *et seq.*)

was crafted to provide legal benchmark of accountability and transparency.

47.   In 2014, Governor Christie executed P.L. 2013, c.195, legislation was introduced requiring

the Commissioner of Health to review financial reporting of hospitals with the examination to

include fiscal reporting made to the "Internal Revenue Service ("IRS"), Securities and Exchange

Commission ("SEC"), and audited financial statements of all affiliated entities receiving Health

Subsidy funds payments."[198]  The foregoing policies and legislative actions combined with the Health Care Facilities Planning Act (N.J.S.A. 26:2H-1 *et seq*.), known commonly as the Planning Act which advanced regulations under N.J.S.A. 8:31B-1.1 *et seq*.  These legislative actions, incorporated a veto measure by then-Governor Christie who sought to ensure the People had protections under health and human services including affordability and quality of care transparency citing the consumer impacts experienced during the 2008 economic crisis which resulted in the closure of hospitals in New Jersey, in some cases, absent any notice to patients, bankruptcy, etc.  The detailing of the Planning Act included an early warning system ("EWS") to ensure transparency to the public of financial distress.[199]

Hospitals, rehabilitation facilities and nursing homes have a history of complex financial ownership structures, this area was subject of the March 19, 2019 report of the Commission of Investigation.  The purpose of the report was to outline "findings and recommendations involving hospital-related oversight and accountability issues."[200]  Plaintiff reviewed the report as it relates to the People's plea, the New Jersey Department of Health failed to follow regulatory requirements in a variety of areas including the EWS system, tracking of hospital (for-profit and not-for-profit) ownership as well as "related-party management entities"[201]  The report stands on its own merit, while complex in content, it indicates appreciative areas where the New Jersey Department of Health was derelict in carrying out its statutory responsibility on behalf of the People, allowing an immeasurable vulnerability to enter by force or manipulation.

---

[198] State of New Jersey Department of Health, "Hospital Financial Transparency – Department of Health Recommendation on Hospital Financial Transparency."  Accessed July 6, 2022.
https://www.nj.gov/health/assets//documents/hospital_transparency_report.pdf
[199] *Ibid.*, 4.
[200] Scancarella, Joseph, Bursichelli, Robert, Iannacone, Rosemary. State of New Jersey Commission of Investigation Report and Findings.  March 19, 2019.  Accessed June 10, 2022.  https://www.nj.gov/sci/pdf/HospitalsReport.pdf
[201] *Ibid.* (2).

In review of this Count, persons may be quick to assert that the party Defendants are not collective in their depravity as it concerns their fellow man/woman/child, Plaintiff asserts that nothing could be further from the truth.  The foregoing report highlights the complexities of hospital/nursing home/rehabilitation center fiduciary ownership and related parties, it applies directly to the People's plea.

**WANAQUE, HASKELL, NEW JERSEY (2018).**

The Wanaque Center for Nursing and Rehabilitation, ("Wanaque Center") in Haskell, New Jersey experienced an outbreak of adenovirus in 2018.  The outbreak resulted in the untimely death of eleven (11) children who were in care at the for-profit facility's pediatric unit for the medically fragile.  The Wanaque Center adenovirus outbreak prompted appreciative legislative evaluation, leading to national press articles, federal investigation and CDC involvement.  Ultimately, the New Jersey governmental bodies cumulatively drafted the legislative action entitled P.L. 2019 c.243 "Long-term Care Facilities". [202]

The legislation detail included appreciative requirements for response in the case of an outbreak "of a life-threatening, contagious disease,"[203] with extensive human welfare guardrails, the development of interdisciplinary teams with an infection control committee and succinct framework for building and implementing an outbreak response plan, extending to areas for isolation, *cohorting*, infected, and at-risk patients who might come into contact with or be exposed to threatening contagion.

Federal investigators from the New York regional office of the Centers for Medicare and Medicaid Services (CMS) investigated the Wanaque Center, an appreciative report resulted,

---

[202] Public Law 2019 c.243 (A5527)," P.L. 2019, c243b (New Jersey Legislature, August 15, 2019).  Accessed January 10, 2022 https://pub.njlet.gov/bills/2018/PL19/243
[203] Ibid., 1.

inaccessible to the Plaintiff; however, as cited by Time[204], "failings in administration and patient care extending to include failings in response to emerging illness, failure to monitor infection rates" attributed to the outbreak and the untimely loss of fragile lives resulted.  The attorney for Wanaque, Andrew Aronson replied to CMS stating, "that the report is riddled with factual inaccuracies, ignorance of medical judgment, statements that are contradicted by experts and other evidence."[205]  An infectious disease physician practitioner, retained by the Wanaque Center following the outbreak, Dr. McManus stated, "*...consequences were attributable to a particularly dangerous strain of virus (adenovirus7) that afflicted a very vulnerable population...nothing in the (State) report identifies systemic deficiencies in policies or procedures, and there is no suggestion that the deficiencies identified contributed to the viral outbreak,*" [EMPHASIS ADDED] the interview continued...the strain of adenovirus (Adenovirus 7) is "*known to cause particularly severe illnesses that affect the respiratory system – especially among patients like those at Wanaque...(with) preexisting medical conditions and a shared living environment.*"[206]

In July, 2019, the Wanaque Center licensing was transferred to SentosaCare and renamed to North Jersey Pediatric and Adult Nursing Wellness Center.  According to ProPublica, SentosaCare, LLC is New York's largest owner/operator of nursing homes in the State with 25-facilities.  On September 23, 2019, U.S. District Court Judge Gershon issued an Opinion and Order regarding Paguirigan v. Prompt Nursing Employment Agency LLC. d/b/a SentosaCare LLC et al. (17-cv-1302 (NG (JO) (E.D.N.Y. Sep. 23, 2019) for violations involving Trafficking Victims Protection Act under 18 U.S.C. §§1589 *et seq*.  The case would lead to a $1.56M

---

[204] Ducharme, Jamie, "Federal Investigators Find Critical Failings at Health Center Where 11 Children Died in Virus Outbreak." March 4, 2019.  Accessed June 10, 2022.
[205] *Ibid.*, 3.
[206] *Ibid.*

settlement. SentosaCare, LLC opened operations in North Carolina by purchase from Florida-based AvanteGroup, it's President being appointed to the Florida Board of Nursing Home Administrators effective December 11, 2020, an appointment by the Governor of Florida.

The U.S. Department of Health and Human Services ("HHS"), Civil Remedies Division record provides an extensive repository regarding Wanaque,[207] dating from August, 2019 through October 10, 2019 (Docket No. C-20-162)[208]. In August, 2019, a "facility housekeeper (sexually) abused a defenseless resident,"[209] site visits remained ongoing throughout the investigative period to ensure compliance under 42 C.F.R. § 483.12(a)(1); a final Decision was issued on February 15, 2022 (CR6030), the perpetrator of the sexual abuse held to count.

The foregoing facts provide clear and irrefutable support that the inclusive Defendants herein named had foreknowledge concerning COVID-19, novel coronavirus and its associated complexities, long before the public disclosure, and moreover, that exceedingly detailed health protocols were codified to ensure the safety of those in nursing homes, rehabilitation centers and more broadly, the public at large.

## COUNT 1 FACTS CLAIMS

1. Analysis of the White House press briefing of March 19, 2020, when weighed against the disclosures herein, the Executive Proclamation 9994 inclusive actions taken were succinct and in keeping with the saving of human lives. The foregoing is emphasized in claims as acts of treason when the Court considers the fact that the seated President, Donald John Trump, with the aid of Operation Warp Speed and the Coronavirus Task Force, emphasized leadership in and among the Governors, those closest to the People.

---

[207] U.S. Department of Health and Human Services (2022). "The Wanaque Center for Nursing & Rehabilitation, DAB CR 6030 (2022). Accessed October 2, 2023 https://www.hhs.gov/about/agencies/dab/decisions/alj-decisions/2022/alj-cr6030/index.html
[208] Rose Ann Paguirigan v. Prompt Nursing Employment Agency LLC, d/b/a SentosaCare, LLC., et al. 17-CV-1302 (NG) (JO) (E.D.N.Y. Sep 23, 2019). United States District Court Eastern District of New York
[209] *Ibid.* 2.

As the record herein reflects, while the body of co-Defendants believed that they were battling the sitting President, they were actually battling the brokenness within themselves; their desire for power, political or otherwise consumed them at every level, and as a consequence the People were harmed, gravely.

2. Multiple layers of governmental entities were aware of or had been directly involved in the body of Wanaque Center data and findings, the repository of which is irrefutable; these include the CDC, NIH, HHS, CMS, IRS, SEC, the New Jersey Legislature as well the herein named Defendants, inclusive of John Doe and Jane Doe as yet unnamed.

3. Based on the facts herein, the DOJ has proven itself either inept or a co-Conspirator, given to oration, acumen and voluminous legal actions of record in the Defendant's tenure, Plaintiff alleges the latter and reasserts the allegations set forth above. Plaintiff reiterates and emphasizes the fact that the Defendant disclosed her controlled knowledge of the Wanaque incident in utilizing the specific term *cohorting* within the DOJ report. Defendant cherry picked content to dissuade liability while altogether dismissing the human depravity associated, these actions provide willful concealment, 52 U.S.C. §20702 and 18 U.S.C. §2422.

4. Plaintiff reasserts each claim in the "Parties" directory of Defendants, and moreover, Plaintiff adds the voices of the children among those honored herein; God chooses the time of passing, human origin to the contrary is a punishable offense, abhorrent and demanding of accountability.

5. The Wanaque Center events, and the subsequent immense repository proved futile against the true storm that overtook our Nation, a storm more palatable than any in recent history, its carnage incalculable and reverberating this very day among sovereign nation-states as much these United States. God have mercy on the Defendant's souls.

## COUNT II

II.    **VOTER CAGING AND RELATED PRE-EXISTING FACTS.**

48.    A Consent Decree was issued following settlement between the Democratic National Committee and the Republican National Committee following violation of the Voting Rights Act, 42 U.S.C. §§1971, *et seq. Democratic Nat'l Comm. v. Republic Nat'l Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013). For the benefit of the People, the Order issued on November 5, 2016, attached hereto as EXHIBIT 4.  The original consent decree was issued in 1982, holding of record by way of pleadings, modifying in 1987 and 2009 through December, 2017, holding to all 50-States. when it  when it again was called forward into legal argument by the Democratic Party with allegations that the Republican party had violated.  The Honorable John M. Vasquez, J.D. ruled that the decree had expired in December, and would not be extended.[210]

There were two areas of the settlement defined in the Consent Decree relevant to this plea of the People:

(d) refrain from giving any directions to or permitting their employees to campaign within the restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place;

(e) refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting; and the conduct

---

[210] Gerstein, Josh. "Judge ends consent decree limiting RNC "ballot security activities" January 9, 2018.  Retrieved August 3, 2022. [POLITICO] https://www.politico.com/story/2018/01/09/rnc-ballot-security-consent-decreec-328995

of such activities disproportionately in or directly toward districts that have a substantial proportion of racial or ethnic populations shall be considered relevant evidence of the existence of such a factor or purpose[.][211]

49.   The January, 2020 National Association of Secretaries of State Winter conference was held in Washington, D.C., the conference ran parallel to the Impeachment of President Donald John Trump.  The keynote speaker, Clint Watts, was previously employed by the FBI.  Plaintiff open sourced his background noting that the speaker provided Congressional testimony concerning the allegations of Russian interference in the 2016 election, he opened his speech with that disclosure, professing it as fact, which has to this writing been invalidated.  The speaker described in vivid detail the manufacturing of a psychological operation, one which benefits from the adaptability and use of social media platforms with consideration to user age interface, including children.  The details of the speech attached hereto, EXHIBIT 5.

50.   On August 24, 2021, the House again evidenced its divide, voting party line on H.R. 4, The John R. Lewis Voting Rights Advancement Act of 2021.  The Plaintiff analyzed the bill, having not passed the Senate.

51.   Plaintiff ran for Mayor in 2021, while it would have been an honor to serve in such capacity for which she heartily campaigned, so too was the election process a component of research for this plea; *every* single communication and exchange retained in repository in the People's interest.  It should be noted that throughout this period of time Plaintiff had been meeting with members of the Legislature in New Jersey, as well County bodies in a diligent attempt to have someone, anyone of good faith and allegiance, to come alongside the efforts and toil; that earnest desire was not kindred, although staff was exceptionally congenial, mirrored by volunteers including the Plaintiff.

---

[211] Democratic National Committee, et al. v Republican National Committee, et al. Civil Action 81-08367, Opinion, November 5, 2016.

52.   On September 9, 2022, the New Jersey Legislature created Senate Bill 2997, entitled the

John R. Lewis Voting Rights Act of New Jersey; the bill remains in Committee (Government,

Wagering, Tourism and Historic Preservation).  Plaintiff followed Committee dialogue, closely.

53.   On October 26, 2022, the DOJ issues a statement concerning the efforts that would be

made in the forthcoming November election:

> ...through the Civil Rights Division, Criminal Division, and National Security Division, to
> ensure that all qualified voters have the opportunity to cast their ballots and have their
> voted counted free of discrimination, intimidation, or fraud in the election process, and to
> ensure that our elections are secure and free from foreign malign influence and
> interference...specially-trained FBI personnel...serving as Election Crime Coordinators in
> the FBI's 56-field offices will be on duty while polls are open to receive complaints...
> (these efforts will include) National Security Division's Counterintelligence and Export
> Control Section...(and) Counterterrorism (as concerns) international and domestic
> terrorism...supports law enforcement in prevent(ion of) any acts of terrorism...including
> violent extremism that might threaten election security.[212]

54.   The repository project and analysis continued through the election cycle of 2022. On

October 27, 2022, the New Jersey Attorney General announced the formation of protocols for the

role of Law Enforcement in election activities, an iteration by policy under P.L. 2021, c.459;

Plaintiff analyzed both documents.

55.   In review of this Count, persons may be quick to assert that the party Defendants are not

collective in their depravity as it concerns their fellow man/woman/child, Plaintiff asserts that

nothing could be further from the truth.  The less than admirable actions of then-candidate Kean

would be echoed years later, being cited in hundred of cases with the vitriol resounding by James

Florio following the 2020, November election.  The Plaintiff makes no distinction of either man,

to whom she has acquaintance, it is the People's Constitutional and sovereign voice with which

she stands, resolute and steadfast.  Given to the implications, inclusive of the COVID-19

---

[212] DOJ.  Press Release, "Justice Department Releases Information on Efforts to Protect the Right to Vote, Prosecute Election Fraud and Secure Elections."  Wednesday, October 26, 2022.  Accessed November 9, 2022. www.https://www.justice.gov/opa/pr/justice-department-releases-information-efforts-protect-right-vote-prosecute-election-fraud

imposed election changes, in most cases now codified into law, and the DOJ's foray into the

elections of 24-States in 2022, the Count hereto applies in and among the inclusive Defendant's

named.

## COUNT II FACTS CLAIMS

1. Plaintiff reiterates the claims stated above, the actions of the co-Defendants witnessed

   by their evidenced written Executive Orders, pontification and vitriol – of their

   volition, stand in evidence of subversive treason; however, when you combine those

   actions with Mr. Watts speech as well the extensive Federal Register record, the

   claims becomes irrefutable.  This claim extends as much to the Legislative bodies

   who coalesced in and among the Defendants named, as to their Administrative and

   third party associates.

2. Based on the facts herein, the DOJ has proven itself either inept or a co-Conspirator,

   given to oration, acumen and voluminous legal actions of record in the Defendant's

   tenure, Plaintiff alleges the latter and reasserts the allegations set forth above.

   Plaintiff reiterates and emphasizes the fact that the Defendant disclosed her controlled

   knowledge of the Wanaque incident in utilizing the specific term *cohorting* within the

   DOJ report.  Defendant cherry picked content to dissuade liability while altogether

   dismissing the human depravity associated, these actions provide willful concealment

   of the facts 52 U.S.C. §§20702 and 10307(b) and 18 U.S.C. §2422.  The knowing

   delay of the COVID-19 nursing home investigation caged the voters of New Jersey,

   suppressing their *inclusive* Civil Rights by knowingly withholding knowledge of

   immense proportion; these actions so too extend to the 24-States for which the DOJ

   imposed itself.

3. Plaintiff retains an appreciative directory of Freedom of Information Act (FOIA) and Open Public Records Act (OPRA) responsive records concerning the November, 2022 election actions or inactions, as the case may be.

4. Plaintiff calls to the 1982 negotiated settlement between the Democratic National Committee and the Republican National Committee and the facts herein provided. Plaintiff asserts that the body of Defendants have recapitulated to §(d) of the 1982 Decree, having held the People hostage for thirty-five years by plea, the parties have now seen fit to hold them hostage by fiat of COVID-19, a mask to their atrocities while we, the People, bury our dead and mourn. The magnitude of the Defendant's traverse on the People's Constitutional Rights is reprehensible.

5. Based on the stated facts herein, the People of these United States have had their sovereign voices held hostage, manipulated, cajoled, and, as the record will show in discovery, resurrected from the dead, yet those seeking to champion the cause of protections, inclusive of the co-Defendants, continue to enact and codify law further exacerbates an increasingly divided structure built on tenons of ideology to that of Country; the People are rightly disgusted, the People's demand setforth below in remedy.

## COUNT III

III. **PUBLIC PRIVATE PARTNERSHIPS (P3) AND RELATED PRE-EXISTING FACTS.**

56. Beginning from the gate of this journey, Plaintiff attaches an authored letter regarding the Center for Tech and Civic Life as <u>EXHIBIT 6</u>. The Court and readers of this plea should know that no one responded to the December 6, 2020 query, the silence was deafening as much as telling. Included with Exhibit 6 is the accompanying spreadsheet of funding disseminated in

New Jersey under CTCL/CARES Act, etc. during the 2020/2021 election cycles.  Plaintiff sent

OPRA requests for fiscal disclosure, all responsive records were denied but for the Cannabis

grants which was very limited in transparency and scope.

    This area of the People's plea is quite complex, Plaintiff makes no apology, not being an

attorney, the Court and readers will find it no less interesting as did the author. The lessons of

this season in our Nation's history were summarized well by Daniel Webster:

> ...It is not to be denied that we live in the midst of strong agitations, and are surrounded by
> very considerable dangers to our institutions of government.  The imprisoned winds are let
> loose.  The East, the West, the North and the stormy South, all combine to throw the whole
> sea into commotion, to toss its billows to the skies, and to disclose its profoundest depths.  I
> do not affect to regard myself...as holding, or as fit to hold, the helm in this combat with
> the political elements; but I have a duty to perform, and I mean to do it with fidelity – not
> without a sense of surrounding dangers but not without hope.  I have a part to act, not for
> my own security or safety, for I am looking out for no fragment upon which to float away
> from the wreck, if wreck there must be, but for the good of the whole, and the preservation
> of the whole...I speak today for the preservation of (these United States).[213]

57.    Plaintiff refers to the Senate hearing of May 7, 2020 transcript, excerpt of dialogue between

parties, Dr. Francis Collins, Dr. Gary Disdrow and Senator Murray concerning COVID-19 tests.

> Senator Murray:...Dr. Disdrow and Dr. Collins, can you commit to me today without
> reservation that you will always prioritize the public health and never give into pressure to
> do political favors and that you will speak out against corruption and incompetence and
> misconduct when you see it? (Parties affirmed)...Do either of you have any reason to doubt
> that Dr. Bright faced the political pressure that he described in this complaint?
>
> Dr. Collins:...I just don't have any personal primary information, so I'm only going by the
> things that I have read.  It's not a circumstance that I can form my own opinion because I
> don't have the facts as a sort of personal experience.
>
> Dr. Disdrow:...So now that this is a personnel matter being handled by the office of Special
> Counsel, I can't really comment.
>
> Senator Murray:...Well, do you both commit to being transparent with Congress and the
> public regarding any partnerships your agencies engage in throughout this COVID-19
> response including what guardrails are in place to make sure government resources are

---

[213]Webster, Daniel. *The Constitution and the Union – Hear Me for My Cause*. March 7, 1850. Accessed Liberty.edu academic repository

devoted to the products most promising to public health and not those that will drive profits….(Parties affirmed).[214]

There are 3-distinct areas of focus in this Count:

(1) Usurpation of privacy and private property;

(2) Public Private Partnership ("P3"); and

(3) NGO's, 501c(3) and their Friends.

58.    Plaintiff calls to the USA Patriot Act, its well-intended, crafted verbiage manifest in public law, meant to protect the citizens of these United States from criminal acts with distinct areas of surveillance to fortify such protections; this too has been usurped and weaponized against the People.

During COVID-19, Plaintiff draws attention to the water, the sewerage systems, specifically.  Facts will provide that under mask of COVID-19, the federal government was monitoring sewerage flow for trace of DNA so as to affirm vaccination employing the guise of tracking the virus.  These fundamentally inappropriate acts of imposition on privacy rights are on their face egregious but are made more so when the People understand the manifestation of tracking, tracing and targeting areas – caging populous – regardless of intent, whether malicious or benevolent; these usurpations have no place in a free society but rather one of socialist construct.  By outward appearance, drawing on acumen, it would appear that in the wrong hands parties could utilize data gathered for actuarial science targeting for health and life insurance premiums by collective sampling to that of human engagement.  These malign acts while beneficial to insurers degrade the rule of law, inviting corruption and corrupt practices, further imposing on the Rights established under the Constitution.

---

[214] US Senate. 2020. *Hearing of the Health, Education, Labor and Pensions Committee.* Senate Testimony on New Tests for COVID-19. day 1. May 7, 2020.  Accessed August 18, 2023. https://www.rev.com/blog/transcripts/health-officials-senate-testimony-transcript-on-new-tests-for-covid-19

59.    In 2021, by way of the Federal Treasury, States offered homeowner assistant funds

("HAF"), the programs were facilitated, seemingly under the guise of assisting homeowners with

home retention citing the economic challenges which allegedly did not exist according to media

sources. HAF is facilitated by third party, 501c3 entities who are preapproved as "counselors"

through the Department of Housing and Urban Development.  The complexity in these programs

arrives through the third-party entities, their 501c3 status and conflicts with standing rule of law,

including the Hatch Act, the Fair Housing Act and IRS rules for non-profit entities.

The same economic complexities that are impacting American citizens is also wreaking

havoc on businesses, remaining viable and operating in positive cash flow requires owner

operators to consider new business models, including merger acquisition while retaining the

original name, in some cases.  The complexities arrive when the ownership of these entities is

traced, Plaintiff undertook that process in several cases, same is presented below:

1.   HUD Approved housing counselors who work with HAF clients, paid through Treasury.

HAF application demands disclosure of private financial data including details of

property, mortgage, income, etc. so as to evaluate viability of loan alternatives best

suited in-home retention, etc.  Completed application for HAF requires disclosure of

tax returns using a 4506C, the processing company is Avantus.  In the past three years,

Avantus has acquired several companies and has, simultaneously been acquired, at

present it is owned by Qinetiq Group Plc, a UK-based company focused on global

defense and security.  These facts are problematic from a fiduciary perspective,

bringing rise to privacy rights, transparency and most certainly conflicts with the Fair

Housing Act.  The foregoing example calls to mind the transparency laws protecting

consumers from hospitals as cited in Count I, above; unfortunately, it is not an isolated case.

2. Returning to voter caging and malign activities, Plaintiff presents the Center for Voter Information ("CVI"), a 501c3. CVI is affiliated with the Voter Participation Center ("VPC") and was responsible for 340 million direct mail including ballot application and voter registration forms in 2020. The fiscal disclosure provides that these entities do not participate in political activities; however, both entities are heavily involved with the Democratic Party. Plaintiff retains direct mail from these entities.

3. Rutgers, the Eagleton Institute for Politics, Richard T. Thigpen, Sr. Vice President with PSE&G. Mr. Thigpen is an interesting case study in equity of end-user, Plaintiff notes that Rutgers was the conduit University that introduced Research Triangle Institute ("RTI") as a medium to address mental health; RTI is a wholly operating entity of the CIA.

4. Another case study concerns real property. Returning to the Waterfront Project, as above, they are housed at 830 Bergen Avenue, Jersey City. The structure is home to many entities including the Hudson County Department of Education, We are One New Jersey, etc. We Are One New Jersey is a 501c3, tax code exempt under broad capture description, the primary officer is Charles Wowkaneck. Mr. Wowkaneck is the former President of the AFL-CIO to which We Are One New Jersey is also yoked, Mr. Wowkanech was appointed to the New Jersey's Future of Work Force organization by Governor Murphy (2019). So too do they share association with Working Families United for New Jersey in Trenton, from this affiliation, Edward Correa emerged, first working for the State of New Jersey and, in 2023 as the Dover Democrat municipal

chairman.  The foregoing parties tie to Hoboken Councilman Mike Russo – an interesting case study in Bankruptcy law.  Mr. Russo ties to the Hudson County Improvement Authority who owns 830 Bergen Avenue, Jersey City (2011) which ties to the Hudson United Insurance and Hudson United Mortgage Services entities.  The affiliates then tether to another 501c3, Act Now Foundation as well Monroe Center Hoboken Urban Renewal (2014); Monroe Center Management, LLC ties to North Hudson Electric.  In 2008, Monroe Center Management filed for Chapter 11 Bankruptcy after a lackluster renovation of the property purchased at 770 Jackson Street, Hoboken which transacted in 2014 for $19,500,000 to Monroe Center Hoboken Operator, LLC, incorporated from 120 Soldiers Field, Boston, Massachusetts, registered as a New Jersey foreign limited liability company which ties to Intercontinental Real Estate Corporation, Peter Palandjian.  Mr. Palandjian manages the private equity real estate under the Intercontinental Real Estate Corporation which originated from the construction firm his father began, Petros Palandjian. Understanding transparency in contract law, those persons with whom you do business becomes exceedingly difficult as articulated P.L. 1971, c.136 (C.26:CH-1 *et seq*.), made more so when laws are skirted and contorted by those who codify them, as above referenced.

5. In 2019, Holtec, Energoatom and SSTC entered into a trilateral agreement concerning nuclear reactor technologies in Kiev, Ukraine.  In the United States, Holtec has been under fire for wastewater release of late.  Holtec contracts with Tetra Tech.  In 2018, residents of New Mexico challenged the National Regulatory Commission in Holtec's application to consolidate nuclear waste.  In recent months, Holtec has come under fire

by Governor Murphy as pressure mounts regarding tax incentives which were provided in 2014. Plaintiff researched tethered areas which led to the 501c3 Fair Share Housing Development ("FSHD"), FSHD was at the heart of Mt. Laurel which resulted with the Mount Laurel Doctrine, the Council on Affordable Housing, etc.

6. The Alpert Group is affiliated with the Housing Authorities in and around New Jersey as a matter of public record, they are a primary development and real property management company. The Housing Authority of Plainfield owns and operates Premier Community Development Co. who has developed and redeveloped property in and around New Jersey, receiving tax credits and exemptions under the guise of affordable housing. The Alpert Group is also affiliated with the U.S. Department of Housing and Urban Development, holding to a long-standing working relationship for specialized affordable housing since the 1970's. Located at One Parker Plaza, Fort Lee, the Alpert Group has a variety of business holdings, not uncommon for land development. Alpert tethers by development to Wachovia which was subsumed by Wells Fargo in the economic crisis of 2008, the Department of Housing and Urban Development tethering to our co-Defendants, herein named. By FOIA, Plaintiff sought a copy of Operation Destiny, presented by AIG under TARP and SIG TARP.

7. Gislaine Maxwell was married to Scott Borgerson. Mr. Borgerson was the President of Arctic Circle Foundation, Inc., a 501c3 where Frederik Paulson serves as Treasurer. Mr. Paulson is the founder of Ferring Pharmaceuticals and had served on the Board of Philip Morris International as well in the capacity as Honorary Consult of the Russian Federation, Switzerland. Ferring Pharmaceuticals is a market leader in maternal and

reproductive medicine, conception to birth.  Mr. Paulson is also the Chairman of Ferring Ventures, S.A. which is affiliated with Mars, Coca-Cola and Credit Suisse.

8.  The contracts associated with the foregoing a conducted through public private partnership ("P3"), apart from public view in many cases and go so far as to avoid governmental contract transparency laws.  The Court and the readers of this plea would do well to avail themselves of the National Governors Association winter conference links provided.  In advance of COVID-19, these tethered organizations would collect under various non-profit umbrellas, since COVID-19, P3 agreements have become increasingly prevalent, a mainstay for State, County and local governments.

## COUNT III FACTS CLAIMS

1.  Plaintiff states that under Title VI of the Civil Rights Act of 1964 and the Fair Housing Act Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601 *et seq.*), once the co-Defendants had achieve their ends of usurping the Executive of these United States,  the facts provide they directed their aim at the taxpaying public.  Under the guise of affordable housing they have funded an extraordinary business enterprise built of fraud and deceptive practices since the 1970's, at least.

2.  Multiple layers of governmental entities were aware of or had been directly involved in the history of affordable and specialize housing data and findings, the repository of which is irrefutable; these include the State Legislatures, nationwide as well the herein named Defendants, inclusive of John Doe and Jane Doe as yet unnamed.

3.  Based on the stated facts herein, the People of these United States have had their sovereign voices held hostage, manipulated, cajoled, and, as the record will show in discovery, resurrected from the dead, yet those seeking to champion the cause of

protections, inclusive of the co-Defendants, continue to enact and codify law further exacerbating an increasingly divided structure built on tenons of ideology to that of Country while the co-Defendants build wealth derivatives for themselves and their co-conspirators; the People are rightly disgusted, the People's demand setforth below in remedy.

## PRAYER FOR RELIEF

Plaintiff will not posture to political diatribe, seeking favor from no one presently holding office, her respect diminishing by the day of such parties.  No, on this occasion, the People seek the unvarnished truth and so as to corroborate advancing affirmation, God has demanded that the Plaintiff amass a repository of facts, for which she obliged.  It is anticipated that parties, organizations and corporations will seek to refute and counter these claims; in doing so they would be wise to understand the magnitude of the People's righteous disgust, so too of the fact that those who might knowingly take such action would be unwittingly implicating themselves as to the allegations herein.  Plaintiff gathers the honored voices and breath, the only measure which would have authored this document, unzipping the bags for the world to behold, the Defendant's herein named, inclusive of John Doe and Jane Doe, are responsible for these atrocities – no one else and most certainly not God, Almighty.

Plaintiff has received no compensation for this undertaking, is and remains self-employed and unburdened by extraneous influence but for God, Almighty and her faith in same. Plaintiff respectfully requests that this Court:

60.   Declare that Defendant's actions as described herein by paragraphs 4 through 21 above abridge and deny those rights and statutes enumerated in the Title 52 U.S.C. §20702; 42 U.S.C. § 4950 Ch.66; 18 U.S.C. §2422(a) (b); the Civil Rights Act of 1964 – the Commerce Clause, Art.

I, Sections I – Voting Rights, VIII – Equal Protections and Constitution Art. III. S3.C1.1.2
Treason Clause withheld and denied the Plaintiff by knowing acts as set forth above.

61. Declare the Defendant's actions as described herein by paragraphs 27 through 45 above
abridge and deny the Plaintiff's statutory rights protected by Title 52 U.S.C. §20702; 42 U.S.C.
§ 4950 Ch.66; 18 U.S.C. §2422(a) (b); the Civil Rights Act of 1964 – the Commerce Clause, Art.
I, Sections I – Voting Rights, VIII – Equal Protections and Constitution Art. III. S3.C1.1.2
Treason Clause.

62. Issue preliminary and permanent injunctions enjoining the defendants from committing
actions similar to those described herein in the future.

63. Award the Plaintiff $8,000,000,000 in compensatory and punitive damages for the
deprivation of the rights so infringed by corruptive practice, will and intent as setforth herein.

64. Award the plaintiff their attorney fees, costs and disbursements incurred in this action, as
provided in 28 U.S.C. §1920 and 42 U.S.C.§1988.

65. Plaintiff demands, given to the actions herein described, fortified by irrefutable supporting
facts, that Donald John Trump be placed on the November, 2023 ballot and that Joseph R. Biden
be removed as Executive of these United States.

66. Plaintiff demands that to fortify the People's rights enumerated, voting be returned to one
day, the first Tuesday of November and that such voting be in person by paper ballot which is to
be hand counted.  All funds and tangential contractual relationships with extraneous computer
peripherals be immediately terminated.

## VERIFICATION

The Plaintiff named below verified that the statements made in the attached Complaint are, upon her information and belief, true.  Sworn pursuant to 18 U.S.C. §1001.

_____
Mary Basile Logan
*Pro-Se* Plaintiff


Sworn to and subscribed before me on this ___ day of October, 2023.

_____
Notary Public

KAREN M ROMANO
Notary Public - State of New Jersey
My Commission Expires Jun 14, 2025

61

# Presidential Documents

Proclamation 9994 of March 13, 2020

## Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak

**By the President of the United States of America**

**A Proclamation**

In December 2019, a novel (new) coronavirus known as SARS–CoV–2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID–19 that has now spread globally. The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19. I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID–19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe. The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F–3 of the Public Health Service Act (42 U.S.C. 247d–6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline bringing new diagnostic capabilities to laboratories. On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID–19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID–19. It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability. Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b–5), do hereby find and proclaim that the COVID–19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020. Pursuant to this declaration, I direct as follows:

**Section 1.** *Emergency Authority.* The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID–19 outbreak.

EXHIBIT 1

1

**Sec. 2.** *Certification and Notice.* In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b–5(d)).

**Sec. 3.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

[FR Doc. 2020–05794
Filed 3–17–20; 8:45 am]
Billing code 3295–F0–P

EXHIBIT 1

2

**U.S. Department of Justice**

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Avenue, NW - RFK*
*Washington, DC 20530*

August 26, 2020

The Honorable Phil Murphy
Governor of New Jersey
Office of the Governor
P.O. Box 001
Trenton, NJ 08625

Dear Governor Murphy:

I write to request information regarding COVID-19 and nursing homes run by, or for, the State of New Jersey, as defined in more detail hereafter. The Civil Rights Division of the Department of Justice enforces the Civil Rights of Institutionalized Persons Act (CRIPA). *See* 42 U.S.C. § 1997. The Division is evaluating whether to open a CRIPA investigation of institutions "providing skilled nursing, intermediate or long-term care, or custodial or residential care" that are "owned, operated, or managed by, or provide[] services on behalf of [New Jersey] or [a] political subdivision of [New Jersey]" ("Public Nursing Homes").

To help us make this determination, the Division respectfully requests the following documents and information for each Public Nursing Home. Data should be provided on a Public Nursing Home-specific basis for each Public Nursing Home in the state.

1.    The number of Public Nursing Home residents, employees, other staff, guests, and visitors who contracted COVID-19, regardless of where such persons contracted COVID-19.

2.    The number of Public Nursing Home residents, employees, other staff, guests, and visitors who died of COVID-19 including those who died in a Public Nursing Home or after being transferred to a hospital or other medical facility, hospice, home care, or any other location.

3.    All State-issued guidance, directives, advisories, or executive orders regarding admission of persons to Public Nursing Homes, including those previously superseded, as well as the dates each such document was in effect.

4.    The number of persons who were admitted to a Public Nursing Home from a hospital or any other facility, hospice, home care, or other location after testing positive for COVID-19 during the period the guidance or orders were in effect.

EXHIBIT 2
1

The Honorable Phil Murphy
August 26, 2020
Page 2

      We have not reached any conclusions about this matter.  In the Division's many years of enforcing CRIPA, the good faith efforts of state, county, or local jurisdictions working with us have enabled us to resolve many matters amicably.  We request the above information within 14 days.

      If you have any questions, please contact our office.

                Sincerely,

                *Eric S. Dreiband*

                Eric Dreiband
                Assistant Attorney General
                Civil Rights Division

EXHIBIT 2
2



**U.S. Department of Justice**

United States Attorney's Office
District of New Jersey

| | |
|---|---|
| *U.S. Mail:* | *970 Broad Street 7th Floor* |
| | *Newark, New Jersey 07102* |
| *Telephone:* | *(973) 645-2700* |

Civil Rights Division

| | |
|---|---|
| *U.S. Mail:* | *Office of the Assistant Attorney General* |
| | *950 Pennsylvania Avenue, NW - RFK* |
| | *Washington, DC 20530* |
| *Telephone:* | *(202) 514-2151* |

October 27, 2020

The Honorable Phil Murphy
Governor of the State of New Jersey
P.O. Box 001
Trenton, NJ 08625

Re:     Investigation of New Jersey Veterans Memorial Home at Menlo Park and New
Jersey Veterans Memorial Home at Paramus

Dear Governor Murphy:

In a letter to you dated August 26, 2020, the Department of Justice requested information regarding COVID-19 deaths that occurred in institutions "providing skilled nursing, intermediate or long-term care, or custodial or residential care" that are "owned, operated, or managed by, or provide[] services on behalf of [New Jersey] or [a] political subdivision of [New Jersey]." Rather than provide all the data requested, however, in a letter to the Department dated September 9, 2020, your office referred the Department to New Jersey's website. The website did not contain all of the requested information. Recent reports suggest that the number of COVID-19 deaths at some nursing homes, including New Jersey Veterans Memorial Home at Menlo Park and New Jersey Veterans Memorial Home at Paramus (together, the "Veterans Homes"), two long-term care facilities operated by the State, have been understated. Moreover, our review of publicly available information gives us cause for concern that the quality of medical care at these nursing homes has been deficient.

Accordingly, we write to inform you that the United States Department of Justice is commencing an investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, into the Veterans Homes.

In conducting the investigation, we are obliged to determine whether there are systemic violations of the Constitution or laws of the United States in the Veterans Homes. Our investigations will focus on whether the Veterans Homes engage in a pattern or practice of violating the rights of veteran residents under the U.S. Constitution or federal statute by failing to provide them adequate medical care generally, and during the coronavirus pandemic in particular.

We have not reached any conclusions about the subject matter of the investigation. During our investigation, we will consider all relevant information, including the efforts the

EXHIBIT 3
1

State has undertaken to ensure compliance with the Constitution and federal law. If appropriate, we will offer technical assistance on ways to address any identified deficiencies in the provision of medical care at the Veterans Homes.

Upon completion of our investigation, if we conclude that there are not systemic constitutional violations, we will notify you that we are closing the investigation. If, on the other hand, we conclude there are such violations, we will provide written notice of the results of the investigation and identify the minimum measures we believe are necessary to remedy the violations. In our many years of enforcing CRIPA, the good faith efforts of state, county, or local jurisdictions working with us have enabled us to resolve many claims without the need to resort to contested litigation.

We encourage the State to cooperate with our investigation, and we can assure you that we will seek to minimize any potential disruption our investigation may cause. The United States Attorney's Office for the District of New Jersey and the Civil Rights Division's Special Litigation Section will be handling the investigation. They will contact your office to discuss next steps.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

Craig Carpenito
United States Attorney
District of New Jersey

cc:    Gurbir S. Grewal
       New Jersey Attorney General

       Colonel Lisa Hou, D.O.
       Acting Commissioner, New Jersey Department of Military and Veterans Affairs

       Scott Mueller
       Acting Chief Executive Officer, New Jersey Veterans Memorial Home at Menlo Park

       Kenneth Chance
       Interim Chief Executive Officer, New Jersey Veterans Memorial Home at Paramus

EXHIBIT 3
2

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

<u>Not for Publication</u>

<table>
<tr><td>

DEMOCRATIC NATIONAL COMMITTEE, et al.,

*Plaintiffs,*

v.

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Defendants.*
</td><td>

Civil Action No. 81-03876

**OPINION**
</td></tr>
</table>

<u>John Michael Vazquez, U.S.D.J.</u>

Plaintiff Democratic National Committee ("DNC") alleges that Defendant Republican National Committee ("RNC") violated a consent decree ("Consent Decree" or "Decree") between the parties. The Consent Decree was originally entered in 1982 and was subsequently modified in 1987 and 2009. The RNC denies that it is in violation of the Decree. The DNC seeks the following relief: a finding that the RNC is in contempt, enforcement of the Consent Decree with sanctions, injunctive relief, and an extension of the Consent Decree. For the reasons that follow, the Court denies the DNC's motions for injunctive relief, for contempt, and for sanctions. The Court denies, at this time, the DNC's request to extend the Consent Decree, but the Court will hear the parties after Election Day as to additional discovery on this point in order to develop a full record to determine whether an extension is warranted.

EXHIBIT 4

1

This opinion will first review the current posture of this matter before turning to the background of the Consent Decree and the positions of the parties. The Court will then analyze the DNC and RNC's arguments in light of the Decree and the applicable law.

## I. BACKGROUND

### A. Procedural History of the Current Dispute

On October 26, 2016, the DNC requested that the Court issue an order requiring the RNC to show cause why the relief sought by the DNC should not be granted. D.E. 95. The DNC included a brief and numerous exhibits in support of its position. The matter was assigned to the Court[1] on October 27 and, in lieu of issuing the order to show cause, the Court held a telephone conference with counsel for both parties the same day. Following the conference, the Court issued a scheduling order, which addressed the dates for briefing, discovery requests, and oral argument. D.E. 102. The Court also denied the DNC's request for temporary restraints, instead indicating that the Court would rule on the request for injunctive relief following full briefing and argument. *Id.*

As to discovery, the DNC filed a request on October 27, 2016, seeking one category of agreements and understandings, and six areas of "communications." "Communications" was to have the "broadest possible meaning and include without limitation, emails, text messages, written correspondence, and any other form of communication, electronic or written." D.E. 103. The RNC filed its objections the next day, essentially arguing that the DNC's requests would result in voluminous discovery, were improperly seeking competitive intelligence, and would be unduly burdensome in light of the time constraints due to the approaching Election Day. D.E.

---

[1] From the inception of the matter in 1981 through the final modification to the Consent Decree in 2009, the case was overseen by the Honorable Dickinson R. Debevoise, U.S.D.J. Judge Debevoise passed away in August 2015.

EXHIBIT 4
2

107. On October 31, 2016, the Court held another conference call to address discovery. The Court agreed with the RNC that the DNC's broad requests were unworkable in light of the timeframe in which the Court had to render its decision (i.e. before November 8),[2] but did order the RNC to produce affidavits from the person or person(s) with knowledge of the events set forth in the DNC's motion. D.E. 103. After reviewing additional submissions from the DNC, (D.E. 114), the Court ordered additional discovery as to the RNC's purported use of poll observers. D.E. 118.

The RNC filed its opposition brief and exhibits on October 31, 2016, to which the DNC replied on November 3, 2016. The Court then held oral argument the next day, November 4.

## B. Background of the Consent Decree

The original Consent Decree was entered in 1982.[3] The Decree was the result of the settlement of a lawsuit which claimed that, in connection with the 1981 New Jersey Gubernatorial election, the RNC and the New Jersey Republican State Committee attempted to intimidate the minority voters, in violation of the Voting Rights Act, 42 U.S.C. §§ 1971, *et seq. Democratic Nat'l Comm., v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013). Specifically, the RNC sent sample ballots to areas where a large portion of the voters were ethnic minorities, then asked that the name of each voter whose ballot was returned as undeliverable be removed from New

---

[2] The Court denied the DNC's discovery requests without prejudice, D.E. 113 at 2 n.2., permitting the DNC to renew its requests after Election Day when the constrained timeframe would no longer be an issue.

[3] The plaintiffs to the 1982 Consent Decree included, besides the DNC, the New Jersey Democratic State Committee, and Virginia L. Peggins. In addition to the RNC, the defendants were comprised of the New Jersey Republican State Committee, Alex Hurtado, Ronald C. Kaufman, and John A. Kelly.

3

EXHIBIT 4
3

Jersey's voter rolls. *Id.* In addition, in an alleged effort of intimidation, the RNC hired off-duty

law enforcement officers to patrol polling places in minority precincts. *Id.* The officers wore

armbands that read: "National Ballot Security Task Force." and some carried two-way radios

and firearms. *Id.*

The Consent Decree was filed on November 1, 1982. Section Two of the Decree set

forth the activities of the RNC that were required or prohibited by the agreement. Among other

things, the RNC agreed that it would it would "in the future, in all states and territories of the

United States":

> (d) refrain from giving any directions to or permitting their
> employees to campaign within the restricted polling areas or to
> interrogate prospective voters as to their qualifications to vote prior
> to their entry to a polling place:
>
> (e) refrain from undertaking any ballot security activities in polling
> places or election districts where the racial or ethnic composition of
> such districts is a factor in the decision to conduct, or the actual
> conduct of, such activities there and where a purpose or significant
> effect of such activities is to deter qualified voters from voting: and
> the conduct of such activities disproportionately in or directed
> toward districts that have a substantial proportion of racial or ethnic
> populations shall be considered relevant evidence of the existence
> of such a factor and purpose[.]

1982 Consent Decree at ¶ 2(d)-(e).

The DNC and RNC also agreed that they would. "as a first resort, use established

statutory procedures for challenging unqualified voters." *Id.* at ¶ 3. The Consent Decree

recognized that the RNC did not have a "right of control over other state party committees,

county committees, or other national, state and local political organizations of the same party,

and their agents, servants and employees." *Id.* at ¶ 4. Nevertheless, the Decree was binding on

the RNC, and its "agents, servants, and employees, whether acting directly or indirectly through other party committees."[4]  *Id.*

In 1987, it came to light that in the previous year's election in Louisiana, a voter challenge list was compiled by sending letters to African-American voters and recording the names of individuals for whom the letters were undeliverable. *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 580. Discovery uncovered the fact that the RNC's Midwest Political Director had remarked that the voter challenge list could "keep the black vote down considerably." *Id.* (citation omitted). As a result, the DNC and RNC agreed to modify the 1982 Consent Decree. First, both parties recognized "the importance of neither using, nor appearing to use, racial or ethnic criteria in connection with ballot integrity, ballot security or other efforts to prevent or remedy suspected vote fraud[.]"  1987 Modified Consent Decree.  In addition, the Decree was modified to include a definition of "ballot security" and a preclearance provision. *Id.* at ¶¶ A, C.

"'Ballot security' efforts" were expressly defined as "ballot integrity, ballot security or other efforts to prevent or remedy vote fraud." *Id.* at ¶ A.  The RNC was allowed, to the extent permitted by the 1982 consent order, to deploy persons for normal poll functions on election day so long as those deployed did not "use or implement the results of any other ballot security effort[.]" *Id.* at ¶ B.  There was an exception for ballot security efforts that complied with the Decree and the law, and had been precleared by the Court. *Id.* at ¶ C.  Otherwise, the RNC could not engage in, assist with or participate in, any ballot security program unless the program was first determined by the Court to comply with the provisions of the consent order and the

---

[4] *See also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 197 n.2 (3d Cir. 2012) (observing that the "RNC agreed that the RNC, its agents, servants, and employees would be bound by the Decree, 'whether acting directly or indirectly through other party committees.'" (citation omitted)), *cert. denied*, 133 S. Ct. 931 (2013).

EXHIBIT 4

5

applicable law. *Id.* Any preclearance decision by the Court was to be determined following twenty days' notice to the DNC. *Id.*

In 1990, the DNC alleged that the RNC violated the Decree by participating in a program with the North Carolina Republican Party ("NCRP"). *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 581. In an alleged attempt to intimidate voters, the NCRP sent 150,000 postcards to predominantly African-American precincts warning that giving certain false information to an election official was a federal crime. *Id.* In reviewing the DNC's allegations, the Court first determined that the evidence failed to demonstrate that the RNC participated in the NCRP program. *Id.* Nevertheless, the Court determined that the RNC violated the Consent Decree by failing to inform state parties of unlawful practices under the Consent Decree and by failing to provide state committees copies of the Decree. *Id.* The Court further ruled that the RNC had to provide a copy of the Consent Decree or proper guidance (on how to comply with the Decree) to state parties in the future. *Id.*

In 2004, Ebony Malone, an African-American resident of Cleveland, brought an enforcement action pursuant to the Decree. *Id.* at 582. Malone's claim was that the Decree was violated when letters were sent to voters in precincts with a high concentration of minorities and then a voter challenge list was compiled based on letters that were returned as undeliverable. *Id.* Following an evidentiary hearing, the Court barred the RNC from using the list for voter challenges and instructed the RNC to inform its agents in Ohio not to use the list for such purposes. *Id.* at 583. The Court reasoned that the RNC violated the Consent Decree because it failed to receive preclearance for the voter challenge program, the program targeted areas based on the percentage of minorities in those areas, and a consequence of the program was to deter qualified voters from casting ballots. *Id.* Following an emergent application, the Third Circuit

6

EXHIBIT 4
6

Court of Appeals denied the RNC's request for a stay of the order. *Id.* The Third Circuit then granted the RNC's petition for a rehearing *en banc* and stayed the Court's order. *Id.* However, before the rehearing could occur, the matter was dismissed as moot because Ms. Malone cast her ballot without challenge. *Id.* at 583-84.

In 2008, the DNC brought another enforcement action in light of the hiring of private investigators in New Mexico to examine the backgrounds of various voters in preparation for challenging those individuals' right to vote. *Id.* at 581. The Court rejected the challenge, finding that that the RNC had not participated in, or directed, the ballot security program in question although there may have been misconduct by the New Mexico Republican Party. *Id.* at 582.

The RNC then moved to vacate or, alternately, modify the Consent Decree. *Id.* at 578. Pursuant to Fed. R. Civ. P. 60(b)(5), and following a full evidentiary hearing, the Court declined to vacate the Decree but did agree that modifications were in order. In doing so, the Court carefully reviewed three different types of voter fraud: voter registration fraud, absentee ballot fraud, and in-person fraud. *Id.* at 603. The Court explained that voter registration fraud concerned an individual registering under a false or fictitious name, in-person fraud applied to persons actually casting ballots when they were not legally permitted to do so, and absentee ballot fraud involved the submission of such ballots by a person other than the person qualified to do so. *Id.* Absentee ballot fraud, the Court found, was not readily addressable by pre-election remedies (due to the inability to personally observe the voters casting their absentee ballots) and that the Consent Decree did not prevent the RNC from reporting suspected cases to the appropriate election officials. *Id.* at 603-04.

The Court likewise observed that voter registration fraud normally only occurred in the context of mailing a registration card to the appropriate state agency. *Id.* at 604. Although the

7

EXHIBIT 4

7

RNC was unable to cite to even one instance of such fraud, the Court recognized that the RNC still had a legitimate interest in ensuring that such fraud did not occur. *Id.* As a result, the Court reduced the preclearance period from twenty to ten days to account for states that permitted registration up to ten days before an election. *Id.* at 604-05.

The Court next turned to in-person fraud, finding that such cases were "extremely rare." *Id.* at 606. In support, the Court pointed to both the majority opinion and dissent in *Crawford v. Marion Cty. Election Bd.*, 128 S. Ct. 1610,[5] 1611 (2008), which involved a challenge to Indiana's requirement that voters prove their eligibility through the production of government-issued photographic identification. *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 608. In short, although the Supreme Court was deeply divided as to the proper outcome, all Justices agreed that there was not even one example of in-person voter fraud in the history of Indiana. *Id.* (citing *Crawford*, 128 S. Ct at 1619 (majority opinion); 128 S. Ct. at 1637 (Souter, J., Dissenting)). The Court concluded that, in the balance, the threat of voter intimidation posed a far greater and real threat to disenfranchising legitimate voters when compared to in-person fraud. *Id.* at 610-13. One example of the scope of the threat of disenfranchisement, pointed to by the Court, was the 2004 case involving Ms. Malone in which the voter challenge list included 35,000 predominately minority persons. *Id.* at 610.

Following its analysis, the Court agreed that modifications to the Consent Decree were appropriate, including the following: (1) only the parties to the Decree could bring an action to redress a violation of the agreement; (2) a reduction in the preclearance period from twenty to ten days; (3) a better definition of "ballot security"; (4) a definition of "normal poll-watch function";

---

[5] The United States Reports citation for *Crawford* is 553 U.S. 181. The Court is citing *Crawford* as Judge Debevoise did before the United States Reports citation was available.

8

EXHIBIT 4
8

and (5) a definitive expiration date of December 17, 2017, unless the DNC proved in the interim

that the RNC violated the Decree, in which case the Decree would be extended an additional

eight years. *Id.* at 622-23.

The term "ballot security" is defined in the 2009 modification as follows:

> (3) . . . any program aimed at combatting voter fraud by preventing
> potential voters from registering to vote or casting a ballot. Such
> programs include, but are not limited to,[6] the compilation of voter
> challenge lists by use of mailing or reviewing databases maintained
> by state agencies such as motor vehicle records, social security
> records, change of address forms, and voter lists assembled pursuant
> to the HAVA[7]; the use of challengers to confront potential voters
> and verify their eligibility at the polls on either Election Day or a
> day on which they may take advantage of state early voting
> procedures; the recording by photographic or other means of voter
> likenesses or vehicles at any polling place; and the distribution of
> literature informing individuals at or near a polling place that voter
> fraud is a crime or detailing the penalties under any state or federal
> statute for impermissibly casting a ballot.

*Id.* "Normal poll watch function" is defined as:

> (4) . . . stationing individuals at polling stations to observe the voting
> process and report irregularities *unrelated to voter fraud* to duly-
> appointed state officials. Such observers may report any disturbance
> that they reasonably believe might deter eligible voters from casting
> their ballots, including malfunctioning voting machines, long lines,
> or understaffing at polling places. *Such observers may not question
> voters about their credentials; impede or delay voters by asking for
> identification, videotape, photograph, or otherwise make visual
> records of voters or their vehicles; or issue literature outlining the
> fact that voter fraud is a crime or detailing the penalties under any
> state or federal statute for impermissibly casting a ballot.*

*Id.* (emphases added).

---

[6] In addition to the unambiguous language used in defining ballot security and normal poll-watch function, the Third Circuit has made clear that the examples used are "non-exhaustive" lists. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 201 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013).

[7] HAVA is an acronym for the Help America Vote Act of 2002, 42 U.S.C. §§ 15301 *et seq.*

On appeal, the Third Circuit upheld the decision. *Democratic Nat'l Comm.*, 673 F.3d 192. The Third Circuit first observed that the "central purpose" of the Consent Decree was to prevent "the intimidation and suppression of minority voters." *Id.* at 203; *see also id.* at 207, 209. Judge Greenaway, writing for the court, further noted that since the inception of the preclearance provision in 1987, the RNC has "never submitted any voter fraud prevention program for preclearance." *Id.* at 212; *see also id.* at 215. The Court of Appeals then indicated that the Decree was intended to address in-person voter fraud, which was a rare occurrence that the RNC could nevertheless address, so long as it abided by the preclearance provision. *Id.* at 212-13. Finally, as to the proximity of actions concerning the Consent Decree to elections, the Third Circuit noted the following:

> The nature and timing of election cycles may cause the need to defend against Decree enforcement suits to arise at inconvenient times, *but resolving those issue before Election Day is crucial to enforcing the Decree by ensuring access to the polls and preventing suppression of minority votes.*

*Id.* at 215 (emphasis added).

### C. Positions of the Parties

**The DNC's Motion**

The DNC's position is essentially that the campaign of Donald J. Trump, the Republican candidate for President (the "Trump Campaign") has encouraged action that would violate the Consent Decree. The RNC in turn breached the Decree through its general support of the Trump Campaign and its specific assistance to the campaign regarding voter fraud, according to the DNC. Moreover, the DNC alleges that certain persons who are both members of the RNC and state parties have promised action that would violate the Decree.

10

EXHIBIT 4
10

As to the Trump Campaign, the DNC claims that the campaign, including the candidate himself, has directed his supporters to engage in voter intimidation. DNC Br. at 5.[8] As to the candidate, the DNC indicates that on October 11, 2016, Mr. Trump told a crowd in Pennsylvania that it is "[s]o important to watch other communities because we don't want this election stolen from us . . . . And everybody knows what I'm talking about." *Id.* at 6, DNC Ex. 3. The DNC claims that Mr. Trump was referring specifically to Philadelphia, with a focus on African-American sections of the city. *Id.* The DNC indicates that Trump advisers have made similar public pronouncements. For example, former New York City Mayor Rudolph Giuliani reportedly indicated on October 16, 2016, that voter fraud is concentrated in "inner cities" such as Philadelphia and Chicago; areas in which supporters back Democrats according to Mr. Giuliani. DNC Br. at 6, DCR Ex. 23. The DNC points to a posting on the Trump Campaign's website titled "Trump Election Observers," as well as the website StopTheSteal.org, as further evidence that the Trump Campaign is intent on voter suppression efforts. DNC Br. at 6-7. StopTheSteal.org is supposedly run by Roger Stone, an alleged advisor to Mr. Trump who was also involved in the 1981 New Jersey Gubernatorial campaign that led to the Consent Decree in the first instance. DNC Br. at 7, DNC Exs. 8 & 9, DNC Elias Ex. 1.

The DNC additionally cites press reports and social media posts which indicate that certain supporters of Mr. Trump have interpreted the Trump Campaign's statements as a call to engage in voter intimidation. For example, one gentleman from Ohio indicated that he was

---

[8] The DNC's initial brief in this matter will be referred to as "DNC Br." The supporting exhibits to the brief, attached to a certification of Angelo Genova, Esq., will be referred to as "DNC Ex." except for those submitted by Marc Elias, Esq., which will be referred to as DNC Elias Ex." The RNC's opposition brief will be referred to as "RNC Br." and its exhibits will be referred to as "RNC Ex." The DNC's reply brief and its exhibits, attached to the certification of Mr. Genova, will be referred to as "DNC RBr." and "DNC REx.", respectively.

EXHIBIT 4
11

planning on going to voting precincts to engage in "racial profiling" to make those voters "a little bit nervous." DNC Br. at 10, DNC Ex. 11. Another man posted on Twitter that he was going to be watching for "shenanigans" and "haul [] away" certain voters. DNC Br. at 10, DNC Ex. 12. The tweet included a picture of a pickup truck with a cage built into the bed. *Id.*

The DNC also asserts that the claim of widespread voter fraud is actually a myth that has been debunked. DNC Br. at 7-8 (citing Lorraine C. Minnite, *The Myth of Voter Fraud* (2010)). The DNC further points to decisions in which courts have ruled, in regard to the state in which the action is brought, that voter fraud is extremely rare and normally used as a pretext for voter intimidation. DNC Br. at 8-9 (citing *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH) (D.N.D. Aug. 1, 2016) (North Dakota); *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222 at *2 (W.D. Wis. July 29, 2016) (Wisconsin); *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251 at *28 (S.D. Ohio June 7, 2016) (Ohio)).

As to the RNC's involvement, the DNC makes four arguments: (1) the RNC believes that voter fraud is real; (2) the RNC is working with the Trump Campaign in lock-step; (3) high-level officials in the Trump Campaign indicated that they are working with the RNC as to ballot security; and (4) certain state political officers (who are also members of the RNC) indicated that they will combat perceived voter fraud. DNC Br. at 10-14. As to the RNC's position on voter fraud, the DNC points to the 2012 comments by the RNC's Chairman Reince Priebus which indicated that Republican candidates needed to be one to two percentage points better to offset voter fraud. DNC Br. at 9, DNC Ex. 29. More recently, on October 23, 2016, Mr. Priebus apparently stated on the television news program *Face the Nation* that voter fraud "is real." DNC Br. at 10, DNC Ex. 24.

EXHIBIT 4
12

Concerning the RNC's general synchronization with the Trump Campaign, the DNC again cites to Mr. Priebus' comments. In October 2016, Mr. Priebus reportedly stated that the RNC is "in full coordination" with the Trump Campaign and that the RNC "remain(s) very much involved and together [with the Trump Campaign] in all levels in making these decisions of how best to run the operation across the country." DNC Br. at 12, DNC Ex. 14. The DNC also points to the joint fundraising committee between the RNC and the Trump Campaign and additionally argues that the RNC has commingled its staff and resources with the campaign. DNC Br. at 11-12.

Regarding the RNC's specific coordination with the Trump Campaign on ballot security initiatives, the DNC points to comments made by Vice Presidential candidate Michael Pence during a rally on August 3, 2016. DNC Br. at 11. In response to a question concerning the Democratic Presidential nominee Hillary Clinton "stealing" the election, Governor Pence reportedly indicated that the Trump Campaign and the RNC were working "very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *Id.* (citing *8-3 Replay: Pence Denver Rally Town Hall,* TrumpTube.tv). In further support of its position, the DNC notes that the Trump Campaign manager, Kellyanne Conway, allegedly stated that the RNC and the campaign (along with others) were working together to "monitor precincts" throughout the United States. DNC Br. at 12, DNC Ex. 15.

The DNC contends, moreover, that the Consent Decree is being violated because two members of the RNC, who are also the heads of their respective state party committees, publicly indicated that they are initiating voter fraud programs. The first is Rob Gleason, the chair of the Pennsylvania Republican Party, and the second is Ronna Romney McDaniel, the chair of the Michigan Republican Party. DNC Br. at 13-14. Mr. Gleason reportedly initiated efforts to

13

EXHIBIT 4
13

recruit poll watchers to work in Philadelphia. DNC Br. at 13. DNC Exs. 17 & 18. Ms. Romney McDaniel has apparently announced a "massive statewide anti-voter fraud effort" in Michigan. DNC Br. at 14. DNC Ex. 5.

In light of the foregoing, the DNC contends that the RNC is violating several provisions of the Decree. DNC Br. at 15. First, the DNC claims that the RNC has not sought preclearance, as required by the Consent Decree, for any of the stated voter fraud efforts. *Id.* The DNC next argues that the Decree has been breached because the voter fraud efforts target areas based on the racial and ethnic composition of the relevant population. *Id.* Finally, the DNC asserts that the proposed measures have the effect of deterring qualified persons from voting, thereby running afoul of the Decree. *Id.*

### The RNC's Opposition

The RNC responds that it is in compliance with the Consent Decree and that the DNC's arguments lack merit. *See* RNC Br. First and foremost, the RNC contends that it has not "organized, participated in, or supported any vote fraud prevention program or ballot security activities." RNC Br. at 9. In support of its position, the RNC submitted the declarations of its Political Director, Chris Carr, and six Regional Political Directors. RNC Exs. B – H. Mr. Carr states that he received training as to the Consent Decree, that those working for the RNC are aware of the Decree, and that he is unaware of any activities that would violate the Decree. RNC Ex. B. All six of the regional directors make declarations in accord with Mr. Carr. RNC Exs. C – H.

The most detailed description of the RNC's efforts in connection with the Decree is found in the Declaration of John R. Phillippe Jr., the Chief Counsel of the RNC. RNC Ex. A. Mr. Phillippe notes that the RNC has 168 voting members, including the chairperson of each

state Republican party. *Id.* ¶ 8. Mr. Trump has never been a member of the RNC, according to Mr. Phillippe. *Id.* at ¶ 9.

Mr. Phillippe indicates that he is "responsible for training all RNC personnel on compliance with the Consent Decree." *Id.* ¶ 5. Mr. Phillippe sets forth the steps that he has taken to educate RNC representatives. Among other things, Mr. Phillippe states that the RNC has done the following: (1) May 2016 – the RNC's Counsel Office provided a legal compliance guide, which included information on the Decree, to "all of the RNC's division heads, state party executive directors, and state party chairmen," *id.* ¶ 16 & A-07; (2) June 5, 2015 to April 15, 2016 – the RNC conducted a total of five sessions at its "Campaign Management College" for staff from state parties and various campaigns on "the parameters and restrictions imposed on the RNC by the Consent Decree[,]" *id.* ¶ 17; (3) July 22, 2016 – the RNC provided an orientation for new members, which included a briefing on the Decree, *id.* ¶ 18 & A-08; (4) August 19, 2016 – the RNC's Counsel's Office sent a memorandum to all RNC staff indicating that the RNC would not engage in any ballot security efforts nor provide any resources for such activities, *id.* ¶ 19 & A-09; (5) September 22, 2016 and October 17, 2016 – the RNC Counsel's Office sent guidance to RNC staff, independent contractors, and volunteers as to the parameters of the Decree, *id.* ¶¶ 20-22 & A-10 – A12;[9] and (6) October 2016 – webinar training on the Consent Decree for all RNC political staff and independent contractors, *id.* ¶ 24 & A-14.

Of note, several of the documents attached to Mr. Phillippe's declaration indicate that the RNC was not, and would not be, participating in any poll watching functions. *See id.* & A-10,

_____

[9] The October 17, 2016 memorandum to "all staff and independent contractors" reviewed the requirements of the Consent Decree. *Id.* ¶ 22. The recipients were required to sign and return an "affirmation form" indicating that they read the memorandum and would abide by it. *Id.* According to Mr. Phillippe, over 400 recipients did so, which Mr. Phillippe characterizes as the "vast majority" of the recipients. *Id.*

A-11, A-12, A-13. Yet, according to the information submitted by the DNC, the RNC is currently engaging poll observers. D.E. 114-1 – 114-3. This information is discussed further below.

Mr. Phillippe also recounts that on October 19, 2016, John Ryder, the RNC's General Counsel, sent an email to all 168 members that reminded the recipients that they could not use RNC resources for any activities prohibited by the Decree. *Id.* ¶ 23 & A-13. Mr. Ryder also encouraged members not to engage in any ballot security activities in any other capacity, for example, as a state party official, but warned that if the members did so, they were not acting as agents of the RNC. *Id.*

Moreover, Mr. Phillippe attests that once he learned that Mr. Trump was "likely to emphasize voter fraud in his campaign," Mr. Phillippe enhanced his training vis-à-vis the Decree. *Id.* ¶ 5. In addition, he wrote an August 13, 2016 letter to counsel for the Trump Campaign advising that the RNC strictly complies with the Consent Decree and would not engage in any ballot security actions. *Id.* ¶ 27 & A-15. The letter also warned that the Trump Campaign was not an agent for the RNC regarding any ballot security initiatives. *Id.*

The RNC submits that the foregoing efforts, as reflected in Mr. Phillippe's declaration and supporting exhibits, demonstrate that it has "taken abundant measures to ensure good faith compliance with the Consent Decree." RNC Br. at 14. In support, the RNC asserts that it educated the necessary RNC representatives as to the Decree and its contours, took prophylactic measures to ensure compliance, expressly and proactively informed the Trump Campaign that it will not partake in any voter fraud measures, and monitored compliance with the Decree. *Id.*

The RNC further decries the evidence submitted by the DNC, arguing that the press accounts relied upon "contain double and triple hearsay, and are inadmissible and not probative." *Id.* at 14-15. The RNC asserts that the DNC cannot point to any current, specific prohibited

activities. *Id.* at 15. The RNC stresses that neither Mr. Trump, his campaign, nor his supporters are subject to the Consent Decree. *Id.* at 15-17. Mr. Trump, the RNC continues, is not a member of the RNC and has never been authorized to act on behalf of the RNC. *Id.* at 16.

Regarding the joint fundraising committee with Mr. Trump, the RNC responds that it is merely a vehicle by which both can collectively raise money. *Id.* at 18. Importantly, according to the RNC, each entity receives and gains full control over its share of the proceeds without obligation to spend the funds in a certain manner. *Id.* at 18-19. The RNC also denies that it is sharing any staff or resources with the Trump Campaign vis-à-vis voter fraud efforts and points out that the DNC provided no evidence to the contrary. *Id.* at 19.

As to Mr. Priebus' comment that the RNC is in "full coordination" with the Trump Campaign, the RNC asserts that is merely evidence of politics rather than misconduct. *Id.* at 19. As to the other comments alleged, the RNC claims that Kellyanne Conway's comments were triple hearsay from a media article. *Id.* at 20. Moreover, the RNC continues, the DNC failed to indicate that the same article stated that the reporter to whom Ms. Conway made the comments also indicated that Ms. Conway later said that she had been mistaken. *Id.* at 21. Regarding Governor Pence's statement concerning "ballot integrity," the RNC asserts that it was a spontaneous remark in response to an audience question, it was mischaracterized by the DNC, and that, in any event, Governor Pence was simply mistaken if he was referring to voter fraud efforts with the RNC. *Id.* Turning to the statements made by the state party chairs in Pennsylvania and Michigan, the RNC represents that such activities are permissible so long as the chairs are acting in their state party capacity as opposed to as an RNC member. *Id.* at 22-23. In support, the RNC argues that the Supreme Court of the United States has made clear that persons may assume different "hats," such as being a national party official while also occupying

17

EXHIBIT 4
17

a position within the state party. *Id.* (citing *McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 139, 157 (2003), *partially overruled on other grounds, Citizens United v. Fed. Election Comm'n,* 558 U.S. 310 (2010)).

The RNC concludes that the DNC fails to establish its right to any of the relief sought. *Id.* at 23-26.

## The DNC's Declarations

After the RNC filed its opposition, the DNC supplemented the record with declarations from three Democratic poll observers. D.E. 114-1 – 114-3. The three Democratic observers consisted of a retired Assistant United States Attorney, an engineering and tech consultant, and an attorney who also serves as a judge *pro tem. Id.* The three indicated that they were assigned to observe early voting in two locations within Nevada at the end of October 2016. *Id.* Republican poll observers, from the RNC, also worked at the same time as the Democratic observers. *Id.* The first Democratic poll observer declared that the Republican observer, K.H., showed her an email indicating that K.H. was not obligated to tell anyone that she was working for the Republicans. D.E. 114-1 at 3. K.H. further noted that she had been trained on poll monitoring rules, and the Democratic watcher saw K.H. take copious notes and fill out an election incident report. *Id.* at 2-3. The two other Democratic observers indicated that their Republican counterparts, O.P. and K.H. again, initially stated that they were "Independent" poll observers before finally admitting that they worked for the RNC. D.E. 114-2 & 114-3. K.H. also reportedly said that she was told to lie about whom she worked for. D.E. 114. In addition,

the two observers also worked with additional Republican observers, C. and J.,[10] who stated that they too worked for the RNC.  *Id.*

The DNC then submitted three additional declarations from Democratic poll watchers. D.E. 122-1 – 122-3.  The poll watchers consisted of two lawyers and a consultant.  *Id.*  The three observers also worked in Nevada at the end of October 2016, in connection with early voting. *Id.*  The first Democratic observer identified a Republican observer, O.,[11] who indicated that the O. gave wrong information to a potential voter concerning voting by paper ballot.  D.E. 122-1 ¶¶ 4-5.  The Democratic observer was also informed that O. provided erroneous information concerning where a person could vote early.  *Id.* ¶ 6.  The second Democratic observer attested that O.P. twice gave voters wrong directions – once concerning a voting location and once regarding voter identification.  D.E. 122-3 ¶¶ 4-5.  The final Democratic observer noted that she worked with a Republican poll observer, B., who admitted that the RNC -- as opposed to the Trump Campaign -- was running the poll watching operations.  D.E. 122-2.  As noted, the information from all six Democratic observers conflicts with the RNC's claim that it is not involved in any poll watching functions.

**The RNC's Discovery**

In response to the Court's discovery orders, the RNC produced three declarations on November 2, 2016 and five additional declarations the following day.  The November 2 production was comprised of declarations of Mr. Phillippe, Ronna Romney McDaniel, and Robert A. Gleason, Jr., as well as attached exhibits.  D.E. 120 – 120-3,

---

[10] C. and J. are the initials for the observers first names as the declarants did not indicate surnames for either.  The same is true for any other observer who is identified by a single letter.

[11] Due to the unique nature of O.'s name, the Court assumes that she is O.P.

19

EXHIBIT 4
19

Mr. Phillippe addressed whether the RNC had any agreements with the Trump Campaign concerning voter fraud, the press statements reportedly made by Governor Pence and Ms. Conway, and remarks by Ms. Romney McDaniel and Mr. Gleason. D.E. 120-1. As to the agreements, Mr. Phillippe attested that none had been located and, to his knowledge, none existed. In completing his due diligence, Mr. Phillippe spoke to each RNC official who had authority to enter into contracts, certain high-ranking members of the RNC's Political Division, and the general counsel of the Trump Campaign. *Id.* ¶¶ 6-7, 9. Mr. Phillippe also performed a search of the RNC's electronic and hard copy files for any such agreements, but none were found. *Id.* ¶ 8.

Turning to Governor Pence and Ms. Conway, Mr. Phillippe personally spoke with each and both indicated that they had no knowledge of any involvement between the RNC and the Trump Campaign as to ballot integrity or poll monitoring activities. *Id.* ¶¶ 12 – 15. As to Ms. Romney McDaniel and Mr. Gleason, Mr. Phillippe contacted counsel for both the Pennsylvania and Michigan Republican Parties. *Id.* ¶¶ 18 – 19. Counsel for each state indicated that the RNC has no involvement in the state committee's poll watching efforts. *Id.*

Ms. Romney McDaniel's declaration indicated that she is the Chairwoman of the Republican Party of Michigan and, by virtue of that position, a member of the RNC. D.E. 120-2 ¶ 2. Ms. Romney McDaniel acknowledged that the state party is engaged in poll watching and ballot security efforts but said that all funding, materials, and training come from the state party, rather than the RNC. *Id.* ¶ 3. Ms. Romney McDaniel stated that the RNC is not involved in the state committee's efforts. *Id.* Mr. Gleason, the Chairman of the Republican Party of Pennsylvania and also a member of the RNC, made attestations similar to those of Ms. Romney

McDaniel. Specifically, to the extent that the state committee is engaged in poll watching activities, Mr. Gleason stated that the RNC is not involved. D.E. 120-3 ¶¶ 5 – 6.

Pursuant to the Court's November 2, 2016 discovery order, and in response to the six declarations of the Democratic poll observers, the RNC submitted five declarations, along with exhibits, on November 3, 2016. D.E. 128 – 128-5. The declarations were from Mr. Phillippe; Peter Graves, the RNC's Regional Political Director in the region covering Nevada; Matt Pinnell, the State Party Director for the RNC; Robert Talbot, the Nevada State Director for the RNC; and Holly Turner, a partner with Stampede Consulting, LLC ("Stampede"). *Id.*

Mr. Phillippe said that it "stood out" to him that the DNC has many attorneys working as poll observers in a particular areas of Nevada. D.E. 128-1 ¶ 9. Mr. Phillippe believes that the Democratic observers are aware of the Decree and are questioning other poll workers in an attempt to find an association with the RNC. *Id.* Mr. Phillippe further attested that his due diligence, including an electronic search of the RNC's emails, failed to reveal any names matching K.H., O.P. or C.[12] *Id.* ¶¶ 11-14. As to Stampede, Mr. Phillippe confirmed that the RNC has contracted with the consulting firm but solely for get-out-the-vote activities limited to a different state in another part of the country. *Id.* ¶ 15. Mr. Phillippe also opined that, in his experience, it is not uncommon for individuals who work or volunteer for a political organization to be confused as to the nature of the organization with whom they are working. *Id.* ¶ 17.

Mr. Graves, Mr. Pinnell, and Mr. Talbot confirmed that the RNC has no poll watching activities underway in Nevada. D.E. 128-2 ¶ 5, D.E. 128-3 ¶ 5, D.E. 128-4 ¶ 7. Ms. Turner acknowledged that Stampede is undertaking poll-watching in Nevada but not in conjunction with

---

[12] Since neither the DNC or RNC knew C.'s last name, the RNC searched for a person named C.S. based on her first name. Ms. Turner's declaration refers to the same C.S.

the RNC.  D.E. 128-5, ⁋⁋ 7-8.  Ms. Turner added that both K.H. and C.S. are employed with

Stampede.  *Id.* ⁋⁋ 8-12.  Ms. Turner could not locate anyone named O.P., B., or J. working for

Stampede.  *Id.* ⁋ 13.

### The DNC's Reply

The DNC replies that its evidence clearly shows that the RNC is involved in ballot

security efforts prohibited by the Consent Decree.  DNC RBr. at 2.  The DNC first notes that five

separate poll workers in Nevada indicated that they are working for the RNC.  *Id.*  The DNC

further claims that while Stampede denies working for the RNC in Nevada, the RNC admits that

Stampede is working for it in some capacity as a contractor.  *Id.  See also* RNC REx. 1 (October

18, 2016 FEC filing by the RNC reflecting that has paid Stampede a total of $1,305,000).

According to the DNC, the RNC's use of Stampede as a contractor establishes a violation of the

Decree, assuming that K.H. and C. are actually working for Stampede rather than the RNC.

DNC Br. at 2-3.

In further support, the DNC again points to the statements of Governor Pence, Ms.

Conway, and Mr. Priebus.  *Id.* at 2-3.  The DNC emphasizes the high rank of each in either the

Trump Campaign or the RNC, and indicates that it is highly unlikely that all three are actually

"mistaken."  *Id.*  The DNC also points to new evidence, that of a high-ranking officer of the

Republican Party of Virginia, who during a poll-watching training session referred to the

involvement of the RNC only to immediately correct himself, reportedly to laughter in the

crowd.  *Id.* at 4, DNC REx. 2.  The DNC claims that another "mistaken" reference to the RNC's

involvement is simply not plausible.  DNC RBr. At 4.

The DNC also argues that the Trump Campaign is acting as an agent of the RNC because

the RNC is running the campaign's ground game and supplying it with voter data.  DNC RBr. at

22

EXHIBIT 4
22

5, DNC REx. 3.  At a minimum, according to the DNC, the Trump Campaign is an agent of the RNC through either apparent authority or authority by estoppel.  DNC RBr. At 7.  As to the state chairs of Pennsylvania and Michigan, the DNC claims that they are bound by the Decree since both are also RNC members.  *Id.* at 7-9.  The DNC also points to a memorandum from counsel for the RNC to all political staff and independent contractors indicating that they can never remove their RNC "hat" regardless of whether they are working in another capacity.  *Id.* at 9.

## II. ANALYSIS

Consent decrees are generally interpreted pursuant to principles of contract construction.  "[C]onsent decrees are judicial acts, [which] have many of the attributes of contracts voluntarily undertaken and are construed according to traditional precepts of contract construction."  *Fox v. U.S. Dep't of Hous. & Urban Dev.*, 680 F.2d 315, 319 (3d Cir. 1982) (internal citations omitted); *see also Miles v. Aramark Corr. Serv., Inc.*, 321 F. App'x 188, 191 (3d Cir. 2009) ("Consent decrees are analogous to contracts, and thus we interpret them with reference to traditional principles of contract interpretation." (internal quotation marks omitted)).  Courts "discern the scope of a consent decree by examining the language within its four corners."  *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998).  A court's "first task in interpreting a consent decree . . . is to determine whether its terms unambiguously cover the dispute in question."  *United States v. State of New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999).  "In so doing, [the judge] must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with [the Court's] own conception of its purpose."  *Harris*, 137 F.3d at 212.  Thus, "[t]he parties are bound by the 'objective definition of the words they use to express their intent.'"  *United States v. State of New Jersey*, 194 F.3d at 430.  The Court will only look to extrinsic

23

EXHIBIT 4
23

evidence in interpreting a consent decree when a term is ambiguous, in other words, when "it is reasonably susceptible to at least two different interpretations." *Id.*

At the outset, it is important to emphasize that the Trump Campaign is not subject to the Consent Decree unless it acted as an agent or representative of the RNC. The DNC clarified in its reply brief and at oral argument that it was advocating two positions in this regard: first, that the Trump Campaign was an agent of the RNC, and, second, that the RNC was acting in concert with the Trump Campaign. As to the agency claim, the Court finds that the DNC has submitted insufficient evidence to support its position.   In addition, the RNC produced documentary evidence from its counsel's office to the general counsel for the Trump Campaign which indicated that the campaign was not an agent of the RNC vis-à-vis ballot security measures. The Court views the actual issue in this case as whether the RNC is working in concert with the Trump Campaign on voter fraud programs. The question is not whether the RNC is working with the Trump Campaign on other campaign strategy and events? They clearly are. Instead, the primary inquiry is whether the campaign and the RNC are operating together in a manner that would violate the Decree. Of course, the RNC's overall relationship with the Trump Campaign may be relevant as to whether they are coordinating on ballot security measures.

For this reason, comments by persons within the Trump Campaign are relevant to the Court's analysis. The Trump Campaign has clearly emphasized voter fraud efforts. Mr. Trump himself has publicly encouraged his supporters to actively fight voter fraud. If the RNC acted in concert with the Trump Campaign on these activities, the RNC would be in violation of the Consent Decree for a number of reasons, chief among them being that the RNC did not seek preclearance of such efforts. The DNC also submitted evidence indicating that at least certain supporters of the Trump Campaign have interpreted the campaign's remarks to take action in a

24

EXHIBIT 4
24

manner that would violate the Decree, whether it be engaging in racial profiling, making potential voters nervous, or hauling voters away in a cage attached to a pickup truck.[13]

As a result, the Court disagrees with the RNC's claims that Mr. Priebus, Governor Pence, and Ms. Conway's statements are not probative. In addition, as the head of the RNC, Mr. Priebus' statements are not hearsay. *See* F.R.E. 801(d)(2). The statements are also important because of the stature of the speakers – the Vice Presidential candidate, the lead manager of the Trump Campaign, and the head of the RNC. While the RNC argues that such higher-ups may naturally be mistaken because they are removed from the granular details of the day-to-day operations of the campaign, the Court finds this explanation lacking. The Trump Campaign has made combatting voter fraud a central issue, and it is implausible to believe that such high level personnel are unaware of this call to action and any corresponding plans to implement it.

Governor Pence stated that the RNC and the Trump Campaign are working with state committees on "ballot integrity." The RNC's own internal guidance acknowledges that such a term implicates the Consent Decree. *See* RNC Ex. A ¶ 20 & A-10 at 2 ("You may have heard [that] the Consent Decree prohibits the RNC from participating in Election Day Operations (or "EDO"), 'ballot security', or '*ballot integrity*' activities. Whatever the name given to such

---

[13] The Court notes that, unfortunately, such calls for uninformed, vigilante enforcement of voting laws carries with it the very real possibility of subjecting the adherents to legal violations. Among other laws, the Voting Rights Act provides, in part, that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]" 52 U.S.C. § 10307(b). From the evidence submitted by the DNC, it appears that some individuals who plan on "watching" polls in "certain areas" are not even aware of the law or its contours. Moreover, such broad calls to action, without specific training as to what is legally permissible, creates untrained watchers with no credible guidance. What are they to watch for? Who are they to watch? Where are they to watch? How are they to act when watching? What action are they to take? What action are they to refrain from? To whom are they supposed to report? What is legally permissible? What is unlawful? Without specific guidance, the "watchers" are left to answer these critical questions for themselves.

EXHIBIT 4
25

programs, *RNC employees, consultants, and volunteers are strictly prohibited from engaging them.*" (emphases added)).

Ms. Conway's statements were somewhat different. She said that the RNC and the Trump Campaign were working together on precinct monitoring. Such monitoring could implicate the Decree if it involved a ballot security or had a voter fraud component. However, such monitoring could also be entirely permissible if it was comprised solely of normal poll watching functions.

As to Mr. Priebus, he publicly stated in October 2016 that the RNC and the Trump Campaign were working in "full coordination [with the RNC]" at "all levels." The RNC dismisses this statement as mere politicking at a time in which the RNC's commitment to the campaign was being questioned. The RNC may be correct. Yet, if taken literally, such a claim could also indicate that the RNC and Trump Campaign are working in lock-step on all matters, including ballot security initiatives. Mr. Priebus' statement also came *after* Governor Pence's comments concerning ballot integrity. Adding to the mix is Mr. Priebus' statement later in October 2016 that voter fraud "is real." The Court cannot overlook the fact that Mr. Priebus is the Chairman of the RNC. In light of the Consent Decree's prohibitions, the Court finds the foregoing statements probative, both individually and collectively.

However, the critical issue remains whether the RNC has in fact acted in coordination with the Trump Campaign to prevent voter fraud in light of the statements. Putting aside the activity in Nevada, which is discussed separately below, the DNC has been unable to demonstrate such coordination. The Court realizes that given the timing of the motion and

Election Day. only limited discovery was permitted.[14]  However, the discovery thus far produced by the RNC reflects that it is not working with the Trump Campaign on ballot security measures. First, no agreements between the two exist as to voter fraud efforts.  In addition, the RNC's Chief Counsel, Mr. Phillippe, personally confirmed with Governor Pence and Ms. Conway that neither were aware of any activities with the RNC pertaining to ballot integrity.  Further, the RNC's counsel informed the Trump Campaign that it will not engage in any such efforts on Election Day.  Moreover, Mr. Phillippe set forth in great detail, with corresponding exhibits, his efforts to continually educate representatives of the RNC as to the Decree and its prohibitions. The Court is aware that recipients of sound legal advice do not always follow the given advice, but it does appear that Mr. Phillippe has undertaken extensive efforts to ensure that the RNC does not violate the Consent Decree.

The DNC also points to the actions of the RNC members. Ms. Romney McDaniel and Mr. Gleason, who are also the state party chairs of their respective states.  To be clear, if Ms. Romney McDaniel or Mr. Gleason were engaging in the reported activity on behalf of the RNC, the RNC would be in violation of the Decree because Michigan and Pennsylvania's voter fraud measures received no preclearance approval.  Moreover, the press accounts indicate that the Pennsylvania effort is focused on Philadelphia, at least in part, due to its racial and ethnic make-

---

[14] Due to the limited discovery, and as is discussed further below, the Court is permitting the DNC to return after Election Day to seek additional discovery.  For example, the DNC posits that if Mr. Priebus advised the Trump Campaign on ballot security efforts, then the RNC would be in violation of the Consent Decree.  This is a fair point.  However, based on the evidence currently before the Court, Mr. Priebus merely stated that he was aware of the Trump Campaign's position on voter fraud.  Mr. Priebus did not add that he was also advising the campaign how to stop such perceived fraud.  That being said, the DNC may be permitted to take additional discovery after Election Day on this issue among others.

EXHIBIT 4
27

up. However, the crucial issue is whether either state director is also acting in his/her capacity as RNC members.

The Court finds, as a matter of law, that neither Ms. Romney McDaniel nor Mr. Gleason are subject to the Consent Decree if they are acting solely in their capacity as state party chairs. The Court notes that the 1982 Consent Decree stated that it was binding on the RNC, and its "agents, servants, and employees, whether acting directly or indirectly through other party committees." *Id.* At first glance, this sentence appears to support the DNC's reading because Ms. Romney McDaniel or Mr. Gleason could be acting as agents of the RNC through their positions in their state committees.

However, the provision is immediately followed by a recognition that the RNC did not have a "right of control over other state party committees, county committees, or other national, state and local political organizations of the same party, and their agents, servants and employees." *Id.* at ¶ 4. All state party chairs are, by virtue of their position, automatically members of the RNC. Thus, the practical effect of the DNC's argument, if accepted, would be that all state party committees are bound by the Consent Decree due their chairs being RNC members. This conclusion would mean that the express acknowledgement that the RNC had no right of control over other "state party committees" would be, at best, meaningless, and at worst, misleading. *See Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) (noting that "a contract should be read so as to give meaning to all of its terms" and "a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions" (internal quotation marks omitted)). Moreover, at the time of the 1982 Decree, only the New Jersey state committee was a party and bound by its parameters. No other state committee has since been added to the Decree.

28

EXHIBIT 4
28

Importantly, the fact that one state committee was bound also supports the conclusion that by using the word "other" to modify state committees, the Consent Decree meant no state committees other than New Jersey.

Notably, Judge Debevoise, who oversaw the Decree from its inception through its 2009 modification, *see* note 1, never interpreted the agreement in the manner proposed by the DNC. First, in 1990, Judge Debevoise found that the RNC was not responsible for the questionable mailings of the North Carolina Republican Party. Instead, Judge Debevoise found that the RNC violated the Consent Decree because it failed to educate the state committees on the terms of the Decree. Similarly, in 2008, Judge Debevoise determined that the RNC was not responsible for the actions of the New Mexico Republican Party. It does not appear that the DNC contested either finding. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 509 (3d Cir. 2005) (explaining that when interpreting a contract courts give "'great weight' to the parties' course of conduct in discerning the intent of the parties"). Thus, the Consent Decree has been interpreted, on at least two occasions by Judge Debevoise, to not apply to state committees even though their chairs were also members of the RNC. *See Democratic Nat'l Comm.*, 673 F.3d at 203 ("In reviewing the District Court's opinion and its modifications to the Decree, we do not take lightly Judge Debevoise's nearly three decades of experience presiding over all matters related to this Decree.").

The RNC also represented that when the 1982 Consent Decree was entered, the rule that state chairs automatically became members of the RNC was in effect. D.E. 132-1 ¶ 3. This evidence lends further support to the Court's interpretation. As noted, the Court views the DNC's position, if taken to its logical extreme, to mean that all fifty state chairs are automatically subject to the Decree because they are also members of the RNC. The Court finds

no support in the Decree, or opinions discussing it, for such a broad reading.  To the contrary, as noted, Judge Debevoise expressly rejected this interpretation on at least two occasions.[15]

The issue then becomes a factual inquiry – were either Ms. Romney McDaniel or Mr. Gleason acting in their capacity as RNC members when announcing and engaging in voter fraud efforts in their respective states?  The Court finds that the DNC has not demonstrated that either were acting in their roles as RNC members.  In fact, the DNC's brief merely states that both are RNC members without further analysis.  The RNC, however, presented declarations from both Ms. Romney McDaniel and Mr. Gleason in which they state that they were acting in their capacity as state party chairs, not RNC members, regarding ballot security efforts in their states.  In addition, Mr. Phillippe spoke with counsel for both state parties and each indicated that any state voter fraud effort was separate and distinct from the RNC.  Finally, the RNC presented evidence that its general counsel warned all 168 members, including state chairs, of the parameters of the Decree, encouraged the members not to act contrary to the Decree while wearing a different hat, and notified the members that if they engaged in ballot security efforts while acting in a different capacity they were not doing so on behalf of the RNC.[16]

---

[15] The RNC also noted that the Supreme Court's decision in *McConnell*, 540 at 139, 157, as well as the Federal Election Commission's Advisory Opinion 2003-10 expressly recognize that a person may lawfully assume different roles, and depending upon the role he/she is in, undertake different activities.  The RNC states that both the Supreme Court decision and the Advisory Opinion recognize that the same person may lawfully solicit certain monies if he/she is acting in her state committee role, although the same solicitation would be prohibited if he/she was acting in her national committee role.

[16] As to the DNC's point that the RNC warned its members that it could not wear different hats, the memorandum in question was sent to RNC political staff and independent contractors, persons essentially working full-time for the RNC.  RNC Ex. A ¶ 20 & A-10.  This memorandum was not sent to RNC members.  As noted, different notice was sent to members.  RNC Ex. A ¶ 23 & A-13.

EXHIBIT 4
30

The final area of inquiry concerns Republican poll watchers at early voting sites in Nevada.  The RNC first questions the backgrounds of the Democratic poll observers who submitted the declarations.  As noted, four were attorneys, with one being a retired federal prosecutor and the other also holding the position of judge *pro tem*; one was an engineering and tech consultant; and one was an unspecified consultant.  The RNC suggests that such backgrounds are somewhat suspect, particularly as to the lawyers.  The Court finds this argument to be, at a minimum, unpersuasive and at odds with the RNC's own position.  The RNC in large part relies upon the submissions of its Chief Counsel, Mr. Phillippe.  If the Court accepted the RNC's argument, it appears that the Court would also have to view Mr. Phillippe's representations with a jaundiced eye, perhaps even more so since he is in-house counsel to an actual party in the dispute.  More importantly, it appears to the Court that having persons with professional legal training acting as observers is commendable for several reasons.  When compared with laypersons, attorneys should certainly have a better understanding of the relevant law, of the distinctions between different political committees (such as a national party as opposed to a state party), and of the responsibility and consequences of submitting sworn declarations to the Court.

Turning to the poll watchers, two inquiries arise:  (1) is the RNC engaging persons to engage in poll observations and, if so, (2) are the observers engaging in activity related to voter fraud?  The former is permissible under the Decree so long as it meets the definition of normal poll-watch functions, while the latter is forbidden.  The suspicions of the DNC were heightened because the RNC submitted many exhibits which indicated that the RNC was not involved in any poll watching activities whatsoever.  *See* RNC Ex. A ¶¶ 20-23 & A-10 – A-13.  To be sure, the RNC emphasized that some of the actions it was internally prohibiting were permissible under

the Decree, but it nevertheless directed that no poll observations be undertaken. Of course, the RNC is free to put greater restrictions upon itself, in an abundance of caution, than those required by the Consent Decree. Yet, if certain RNC employees or representatives are not following the clear advice of its Chief Counsel, the concerns are obvious – not only as to poll watching but potentially also as to other areas in which legal instruction has been provided.

As to the first inquiry, the DNC presented credible evidence that the RNC is engaging in poll observations in Nevada. The DNC poll observers identified five separate Republican watchers who stated that they were working for the RNC: K.H., O.P., C., J., and B. Importantly, it appears that subterfuge was involved. O.P. and K.H. first identified themselves as "Independent" observers before acknowledging that they were present on behalf of the RNC. On another occasion, O.P. stated that she was with a grassroots organization. B. stated that she was working for the RNC although she had been told to say that she was there on behalf of Trump Campaign. K.H. further indicated that she was instructed that she did not have to indicate for whom she worked and also stated that she was told to lie about representing the RNC. As noted, the backgrounds of the Democratic poll watchers inures to the benefit of the DNC.

As to the second question, the DNC presented evidence that at least one of the Republican poll observers, O.P., engaged in conduct that could be construed as related to voter fraud. O.P. reportedly gave incorrect information to voters on four separate occasions. The bad advice concerned paper ballots, voting locations, and voter identification. However, outside of O.P., the only other potentially questionable act arose when K.H. filled out an election incident report. If the report concerned voter fraud, then it would also violate the Decree. On the other hand, the Democratic poll watchers did not indicate that the remaining three RNC watchers – C., J., and B. – engaged in any conduct that could be construed as related to ballot security.

The Court first reviews the foregoing analysis and findings in light of the injunctive relief sought. "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318 (3d Cir. 2015) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994)). To obtain a preliminary injunction, the party seeking relief must show "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* at 318-19 (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004)). A preliminary injunction will not issue unless all four elements are satisfied. *Id.*

As to the second element, irreparable harm, the United States Supreme Court has recognized that the right to vote is a "fundamental political right." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (internal quotation marks omitted). Accordingly, courts have consistently found that a "person who is denied the right to vote suffers irreparable injury." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1082 (N.D. Fla. 2004); *see also Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (same); *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (explaining that infringement on the fundamental right to vote causes irreparable injury that cannot be remedied through monetary damages). That is so because infringement on the right to vote "cannot be alleviated after the election." *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *see also United States v. Berks*

33

EXHIBIT 4
33

*Cty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("The impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy[.]").

The third and fourth elements also appear to inure to the benefit of the DNC. As to potential harm to the RNC if the Court enjoined the RNC from engaging in poll watching activities involving voter fraud, the RNC would merely be prohibited from doing what the Consent Decree already forbids. No additional harm, except perhaps reputational, would come to the RNC. And the public interest certainly favors the enforcement of consent decrees and the prevention of potential voter suppression.

Yet, in the Court's view, the injunctive relief sought turns on the first element, that is, the DNC's likelihood of success on the merits. For the reasons stated above, in light of the evidence currently in the record, the Court finds that the DNC has not demonstrated a likelihood of success concerning action taken by the RNC in light of the statements by Mr. Priebus, Governor Pence, Ms. Conway, Ms. Romney McDaniel, or Mr. Gleason. The poll watching activity in Nevada is not as clear. However, assuming that the DNC has shown a probability that it will succeed in demonstrating that the RNC is engaged in poll watching, the DNC has not done the same concerning whether such activity is related to voter fraud or ballot security, which is what the Decree prohibits. As noted, normal poll-watch functions are expressly permitted under the Consent Decree, so proving this fact alone would not entitle the DNC to relief. The Court is sensitive to the DNC's position that such activity is suspicious in light of the RNC's position that it is not engaging in any poll watching, but the Court's only focus is whether the Decree itself is being violated.

At best, the DNC shows a possibility, not a probability, that the poll observers' activities were related to voter fraud. The strongest evidence concerns the statements of O.P., who

34

EXHIBIT 4
34

allegedly gave potential voters materially wrong information on four occasions. Even this evidence, however, turns on O.P.'s intent when she provided the erroneous advice – did she do so intentionally or was she unintentionally mistaken? More importantly, even if O.P.'s statements were intentionally misleading, the Court is unable to infer an overarching program based on the actions of one person. Outside of the O.P. examples, the DNC's submissions on activities related to potential voter fraud are scant. K.H. reportedly filled out an incident report, but the Court would have to speculate as to whether the report related to alleged voter fraud. Critically, three observers who indicated that they worked for the RNC did not engage in any activities that could be deemed related to ballet security or voter fraud. As a result, the DNC has not demonstrated a probability of success on the critical issue – a program related to voter fraud – and its motion for injunctive relief is denied.

For similar reasons, the DNC's motion for contempt also fails. Regarding contempt, a "plaintiff has a heavy burden to show a defendant guilty of civil contempt." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 974 (3d Cir. 1982) (quoting *Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir. 1938)). "To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995). "Those elements must be proven by 'clear and convincing' evidence, and ambiguities must be resolved in favor of the party charged with contempt." *John T. ex rel. Paul T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003). "Substantial compliance with a court order is a defense to an action for civil contempt." *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (quoting *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir.1986)). Because the DNC has not shown a reasonable likelihood of success on the merits, it, by definition, has not shown

an actual violation of the Consent Decree by the more exacting standard of clear and convincing evidence. For similar reasons, the Court will deny the DNC's request for sanctions.

Finally, as to the breach of the Consent Decree, the DNC similarly has not met its burden of showing a violation by a preponderance of evidence. Again, the evidence currently in the record at most demonstrates a possible violation. Yet, the Court is cognizant that neither party was permitted to engage in full discovery. The DNC has made a colorable showing of a possible breach. As a result, the Court will deny the DNC's motion to extend the Consent Decree without prejudice at this time. Following the election, the Court will hear the parties as to whether additional discovery[17] is justified and, if so, the scope of the discovery.

### III. CONCLUSION

For the foregoing reasons, the Court denies the DNC's motion for injunctive relief, denies the DNC's motion to hold the RNC in contempt, denies the DNC's request for sanctions, and denies without prejudice DNC's motion to extend the Consent Decree.[18]

An appropriate Order follows.

Dated: November 5, 2016          s/ *John Michael Vazquez*
At Newark, New Jersey            JOHN MICHAEL VAZQUEZ
                                 United States District Judge

---

[17] To be clear, the Court is not limiting post-election discovery requests to the events described in Nevada. Based on the evidence currently before the Court, it cannot find that certain statements about coordinated efforts between the Trump Campaign and the RNC were actually implemented. However, the Court is aware that the reason that the evidence is so limited is due to the time constraints that the parties were operating under due to the approaching Election Day and, as a result, limited the discovery that could reasonably be provided. The Court made this point clear in its October 31, 2016 Order. D.E. 113 at 2 n.2.

[18] Although the Court is denying the DNC's current motion for injunctive relief, for a contempt finding, and for sanctions nothing herein prohibits the DNC from making similar motions in the future if, in its view, the DNC believes that such motions are warranted in light of additional information revealed during post-election discovery.

JANUARY 31, 2020

National Association of Secretaries of State Discussion on Election Security

In this portion of the National Association of Secretaries of State (NASS) winter conference, Clint Watts made keynote remarks. (Transcript of C-SPAN).

I WANT TO THANK YOU FOR JOINING US HERE AT THIS CONFERENCE FOR THE NATIONAL ASSOCIATION OF SECRETARIES OF STATE AND OUR PROGRAM ON ELECTION SECURITY. IT IS MY PLEASURE TO INTRODUCE OUR KEYNOTE SPEAKER. CLINT IS A SENIOR RESEARCH FELLOW AT GEORGE WASHINGTON UNIVERSITY. HE RECENTLY EXAMINED THE RISE OF SOCIAL MEDIA INFLUENCE IN HIS FIRST BOOK TITLED " MESSING WITH THE ENEMY: SURVIVING IN A SOCIAL MEDIA WORLD OF RUSSIANS, HACKERS, AND FAKE NEWS." HIS RESEARCH AND WRITING FOCUSED SINCE -- FOCUSES ON TERRORISM AND COUNTERTERRORISM. HE HAS WORKED WITH THE TEAM TO TRACK AND MODEL THE RISE OF RUSSIAN INFLUENCE OPERATIONS VIA SOCIAL MEDIA LEADING TO THE PRESIDENTIAL ELECTION OF 2016. THE SEARCH LED HIM TO TESTIFY BETWEEN FOUR DIFFERENT COMMITTEES IN 2017 AND 2018 REGARDING RUSSIA'S INFORMATION WARFARE CAMPAIGN. BEFORE BECOMING A CONSULTANT, CLINT SERVED AS AN ARMY OFFICER AND AN EXECUTIVE OFFICER OF COMBATING TERRORISM CENTER, AS A CONSULTANT OF THE COUNTERTERRORISM DIVISION, AND THE NATIONAL SECURITY RANCH -- BRANCH. HE IS AN ANALYST SUPPORTING THE INTELLIGENCE COMMITTEE AND SPECIAL OPERATIONS COMMAND. HIS REMARKS TODAY CONCERNING ELECTION SECURITY, SPECIFICALLY THE BEHAVIOR OF STATE AND NONSTATE ACTORS. THESE JOIN ME IN WELCOMING DR. CLINT WATTS. [APPLAUSE] -- PLEASE JOIN ME IN WELCOMING DR. CLINT WATTS. [APPLAUSE] Show Less Text

00:02:16

THANK YOU FOR HAVING ME TODAY. BRAD TALKED ABOUT THIS TOPIC IN 2016, NOBODY WAS TOO INTERESTED. I'M NOT SURE IF YOU'RE AWARE, RUSSIA INTERFERED IN OUR ELECTION. BUT TODAY, I WANTED TO TALK TO ABOUT SOMETHING OTHER THAN THAT. I THOUGHT A GOOD WAY TO PUT CONTACTS ON IT AND TO THINK ABOUT THE DILEMMA YOU ALL FACE IN EACH OF THESE STATES, WHICH HAS DIFFERENT POLITICAL AND SOCIAL INTERESTS. YOU HAVE DIFFERENT POPULATIONS LOOKING AT DIFFERENT INFORMATION SOURCES. I THINK THAT IS WHERE I WOULD LIKE TO START. I WAS IN NEW ORLEANS AND I HAD NOT BEEN THERE AND 25 YEARS. -- IN 25 YEARS. I CONVINCED AN AUDIENCE THAT I WAS HARRY CONNICK JR.'S STOCK MOVIE HAD JUST CANNOT -- STOPPED DOUBLE -- SUNT DOUBLE, BECAUSE THE MOVIE HAD JUST COME OUT. IF WE HAD SET UP A FOUR, WE WOULD HAVE LEFT IT OFF. 10 YEARS LATER, YOU WOULD'VE IMMEDIATELY HAD MOBILE INFORMATION AT YOUR FINGERTIPS. IF THAT HAPPENED TODAY IN 2016, WHAT PEOPLE BELIEVE WHAT THEY SAW ON THE INTERNET OR WHAT THEY BELIEVE ME -- WOULD THEY BELIEVE ME? OR MAYBE I POSTED A BUNCH OF STORIES ABOUT HARRY CONNICK JR.'S STUNT DOUBLE. OR I RUN A WEBSITE TALKING ABOUT HOW I WAS PRETTY SURE HARRY CONNICK JR. DID NOT DO HIS STUNTS. I LATEST TOUGH OUT THERE, AND WHEN I WALK IN, WHAT HAPPENS? WE'VE GONE FROM YEARS WITHOUT INFORMATION UNTIL LAUGHING AT A STORE IN NEW ORLEANS -- STORY IN NEW ORLEANS. WE HAVE GONE FROM HAVING SO MUCH INFORMATION THAT WE

EXHIBIT 6
1

ACTUALLY KNOW LESS. YOU HAVE INVESTED MORE TIME GOING INTO 2020 THAN ANY ELECTION IN HISTORY. WE HAVE INVESTED A TREMENDOUS AMOUNT OF TECHNICAL RESOURCES. YET, NO MATTER WHAT WE DO, WILL THE PUBLIC THE CONVINCED ON ELECTION DAY THAT THE VOTE IS TRUE, SAFE, AND AUTHENTIC? I THINK THAT IS A BIG CHALLENGE. SO WHEN WE THINK ABOUT THE SELECTION, I WILL REWIND HOW THIS GOES FOR ME. I WAS WITH A SMALL TEAM TRACKING TERRORISTS IN SYRIA. TERRORISTS ARE VAIN AND THEY LIKE TO BRAG. EVERY TIME, WE WOULD RECORD IT AND TRY TO UNDERSTAND THE LANGUAGE. THAT IS WHEN WE STARTED COMING INTO THE DISINFORMATION SPACE WITH ALL OF THESE STRANGE ACCOUNTS THAT WERE MADE TO LOOK LIKE AND TALK LIKE AMERICAN ALL OVER THE UNITED STATES AND AUSTRALIA AND EUROPE. THESE POWERS WANTED TO CONVINCE THE AUDIENCE THAT I WAS AN AL QAEDA SUPPORTER, WHICH MAKES SENSE, AS IS EVERYONE THE FBI. -- FROM THE FBI. WE ARE ALL AL QAEDA SUPPORTERS. MANY OF THESE PERSIST TODAY AND YOU WILL EVEN SEE THEM SOMETIMES IN OUR ALTERNATIVE NEWS ENVIRONMENT. FROM THAT, WE SAW THE RELENTLESS SOCIAL MEDIA TURN. WHAT WAS FASCINATING AS I DID NOT BELIEVE IT WOULD WORK. IT SEEMED SUPER DUMB. IF YOU'VE EVER LOOKED AT A PIECE OF MISINFORMATION YOU THINK, WELL, SURELY NOBODY BELIEVES THAT. BUT PEOPLE STILL CLICK ON THE EMAIL FROM THE GUY IN NIGERIA WHO WANTS TO GIVE YOU $1 MILLION. SO IMAGINE THAT IN YOUR SOCIAL MEDIA ENVIRONMENT. IF YOU STICK AT IT OVER AND OVER , IT WEARS DOWN PEOPLE'S PERCEPTIONS. IT USED TO BE HACKERS. NOW, IT'S IF I JUST HECKLE PEOPLE ENDLESSLY, THEY WILL EVENTUALLY TAKE THEMSELVES OFF OF SOCIAL MEDIA. IF I CREATE A VERY ATTRACTIVE YOUNG LADY OR A HYPER-PARTISAN LITTLE FIGURE WHO WANTS TO DIRECT MESSAGE OF SOMETHING REALLY IMPORTANT. THEN ALL OF YOUR ACCOUNTS ARE COMPROMISED THE NEXT DAY. IN 2014, I BRIEFED FOR THE FIRST TIME HERE IN THE D.C. ERA -- AREA AND IT WAS AT THE END OF THE TERRORISM PREVIEW. EVERYBODY WAS LIKE, WE CARE ABOUT ISIS. THIS STUFF DOESN'T WORK AND NOBODY CARES. I WAS SKEPTICAL, BUT WE FAST FORWARDED ONE YEAR AND WE SAW SUCH DISINFORMATION AROUND A MILITARY EXERCISE DOWN IN TEXAS. I SPECIFICALLY REMEMBERING A PRESS CONFERENCE OF AN ARMY COLONEL TRY TO BRIEF AN AUDIENCE THAT THERE WAS NOT GOING TO BE MARTIAL LAW CLEARED IN TEXAS. THAT SPECIAL OPERATIONS COMMAND WAS NOT GOING TO INVADE TEXAS. IT SEEMS CRAZY, BUT THERE WERE PEOPLE THERE SHUT UP IN PERSON AND LOOKED AROUND TRY TO FIGURE OUT WHERE THE OTHER 200 PEOPLE WERE WHO SAID THEY WOULD BE THERE. YOU ARE SEEING INFORMATION MOBILIZE PEOPLE TO ACTION. IF YOU LOOK AT 2016, YOU SAW PEOPLE MOBILIZED FOR AND AGAINST ISSUES AND PROTESTS ORCHESTRATED BY PEOPLE IN RUSSIA WHO HAVE NEVER EVEN SET FOOT CARE. IN THE MESSAGE FROM THE ORGANIZERS WAS TO TAKE PICTURES, TAKE PICTURES. BECAUSE ON SOCIAL MEDIA, I CAN AMPLIFY OVER AND OVER. I WANT TO MOVE PAST THE RUSSIAN DISCUSSION. THIS IS SOMETHING I'M SURE YOU'RE ALREADY AWARE OF, THIS IS WHAT EVERYBODY DOES NOW. IT'S BASED ON STAMP. -- SCALE. SO I WANTED TO TALK TO YOU ABOUT THE RANGE OF WASTE CAN PLAY OUT. ON ELECTION NIGHT, I WAS NOT WORRIED ABOUT RUSSIA. IT WAS THAT EARLY WHAT MY COLLEAGUES AND I WERE WATCHING. REGARDLESS OF YOUR POLITICAL STANCE, WE DON'T WANT PEOPLE SHOWING UP TARGETING ELECTION MACHINE. WE DON'T WANT PEOPLE TO LOSE FAITH IN ELECTED OFFICIALS. I WANT TO TALK ABOUT HOW WE GOT TO THIS POINT SO WE CAN THINK OF WAYS TO HELP YOU. HELP YOU BE BETTER INFORMED TO THINK ABOUT STRATEGIES TO DEAL WITH THIS. IN 2011 THERE WAS A GUY WHO FIGURED OUT WHEN YOU LOOK AT GOOGLE, YOUR RESULTS WERE TAILORED TO YOU, AND HE CALLED IT A FILTER BUBBLES. ONCE PEOPLE TYPED IN RESULTS, THEY MIGHT BE LOOKING AT AN ISSUE IN DIFFERENT WAYS. THEY ARE GETTING A VIEW BASED ON THEIR FILTERS. ADD SOCIAL MEDIA TO THAT, AND IT IS AN INFORMATION NUCLEAR DISASTER. SOCIAL MEDIA IS ABOUT PREFERENCES, THAT IS WHY

EXHIBIT 5
2

WE GO TO IT. YOU GET THE INFORMATION YOU WANT FROM PEOPLE YOU LIKE TO HEAR FROM, AND YOU CAN HAVE IT WHEN YOU CHOOSE. IF THERE IS INFORMATION YOU DO NOT LIKE HOW MIGHT YOU CAN BLOCK IT OUT. WITH ALL THE HYSTERIA, WHILE SOCIAL MEDIA CAN DO BETTER, IT IS LARGELY UP TO US TO DECIDE HOW WE WANT TO CONSUME INFORMATION, AND TO KNOW WHAT WE ARE DOING THAT IS GOOD OR BAD FOR US. IT IS ONE PART ALGORITHM AND ONE PART US. IN ANY AUDIENCE, EVEN WITH YOUNGER AUDIENCES, IOWA'S REMIND THEM WHEN YOU LOOK AT THE PHONE, THAT WORLD IS UNIQUELY TAILORED TO ONLY YOU, NO ONE ELSE SEES IT. IT HAS SHAPED TO YOUR PRI PREFERENCES. IF *THEY DO NOT HAVE YOUR PHONE, THEY ARE SEEING A DIFFERENT WORLD. IT IS SHAPED BY YOUR* PREFERENCES. WHEN WE TALK TO PEOPLE, DIDN'T YOU SEE THIS, CAN YOU BELIEVE WHAT HAPPENED? THERE IS CHANGING RECEPTIONS. EVERYONE'S PERCEPTION IS BEING CHANGED. HOW DID WE GET TO THE SYSTEM? SOCIAL MEDIA PLAYS TO THREE BIASES THAT THEY CANNOT UNWIND, WE CAN SCREEN. THE SYSTEM IS MADE TO DO WHAT? GIVE YOU INFORMATION THAT YOU LIKE FROM PEOPLE THAT LOOK AND TALK LIKE YOU. AS LONG AS THAT SYSTEM IS IN PLACE, YOU CANNOT UNWIND THE BIASES. CONFIRMATION BIAS IS LITERALLY A LIKE SIGN, I LIKE THIS. HERE IS ANOTHER BATCH OF IT. I AM ONE OF THOSE WEIRD STOCKERS IN COFFEE SHOPS WHO WATCH OLD PEOPLE ON FACEBOOK. I DO NOT WATCH WHAT THEY ARE SAYING THAT HOW THEY INTERACT WITH TECHNOLOGY. THE HUMAN BODY IS NOT MEANT TO PROCESS NINE MEMES A MINUTE AND SEND IT TO 100 PEOPLE. THINK ABOUT THE AMPLIFICATION OF THAT. ACADEMICS SAY WE HAD THE SAME PROBLEM WHEN THE PRINTING PRESS CAME OUT, NO, NO. THERE WERE NOT 3 BILLION PRINTING PRESSES SHOOTING IT OUT EVERY DAY, EVERY MINUTE. THE AMPLIFICATION IS NOT THE EQUIVALENT OF EIGHT PRINTING PRESSES IN NEW YORK CITY 100 YEARS AGO. THE HUMAN BODY CANNOT PROCESS THAT MUCH INFORMATION. YOU WILL FALL FROM FAKE NEWS BECAUSE YOU WENT FROM 10 STORIES A DAY TO 110 STORIES A DAY. EVEN IF *YOU MAKE A MISTAKE ONE TIME, YOU ARE PUSHING OUT FALSE INFORMATION, MISINFORMATION* ABOUT YOUR ELECTIONS, POLLING SITES, WHATEVER IT MIGHT BE FASTER, AND THAT DESTROYS HOW PEOPLE TAKE IN INFORMATION. IT ANNIHILATES THEIR ABILITY TO PROCESS INFORMATION. IF YOU CANNOT MAKE SENSE OF THE WORLD, IF YOU BECOME DISTORTED, IT RESULTS IN APATHY. YOU CAN SEE INTERNALLY IN RUSSIA, THEY USE THAT INFORMATION TO WHERE IT IS SO CONFUSING PEOPLE BACK AWAY AND LOOK AT MEMES OF CATS AND FOCUS ON KIDS. THE SECOND BIAS IS IMPLICIT BIAS. THROUGHOUT PSYCHOLOGICAL STUDIES, PEOPLE LIKE INFORMATION THAT LOOK AND TALK LIKE THEM. YOUR FEEDS ARE NOTHING MORE THAN GIANT COLLECTIONS OF PEOPLE SAYING THINGS YOU LIKE AND WHO TALK LIKE YOU DOMINANTLY. THEY ARE YOUR TRIBE. THIS IS MORE DEVASTATING IN THE DEVELOPMENT A WORLD WHERE WE HAVE TRIBES, AND SOCIAL MEDIA REINFORCES TRIBALISM AND INFIGHTING. THE THIRD BIAS IS WHAT I CALL STATUS QUO BIAS, ONCE YOU GET INTO YOUR TRIBE ON SOCIAL MEDIA, YOU DO NOT WANT TO SAY ANYTHING THAT MAKES THE TRIBE ANGRY. IF YOU WATCH ME ON TWITTER, I WILL SHOOT OUT A TWEET THAT WILL NOT BE LIKED BY MY TRIBE SO I CAN GET THE DATA ANALYTICS TO KNOW WHAT THEY DO NOT LIKE. I DID THIS TWO DAYS AGO. 150,000 RETWEETS, OR, WHY DID HE SAY THAT? THAT IS STATUS QUO BIAS, IT CHANGES HOW PEOPLE INTERACT ON THE *PLATFORM SO WHEN SOMETHING IS SAID THAT YOU KNOW IS NOT TRUE, YOU DO NOT REFUTE IT, YOU* LET IT GO. AS YOU LET IT GO, THE REST OF THE AUDIENCE PASSIVELY PASS THIS ON INTO THE CIRCLE. THOSE THREE BIASES HAVE AMAZING CONFOUNDING EFFECTS ON OUR DON'T -- ON OUR CULTURE AND DEMOCRACY. IF YOU WANT TO GAIN POWER, WIN THE CROWD AND YOU CAN DICTATE TO THE CROWD WHAT TO THINK AND WHAT TO DO. IT IS AN AMAZING ABILITY. WE HAVE ALWAYS HAD THIS TO A DEGREE, BUT SOCIAL MEDIA ALLOWS YOU TO OPTIMIZE IT BECAUSE THE ALGORITHM TELLS YOU WHEN YOU WERE SUCCESSFUL. THINK HOW MANY SPEECHES TEDDY ROOSEVELT WOULD HAVE HAD TO GIVE

EXHIBIT 5
3

TO FIGURE OUT THE PERFECT MESSAGE A CENTURY AGO? . TODAY YOU CAN DO THAT IN 24 HOURS AND SAY IT OVER AND OVER AGAIN. THE MORE YOUR SUCCESSFUL WITH THE MESSAGE, THE MORE POWER YOU ACCRUE AND YOU CAN DICTATE TO THE CROWD AND USE THE STATUS QUO BIAS TO INFLUENCE THEIR PERCEPTION OF THE WORLD. THIS GIVES POWER TO PEOPLE WHO DO NOT KNOW ANYTHING. EXAMPLES, YOU ARE DEALING WITH IT WITH YOUR ELECTIONS, YOUR POLLING PLACES -- ARE THE MACHINES SECURE? EVERY DAY ON SOCIAL MEDIA, DO WE KNOW THE VOTE COUNTED IN 2016? EVERY DAY FOR FOUR YEARS I HAVE GOTTEN BETWEEN 100 AND 200 QUERIES ABOUT THAT. YES, I THINK THE VOTE WAS ACCURATELY COUNTED, AND EVERY DAY THEY ASKED ME THAT QUESTION. THINK ABOUT HOW THAT CHANGES AND ACCRUES POWER. SOMEBODY WITH INFLUENCE, NO MATTER WHAT YOU TELL THEM, IT CAN BE A PROBLEM. SCENARIOS WITH NECK SCENES YOU GET STRONG INFLUENCERS AND YOU ARE CHANGING HEALTH POLICY. THE BIG ONE TODAY IS CORONAVIRUS . NEWS ARTICLES ABOUT FALSE AND MANIPULATED INFORMATION IS BEING SPREAD ABOUT A HUGE HEALTH CRISIS. YOU GET AN INFLUENCER PUSHING OUT REPETITIVELY, IT IS HARD NOT TO BELIEVE THEM BECAUSE YOU WANT TO. THE COUSIN THEY ARE IN YOUR SOCIAL MEDIA NATION -- BECAUSE THEY ARE IN YOUR SOCIAL MEDIA NATION. I ASKED HOW MUCH TIME DO YOUR KIDS SPEND ON PHONES? . AVERAGES VARY FROM THREE TO FIVE HOURS A DAY, AND FOR SOME TEENAGERS EIGHT OR MORE ON A DEVICE, NOT COUNTING TELEVISION, GAMING. THE MORE TIME PEOPLE SPEND IN THE VIRTUAL WORLD, THE LESS TIME IN THE PHYSICAL WORLD, THE MORE THEIR ALLEGIANCES CHANGE. SOME SURVEYS ARE ALARMING ABOUT YOUNG PEOPLE OPEN TO ALTERNATIVE FORMS OF GOVERNMENT WHICH ARE POORLY EXPLAINED AND I DO NOT THINK EFFECTIVELY RESEARCHED, BUT THEY ARE OPEN TO THAT BECAUSE OF THE DEGRADATION CAMPAIGNS AROUND DEMOCRACY CONDUCTED DOMESTIC AND INTERNATIONAL. TAKING ABOUT THAT OVER TIME, KIDS WILL NOT BE OVERTAKEN BY THE MATRIX, THEY WILL ENLIST IN THE MATRIX, THEY LOVE THE MATRIX. SEVEN HOURS A DAY ON YOUR DEVICE IS BETTER THAN THE REAL WORLD. THIS DYNAMIC IS UNFOLDING IN REAL TIME BUT IT CHANGES ALLEGIANCES AND PEOPLE BECOME TIED TO HASTAGS OR AVATARS, BUT DO NOT WANT TO THANK THEY HAVE IT IN OUR NEIGHBORHOOD TO AFFECT THEIR DAILY LIFE. CHANGING THAT IS SOMETHING WE HAVE TO THINK ABOUT. IT RESULTS IN THE ULTRA-WOKE PERSON WHO WANTS TO STAND UP FOR EVERY ISSUE BUT NEVER LEAVES THE COUCH, WHICH IS ANNOYING. OR YOUR ANGRY UNCLE WHO SCREAMS THAT YOU ON FACEBOOK. IT CREATES A STRANGE DYNAMIC THAT WE DO NOT UNDERSTAND HOW WE ARE PERCEIVED, SO I JOKE THAT TWITTER IS WHERE YOU GO TO GET YELLED AT WHERE PEO BY PEOPLE YOU DO NOT KNOW. THAT DYNAMIC HAS CHANGED WHERE WE ARE PUSHING PEOPLE AWAY TO DRAW THE ATTENTION OF PEOPLE WHO MIGHT BE ON THE OTHER SIDE OF THE WORLD, THE COUNTRY, OR NOT EVEN WHO THEY SAY THEY ARE. THE THIRD PART IS THE DEATH OF EXPERTISE WHICH IS THE MOST CRITICAL PART. TOM NICHOLS WROTE A BOOK ABOUT THIS. YOU AS INSTITUTIONAL LEADERS AND DEFENDERS OF VOTING OF THE PROCESSES OF EXECUTING OUR DEMOCRACY IS ESSENTIAL THAT EVERYONE HAS CONFIDENCE IN YOU. I DO, I SEE WHAT YOU ARE DOING TO PREPARE THE ELECTION, BUT IT ONLY TAKES ONE IDIOT ON SOCIAL MEDIA TO RUIN YOUR LIFE, AND IT CONSUMES SO MUCH OF YOUR TIME THAT YOU CANNOT EFFECTIVELY EXECUTE THE DUTIES OF YOUR JOB. NOW YOU'RE DEALING WITH MISINFORMATION WHEN YOU WANT TO SECURE THE ELECTION, IT IS A COST. EVERYONE WITH AN INTERNET THE BELIEVES THERE ARE SMARTER THAN EVERYONE IN THE WORLD ON ANY TOPIC. ANYONE WITH CHILDREN IN HIGH SCHOOL KNOWS THIS IS TRUE. THIS IS A TOUGH DYNAMIC THAT WE NEED TO RESTORE IN THE COMING YEARS. WHEN THINKING ABOUT THIS, I WANT TO ALERT YOU TO SOMETHING ELSE ON THE HORIZON. WHEN I STARTED DOING THIS, WE GET ACTIVISTS AND HACKERS WHO KICK THIS OFF, THEY WERE THE FIRST TO HACK INTO CRITICAL INFORMATION TO EXPOSED TO THE PUBLIC, THEY

EXHIBIT 5
4

COULD INFLUENCE BEHAVIOR AND HOW PEOPLE THINK. THE SECOND GENERATION IS EXTREMISTS, THEY REACHED AN ENTIRE AUDIENCE AROUND THE WORLD, AND THEY DID IT BY GOING MULTIPLATFORM, MULTIMEDIA, COMMUNICATING IN ALL DIFFERENT LINKAGES. THAT IS WHY ISIS OVERTOOK AL QAEDA, THEY COULD OVERTAKE MORE PEOPLE. THEY WOULD TRANSLATE INTO DOZENS OF LANGUAGES. THEY WERE EXPANDING THE AUDIENCES THEY COULD REACH. NATIONSTATES, RUSSIA AND MANY HAVE OVERTAKEN THE SYSTEM. WHEN THEY SAW THE ARAB SPRING WERE SOCIAL MEDIA RALLIES WERE OCCURRING, PEOPLE DID NOT KNOW EACH OTHER, TOPPLING DICTATORS. DID YOU THINK AUTHORITARIANS WOULD THINK THAT SOCIAL MEDIA WOULD JUST BE THEM? NO WAY. WITHIN MONTHS, EVERY ONE OF THESE COUNTRIES GOING BACK TO IRAN AFTER THE TWITTER UPRISING IN 2009, EVERY ONE OF THEM MOVED INTO THIS SPACE. FIRST, FIND MY OPPONENTS, TRACK THEM DOWN, INFILTRATE GROUPS, DESTROY THE SYSTEM WITH INFORMATION. WE CALL IT A TROLL FARM, IN THE TECHNICAL WORLD A DISINFORMATION CENTER. MEME MAKERS, BLOG POSTS, SOCIAL MEDIA TROLLING AND EVERY COUNTRY. THE NATIONSTATES WILL TRY TO AFFECT YOU, THEY HAVE TO SPEAK IN YOUR LANGUAGE. IF THEY WANT TO MESS AROUND IN YOUR ELECTION, THEY HAVE TO SPEAK ENGLISH LIKE AN AMERICAN. THE EASIEST WAY TO SPOT THEM, THEY DO NOT KNOW HOW TO USE SPELLCHECK. THEY MAKE MISTAKES GRAMMATICALLY. THEY LAY THE JOKES OUT WHEN IT DOESN'T FIT THE SCENARIO. THOSE WERE EARLY INDICATIONS OF FOREIGN INTERFERENCE. TODAY WE HAVE MOVED TO THE FOURTH GENERATION, TROLLING AS A SERVICE. THE MOST GROUNDBREAKING THING IS YOU HAVE A WIDE SPECTRUM OF ACTORS WHO CAN BUY OR ACQUIRE THESE SERVICES INDIVIDUALLY OR COMBINE THEM TOGETHER TO AMPLIFY DISINFORMATION AND PICKED THAT AGAINST YOU -- PIT THAT AGAINST YOU. EVERYONE HAS ITS ABILITY AT THEIR FINGERTIPS. YOU CAN GO TO THE DARK WEB AND BY SOCIAL BOTS OR HIRE PEOPLE TO TROLL. IT IS REMARKABLE HOW THIS HAS GONE DOWN. NEXT ON THE HORIZON WHICH IS JUST STARTING IS ESSENTIALLY OWNING THE SYSTEM, AND CHINA WILL WIN. THIS IS A COMBINATION OF CENSORSHIP, SOCIAL SCORING, SAY SOMETHING NICE ABOUT US OR YOU DO NOT GET POINTS, NO POINTS, NO LOANS OR JOBS. SCORING SYSTEMS WILL SHAKE PEOPLES BEHAVIOR -- SHAPE PEOPLE'S BEHAVIOR. IF YOU WANT TO SEE WHAT WILL BE THE 9/11 OF THAT, IT WILL BE THE NBA IN CHINA IN RECENT WEEKS. SOMEONE STICKS UP FOR DEMOCRACY AND THE NBA SAYS HE LIKES SOME DEMOCRACY, BUT WE LIKE PROFITS A LITTLE MORE. MAJOR SOCIAL INFLUENCERS ARE SAYING WE NEED TO STICK OUT OF THEIR BUSINESS, AND CHINA SAID THIS IS THE BEGINNING, WE WILL SEE YOU. WAIT UNTIL WE GET ARTIFICIAL INTELLIGENCE, WE WILL CHANGE YOUR WORLD VIEW. YOU WILL NOT HAVE ANY IDEA BAD THINGS ARE HAPPENING, AND I WILL MAKE YOU BELIEVE GOOD THINGS ARE HAPPENING THAT NEVER HAPPENED. THEY WILL HAVE THAT ABILITY TO SHAPE. I PUT THAT TO YOU AS YOU PLAN THESE SCENARIOS HOW TO DEAL WITH THESE ACTORS. IN TERMS OF SOPHISTICATION, ON THE LEFT SIDE IS WHAT IS IMPORTANT TO UNDERSTAND, THERE ARE DEGREES TO INFLUENCE, SOME EASIER THAN OTHERS. SELLING SOMEONE SOMETHING, CHANGING THEIR VIEWS EVEN A LITTLE BIT BASED ON HOW THEY VOTE, HARD BUT NOT IMPOSSIBLE. THE NEXT LEVEL PLAYERS ARE SETTING UP FAKE UNIVERSITIES, FAKE THINK TANKS, INSTITUTIONS AND NONPROFIT TO SAY ALL VOTING MACHINES ARE WEAK AND YOU CANNOT TRUST THEM. THIS IS THE COMBINATION OF LOBBYISTS, POLITICAL GROUPS, OLIGARCHS, THEY ARE BUYING MEDIA OUTLETS AND COMBINING THESE TOOLS TO SHAPE YOUR REALITY. THAT IS WHAT I WORRY ABOUT, CAN WE FIGHT OFF THOSE WHO HAVE NO INTENT, KNOW-HOW, AND RESOURCES TO CHANGE THE REALITY OF OUR DEMOCRACY. THE REALITY OF OUR DEMOCRACY IS IT IS THE BEST FORM OF GOVERNMENT ON THIS PLANET, WE HAVE ACHIEVED MORE THAN ANY SOCIETY, AND PLACES THAT HAVE MOVED TOWARD DEMOCRACY HAVE DONE BETTER. THAT IS TRUTH. THAT IS WHAT I SAID, BUT MANY PEOPLE WOULD WANT TO ARGUE WITH ME. WE HAVE OUR UPS AND DOWNS, THIS IS NOT THE

EXHIBIT 5
5

BEST WEEK. IN THE LONG-TERM WE HAVE PEOPLE FROM ANY CULTURE OR IDENTITY HERE TODAY FROM ALL 50 STATES WORKING TOGETHER TO COME UP WITH SOLUTIONS TO MAKE SURE PEOPLE KNOW THEIR VOTES COUNT ON ELECTION DAY. WHAT OTHER COUNTRY COULD ACCOMPLISH THIS? NO ONE COULD DO THIS. WE HAVE TO REINFORCE WHAT WE ARE DOING. OF THE AWARENESS IS A BIG PART OF IT. FEAR IS A WEAPON FOR OUR ADVERSARIES. FEAR THAT YOUR VOTE DID NOT COUNT, THAT VOTING MACHINES GOT HACKED, FEAR THAT YOU WILL NOT GET TO THE POLLING PLACE OR BE ON THE ROLLS. WHEN YOU SEE THOSE RESPONSES OF FEAR AND THE PUBLIC RISING UP, CORONAVIRUS IS AN AMAZING EXAMPLE RIGHT NOW, THAT IS WHEN YOU HAVE TO BE OUT THERE AGGRESSIVELY PUSHING BACK. I WILL CLOSE WITH A FEW THINGS TO THINK ABOUT IN YOUR ROLES, AND LET ME KNOW IF I AM GOING TOO LONG. AS COUNTRIES, THE MOST IMPORTANT THING WE CAN DO, WHETHER YOU ARE STATE, LOCAL OR FEDERAL OFFICIAL IS HAVE A RIGID PINNING TO THE TRUTH AND BE DATA DRIVEN. YOU ARE THE HOLDERS OF DATA, THE U.S. GOVERNMENT HOLDS MORE DATA THAN ANY INSTITUTION AROUND THE WORLD. THERE WAS A CONSPIRACY YESTERDAY THAT SOME RUSSIAN SPOKESPERSON SAID THE U.S. HAD USED A CLIMATE WEAPON ON MOSCOW AND THAT IS WHY IT WAS WARMER. I SAID YES, IT IS CALLED CARBON DIOXIDE AND YOU CAN READ ABOUT IT AT OUR WEBSITE, NASA.GOV. HOW CAN YOU USE FACTS AND DATA? WE HAVE THAT ABILITY, WE ARE ONE OF THE ONLY COUNTRIES WHO HAS THAT ABILITY TO PULL BACK INTO DATA AND USE IT. THAT IS YOUR STRENGTH AGAINST TROLLS. YOU KNOW THINGS AND THEY DO NOT. YOU HAVE DATA BEHIND YOU, THEY OFTENTIMES HAVE ZERO. YOU HAVE RESOURCES, THEY USUALLY HAVE NOTHING. USE YOUR ADVANTAGES YOU HAVE TO PUSH BACK. THE OTHER PART IS ANTICIPATING REACHES AND SMEAR CAMPAIGNS. THAT IS WHAT I AM TRYING TO DO, OVER READING OF WHAT PEOPLE SAY. IF PEOPLE TALK TERRIBLE ABOUT YOU, THEY MIGHT HACK YOU AS WELL. WHO KNEW? THAT IS A LEADING INDICATOR. PEOPLE WOULD ASK ME, I TESTIFIED TO THE SENATE AND MENTIONED TO SENATOR RUBIO, RUSSIA DID NOT DO YOU ANY FAVORS. I READ RUSSIAN NEWS AND THEY DID NOT LIKE HIM. YOU CAN GUESS WHAT THEY MIGHT BE DOING. THEY MIGHT BE TRYING TO HACK INTO HIS SYSTEMS. YOU CAN LOOK AT THESE MEASURES, AND IT WILL SIGNAL WHAT THEY ARE DOING IN THE COVERT SPACE. THE OTHER WAY IS A CAPABILITY TO A SMEAR CAMPAIGN. AS SOON AS YOU KNOW YOU GOT HACKED, WHAT WILL YOU DO ON OUR ONE, ON OUR ONE, OUR 12 -- HOUR ONE, HOUR 12? THIS IS A BIG WEAKNESS FOR US. WE DID NOT UNDERSTAND HACKING WAS TO GET MONEY OR D FAME PEOPLE. HOW DO WE STAY IN FRONT OF THAT? A DOMAIN POPS UP, THEY SAY I NEED TO EXPOSE THE TRUTH, AND A WEEK LATER A BUNCH OF DOCUMENTS SHOW UP, AND THANK YOU FOR EXPOSING CRIMINAL THEFT OF DUMPING INFORMATION. THOSE ARE EARLY WARNINGS YOU CAN LOOK AT IN THE INTERNET SPACE THAT SHOULD GIVE YOU A TIP TO PREPARE AND PLAN, IT IS PROBABLY COMING YOUR WAY. FOR AGENCIES, SOCIAL MEDIA IS NOT SOMETHING THAT IS GOOD TO DO . I CAN TELL YOU NOW 6:00 P.M. ON FRIDAY I WOULD STALK EMPLOYEES TO FIND INFORMATION, AMAZING HOW MANY PICTURES OF ID BADGES AND WHAT THEY REALLY FEEL ABOUT THEIR BOSS, OUT ON WEEKENDS WHEN THEY ARE MORE RELAXED. THAT IS THE STUFF HACKERS ARE THINKING ABOUT. WE SAW THAT CONSISTENTLY ENJOY 14 AND 2015. UNDERSTAND IF PEOPLE HAVE COMPLAINTS, BRING THEM FORWARD, BUT HOW DO YOU DO YOUR OWN PUBLIC SOCIAL MEDIA ENGAGEMENT QUESTION MARK THE CLASSIC MISTAKE AGENCIES MAKE IS AN ALLEGATION COMES OUT, THEY THINK IT IS DUMB OR SILLY AND THEY WAIT. THEN AFTER THE 100,000TH TWEET THEY WANT TO ISSUE A RESPONSE, TOO LATE, IT IS ALREADY OUT THERE. THEIR RESPONSE WILL BE YOU ARE HIDING SOMETHING BECAUSE THEY KNOW THE VOTES WERE HACKED. TIME, RESPONSE, WENT TO RESPOND, WHO YOU WOULD RESPOND TO. THE OTHER CLASSIC MISTAKE IS A TROLL WITH TWO FOLLOWERS WHO HAS AN ACCOUNT FOR ONE WEEK, YOU SEE A MAJOR INSTITUTION RESPONSE. NO WE DIDN'T. AND THEY GO, I GAINED 200

EXHIBIT 5
6

FOLLOWERS, THANK YOU. YOU CAN AMPLIFY YOUR DISSENTERS. YOU HAVE TO WARGAME, YOU HAVE TO PRACTICE, YOU DO NOT DO IT IN THE OPEN, TALK TO YOUR TEAMS AND YOUR STRATEGY AS YOU MOVE FORWARD. YOU WILL KNOW IN THE LAST 60 DAYS GOING INTO THE ELECTION, ELECTION RIGGING, VOTER FRAUD, MACHINES ARE DOWN, POWER OUTAGE, ALL THOSE CONSPIRACIES WILL COME FORWARD BECAUSE PEOPLE WANT TO WIN, OR OVERSEAS WANT TO MESS AROUND IN YOUR ELECTION AND HURT YOUR INSTITUTIONS. YOU HAVE TO WARGAME THOSE SO THE PUBLIC STAYS CONFIDENT IN YOU AND NOT SOME RANDOM SOCIAL MEDIA ACCOUNT. IN TERMS OF CITIZENS, THIS IS *WHERE IT IS THAT, HOW DO WE HELP PEOPLE UNDERSTAND THE INFORMATION? I USE THE EXAMPLE,* WHEN I WAS A KID YOU GO TO THE GROCERY STORE AND THERE WOULD BE A NEWSPAPER STAND WHERE AN ALIEN HAD LANDED AT AREA 51. I VAGUELY TALKING TO MY PARENTS, DID AN ALIEN LAND? NO, NO ONE READS THAT. ALL OF OUR PARENTS READ THAT NOW ON SOCIAL MEDIA AND SEND IT TO ME. HOW DID THIS HAPPEN? THEY ARE SO BRILLIANT AT THE GROCERY STORE, BUT THEN I GET HAMMERED BY PEOPLE I WENT TO HIGH SCHOOL WITH BY THE CRAZIEST STUFF I HAVE SEEN IN MY LIFE. IF I PRINTED THIS PUT IT AT THE GROCERY STORE, YOU WOULD NOT BUY IT, BUT IF IT IS ON FACEBOOK, YOU SEND IT TO ME EVERY DAY. IT IS ABOUT UNDERSTANDING WHERE THOSE COME FROM. THE FIRST IS THE COST AND BENEFITS OF SOCIAL MEDIA USE, IS IT A GOOD OR MISERABLE EXPERIENCE? DO YOU SPEND MOST OF THE DAYS WITH THE HAIRS ON THE BACK OF YOUR NECK AND YOU ARE ANGRY, AND YOU HAD SOCIAL MEDIA RAGE -- IT IS PROBABLY NOT WORTH IT. YOU COULD LET IT GO IN YOUR WORLD WOULD BE BETTER AND YOU WOULD BE HAPPIER. THE IDEA WE WILL GIVE THEM PHONE BREAKS -- WE ARE NOT. IT IS HOW DO WE INTEGRATE TECHNOLOGY AND PEOPLE IN WAYS WHERE IT IS A BLENDED ENVIRONMENT AND PEOPLE ARE WORKING TOGETHER. THAT HAS HAPPENED MORE IN THE LAST THREE TO FOUR YEARS LARGELY DUE TO MY GENERATION AND OLDER SOURING THEM ON SOCIAL MEDIA BEHAVIOR. THEY HAVE FIGURED THIS OUT ON THEIR OWN, BUT HOW DO WE REINFORCE THAT OVER TIME? JUST THIS WEEK THE GUY WHO LIVED ACROSS THE STREET FROM ME STOLE THE WHEELS OFF MY CHEVY NOVA, JUST MISPLACED ANGER, BUT WAS SENDING ME TOTALLY BOGUS NEWS I KNEW WAS FALSE, AND POSTING RUSSIAN STATE-SPONSORED PROPAGANDA SAYING WE COULD NOT TRUST THE FBI. I AM MOST FLEW TO MISSOURI TO FIGHT HIM OVER THE WHEELS ON MY CAR AND THE PROPAGANDA. HOW DOES THIS STILL HAPPEN? WHY DOES RUSSIA WANT TO RUN A NEW SITE THAT TELLS YOU WHAT IS HAPPENING IN AMERICA IN ENGLISH? THEY DO NOT TALK ABOUT WHAT IS HAPPENING IN RUSSIA BECAUSE YOU DO NOT USUALLY CARE. WHY? THEY WANT -- THEY DO NOT CARE WHO WINS THE ELECTION, THEY WANT DEMOCRACY TO FALL. THEY WANT AMERICANS TO NOT BELIEVE IN THEIR ELECTED LEADERS, THEIR OFFICIALS, OTHER INSTITUTIONS, THEIR DEMOCRATIC PROCESSES. WE ARE VERY GOOD AT DOING THAT OURSELVES, DO NOT LET SOMEONE ELSE DO IT. THE IDEAS, KNOW WHAT YOU CONSUME. I TRY TO GIVE TIPS TO PEOPLE ON SOCIAL MEDIA BECAUSE YOU ARE MAKING DECISIONS SUPERQUICK. DO YOU KNOW THE OUTLET? IF THEY ARE NOT TELLING YOU WHERE THEY ARE LOCATED AT, THERE IS A REASON FOR THAT. THEY ARE NOT UP TO SNUFF IN TERMS OF THEIR EDITORIAL PROCESSES. DO YOU KNOW WHO THE AUTHOR IS? PARTICULARLY A MEME. *SEVEN WORDS THAT FEEL GOOD ARE OFTENTIMES NOT TRUE. DO YOU KNOW WHERE IT CAME FROM? HOW DOES THAT INFORMATION SOURCE MAKE THEIR MONEY?* IF THEY DO NOT HAVE ADS AND YOU CANNOT FIGURE OUT HOW THEY ARE PAYING THEIR BILLS THAT THEY WRITE 50 MEMES A DAY OR 15 NEW STORIES A DAY, HOW DO THEY DO THAT? DO YOU UNDERSTAND THEIR MOTIVATIONS? LISTEN MORE THAN YOU SPEAK, READ MORE THAN YOU WRITE, WATCH MORE THAN YOU FILM. THE CURRENT GENERATION CAN MAKE MORE CONTENT THAN THEY CAN CONSUME. THEY MAKE THAT FOR THEMSELVES OFTENTIMES. THEY ARE CONSUMMATE BROADCASTING PRODUCING. IT MAKES IT HARD

EXHIBIT 5
7

FOR ANYONE TO CONSUME ANYTHING IF YOU ARE PRODUCING CONTENT. THE BIGGEST THING, IF I COULD LEAVE ONE THING FOR YOU, IS UNDERSTAND WHAT YOU TEND TO BELIEVE. WAR PROPAGANDA BACK THROUGH TIME , IT IS BIOLOGICAL, PSYCHOLOGICAL, THE THING YOU HEAR FIRST, THAT WHICH YOU HEAR THE MOST, THAT WHICH COMES FROM A TRUCK THAT SOURCE, AND THAT WHICH IS NOT ACCOMPANIED BY A REBUTTAL, THAT IS BASICALLY YOUR SOCIAL MEDIA FEED. SPEED FIRST. LIKING AMPLIFICATION IS ARE THINGS. DO YOU TRUST THEM NATURALLY? THE SOURCE OF THE INFORMATION, NOT NECESSARILY WHO MADE THE CONTENT,THIS IS WHERE IT GETS MUDDLED ON SOCIAL MEDIA. WE ALREADY BLOCK OUT REBUTTALS TO THAT INFORMATION. FIRST, MOST, TRUSTED SOURCE, REBUTTAL. THAT IS WHAT YOU HAVE GOT TO DO. YOU HAVE GOT TO SEEMED, YOU HAVE GOT TO BE REPETITIVE, THOUGH IT SEEMED STUPID BUT YOU HAVE TO KEEP DOING IT OVER AND OVER. YOU HAVE TO BE A TRUSTED SOURCE, WHICH MEANS YOU HAVE TO BE RIGHT ALMOST 100% OF THE TIME. IN TERMS OF BEING IN THAT SPACE SO THAT PEOPLE CAN HEAR YOU CHALLENGE THEM, THAT MEANS THAT IF IT'S HAPPENING ON SOCIAL MEDIA, YOU MIGHT NEED TO BE THERE ON THE GROUND. THE BEST WAY IS TO SHOW UP AT THEIR HOUSE COME AT THEIR COMMUNITIES. IF THEY ARE BROADCASTING SOME CONSPIRACY ABOUT YOUR POLLING PLACE, EITHER. -- BE THERE. KNOCK THEM DOWN, HAVE YOUR DATA. WE JUST THINK WE POST BACK OR TWEET A LOT. NOTHING WORKS BETTER THAN A DIRECT CHALLENGE TO SOMEONE WHO IS PUSHING THIS INFORMATION AGAINST YOU. THE LAST THING IS TO KNOW WHEN YOU ARE AN EXPERT. WHEN IT IS THE DEATH OF EXPERTISE, PEOPLE SAY EXPERIENCE. I WILL SAY, YOU HAVE BEEN ANALYZING SOCIAL MEDIA FOR 30 YEARS? Show Less Text

00:39:38

THEY SAY, THE SORT OF THING. THE NEXT THING IS COMPETENCY. WHAT IS THEIR ACTUAL EXPERIENCE? THE THIRD PART IS WHAT ANALYSIS THEY USE TO ARRIVE. WE USED TO THINK OF THIS THING IS THE INTELLIGENCE COMMUNITY WHERE WE WERE ALWAYS EVALUATING EXPERTS. HOW DO WE PUT THAT TOGETHER TO UNDERSTAND WHAT THEY ARE PUTTING OUT IN TERMS OF INFORMATION. THE LAST PART IS WHEN I CLOSE WITH. I WORK WITH TWO DIFFERENT TEAMS DESIGNED TO HELP PROTECT THE ELECTIONS IN 2020. THE FIRST IS AT THE FOREIGN POLICY RESEARCH INSTITUTE. I HAVE BEEN ABLE TO RECRUIT 33 INTERNS THAT ARE STUDENTS FROM ALL AROUND THE COUNTRY. THEY ALL WORK REMOTELY, BUT WE GO THROUGH STATE-SPONSORED PROPAGANDA TO SEE HOW THEY ARE TALKING ABOUT THE ELECTIONS AND THE CANDIDATES. THAT IS A GOOD FORECAST TO LOOK AT HOW SERIOUS THEY ARE ABOUT ELECTION 2020. WE ARE ALSO DOING HOW THEY TALK ABOUT TECHNOLOGY AND ELECTORAL SYSTEMS IS ANOTHER THING WE ARE LOOKING AT. THEN WE TRY TO PUSH THAT OUT INTO THE SOCIAL MEDIA SPACE. THE OTHER IS CALLED THE HAMILTON DASHBOARD. IT IS BUILT OUT OF SOCIAL MEDIA CAMPS WE HAVE BEEN LOOKING AT. THE ALLIANCE FOR SECURING DEMOCRACY CREATED A DATABASE THAT RUNS IN REAL-TIME. THEY HAVE CONTENT FROM RUSSIA, CHINA, AND IRAN COMING ON THAT TELLS YOU WHAT THAT NEW CYCLE IS ABOUT. IT IS ONE PART TO TELL YOU ABOUT VULNERABILITIES AND A SECOND TO CHALLENGE THOSE CANDIDATES WHO SAY THERE ARE ALL SORTS OF PEOPLE MESSING AROUND. THEY WILL SAY, I DON'T KNOW, I DON'T SEE IT. MAYBE YOU ARE GOING TO LOSE JUST BECAUSE PEOPLE DID NOT VOTE FOR YOU. IT IS TWO PARTS THIS TIME. THIS IS A BIG ISSUE WILL BE STUDYING HERE IN THE SUMMERTIME. WE KNOW DISINFORMATION WILL RAPIDLY START TO EMERGE IN THAT SPACE AND WE WILL USE THOSE TWO PROJECTS. IT'S PRETTY AMAZING TO WATCH HOW FAST YOUNG PEOPLE CAN READ NEWS COMPARED TO ME, WHICH I ENJOY. I THINK WE WILL HAVE APPROACHED 11,000 NEW STORIES. THEY ALSO USE IT FOR THEIR OWN COLLEGE PROJECTS AND PAPERS. WITH THAT, THANK YOU FOR HAVING ME TODAY. GOOD LUCK. [APPLAUSE]

EXHIBIT 5
8

Mary Basile Logan

December 6, 2020

*Sent Via Fax*
Phillip Kline, Esq.
c/o Liberty University School of Law

*Sent Via Email*
The Honorable Ted Cruz
Washington, D.C. Office

*Sent Via Email*
Maria Bartiromo, Fox News

*Sent Via Email*
Mark Levin, Esq.
c/o Westwood One

*Sent Via Email*
Jenna Ellis, Esq.

RE:   Center for Technology and Civic Life
      Center for Election Innovation and Research

Dear Messrs and Mses:

This letter and associated sourced documents attached concern the analysis of the Center for Tech and Civic Life (CTCL), the Center for Election Innovation and Research (CEIR), as well associate entities regarding their actions taken during the 2020 election cycle.

During the 2020 election cycle, I was intimately involved in the election process both as a municipal candidate as well as canvasser for candidates at the State and Federal level. This experience brought about a first-hand knowledge and insights into the reason for this letter as outlined below. I am a Paralegal/Analyst with Trino Paralegal Services, LLC with credentials including a Bachelor's in criminal justice, minor in Strategic Intelligence and a Master's in Public Policy.

The initial analysis query focused on Mark Zuckerberg and his wife, Priscilla Chan, $350 million donation to The Center for Tech and Civic Life (CTCL) and $50 million for The Center for Election Innovation and Research (CEIR). Fundamentally, the provision of these funds would be commingled with public funds clearly creating entanglement, however a more insidious vulnerability becomes apparent through undisclosed fund source donor capacity. In such cases, recipients may be subject to directives of use of said funds, up to and including undue influence on final outcome of funding necessity – in this case Constitutional protections of the Legislative, Executive and body of the taxpaying public – We the People and the public trust.

EXHIBIT 6
1

Page Two
December 6, 2020

Under the guise of non-profit status, in the company of associate entities, as disclosed herein, the CTCL circumvented Constitutional bodies in the usurpation of **the** most sacred protected and informed right of the American people; the voice of the people as transcribed in their private voting freedom.

This fact-sourced analysis includes grant solicitation by the CTCL, acceptance and directives in application of funding, and post-Administration reporting.  Layering the constraint on 1st Amendment rights by Facebook in the selective use of Section 230 as concerns contextually and self-informed public disclosure constraint regarding COVID-19, seemingly in the interest of public health and safety.  The facts disclose that the collective actions were knowingly orchestrated as part of a larger scheme echoed among sworn Affidavit testimony of principled election volunteers in the states of Pennsylvania, Arizona, Georgia and Michigan.  With CTCL grant funding provided across the United States, such schemes may have broader implications not yet having surfaced.

Moreover, Facebook, Google and Twitter have continued their usurpation of the 1st Amendment with evidenced imposition on the post-election, Constitutionally informed, legal remedy examination with the composed interdiction of the Legislative voice, including that of Senator Douglas Mastriano (PA-33), among others.

In the midst of an unprecedented pandemic gravely impacting the United States and, more broadly, the world, the 2020 primary and general election timelines, venue and casting of votes were altered under the auspices and interests of public health (National Association of State Elected Directors, 2020).  Apart from the Constitutional legitimacy of such changes, Facebook's founder and President, Mark Zuckerberg, et al. donated $250 million to the CTCL on September 1, 2020, as provided by joint press release (Center for Tech and Civic Life, 2020).  On October 13, 2020, Chan and Zuckerberg donated an additional $100 million to the CTCL, citing the "unprecedented demand for support from local election jurisdictions across the country" (Center for Tech and Civic Life, 2020).  The CTCL's press statements evidence broadly disseminated recipient funding (Center for Tech and Civic Life, 2020) across these United States absent disclosure of principle funding source.

Based on the foregoing sourced facts concerning private funding permeation into our most sacred of foundational tenons, that being the Constitution, 14th Amendment, Section 1.  These facts are made more imperative for immediate policy redress when considering the knowing actions taken by members of the Federal and State Legislative bodies, Governors and paid designees to aid in the aforementioned permeation; in essence these parties collaborated affixing a fiscal environment which allowed for the CTCL to become the premier firefighter in a nationwide arena of immediate and untenable election changes (National Association of State Elected Directors, 2020).

EXHIBIT 6
2

Page Three
December 6, 2020

Due to limited time constraints and staffing, the author presented the findings herein to parties entrusted with journalistic integrity, advanced legal scholar and public policy advancement. Left to resolve itself, the enclosed facts may not otherwise surface, may be ignored or in worst case scenario, be repeated including the pending January 5, 2021 Georgia election.

Additional areas of research demand examination including thorough analysis of individual Governor actions through Executive Order in and during the COVID-19 pandemic concerning the CARES Act federal funding appropriations as well the State directed alterations made to the election process under COVID-19 Emergency Response. Theory from initial analysis suggests that Governors may have knowingly held funds from local appropriation, including any and all additional funds available during the election cycle while acting as a conduit in disseminating information regarding the CTCL grant application process; opening pandora's box to the election outcome with its myriad of irregularities which has resulted, knowingly causing voter disenfranchisement and inserting divisiveness in and among the three branches of government. If this theory holds true under examination, there is direct culpability between identified Governors and/or Legislators, providing for CTCL in causation and access.

In furtherance of the author's query, a telephonic interview with Hunterdon County Board of Election's Beth Thompson and email communications with Hunterdon County Clerk, Mary Melfi took place. Neither the Hunterdon County Board of Election or the County Clerk's Office received specific guidelines and/or suggestions for equipment procurement. The Deputy City Commissioner, Philadelphia also received CTCL grant funds, however the disclosed CTCL communication directed to Nick Custodio, Deputy City Commissioner, Philadelphia, were appreciatively more extensive.

Expanding on the pleading filed by the Amistad Project – Thomas More Society which cited, "…CTCL funded ballot boxes that disproportionately benefitted Democrats" (WisPolitics.com, 2020), additional areas of legal query seem to demand analysis. As to the Philadelphia CTCL grant funding, the author refers to page 24, email communications received by Exhibit from The Amistad Project's court pleading which provides (attached hereto),

Note: We have a network of current and former election administrators and election experts available to provide assistance (at no cost) on communications ;scaling up your vote by mail processes; poll worker recruitment and training in a pandemic; applying public health guidelines to polling places; designing election materials to ensure forms, envelopes, and other materials are understood and completed correctly by voters; and more…Technical Assistance Partners…I know that you all have already been working with a couple of these partner organizations, so we can spend most of the time focused on how we can best support you in the coming months rather than on intros…

EXHIBIT 6
3

Page Four
December 6, 2020

The experiences of Hunterdon County in contrast to Philadelphia were in content, guidelines and/or suggestions for procurement; therefore, an audit of CTCL recipient grants more broadly must be undertaken by time constrained subpoena. Initial research provides that the CTCL may have knowingly directed Philadelphia in the procurement of certain equipment for use during the 2020 election cycle as well in furthering the CTCL and affiliate entities into the heart of the election process.

Moreover, by providing directive in how the grant funds were to be used, extending to and including the specific equipment procurement, CTCL becomes a party to culpability for data breaches through Dominion, Smartmatic, ES&S, Hart, etc. But for the CTCL directive to purchase including funding allocation, access to voter ballots and any resulting misuse, manipulation and/or fraudulent handling would have otherwise been avoided with the Board of Election bodies maintaining original and legally described chain of custody.

Lastly, through sworn Affidavit, many American citizens observed election volunteers intimately involved in the election process who were designees of certain non-profit entities including Rock the Vote, the ACLU, among others. Based on the analysis herein, such organizations share affiliation in principled foundational tenons and, from the CTCL website, referred to as "key funders and partners" (Center for Tech and Civic Life, 2020). These entities are the same as referred to in the Philadelphia grant directive email communication from CTCL as already being in communication with or accessible to representatives of Philadelphia through the CTCL conduit grant relationship, referred to on page 3, herein.

Such entities include but are not limited to Google, Center for Democracy and Technology, Rock the Vote, The Voting Project, Women Donors Network, Rockefeller Brothers Fund, the Knight Foundation, the Democracy Fund, Pew Charitable Trusts, IBM, Democracy Works, the New Organizing Institute – Wellstone and RePower Fund, and the Skoll Foundation. The foregoing entities share parallel tenons to the CTCL including donor capacity with "collaboration…in CTCL's organizational DNA…" (The Center for Tech and Civic Life, 2020).

A thorough analysis of the holistic 2020 election configuration discloses that the proverbial firefighter (CTCL), may have been a trojan horse/arsonist, intent on employing the manufactured crisis as a means of imposing itself and its associate entities on both the Constitutional principles of our Founding as well the resulting election outcome fraught with allegations of malfeasance. The Constitutionally informed right to vote is among the most sacred held in these United States – from all accounts it has been compromised with malice. The Constitutional protections of this right are paramount in ensuring public engagement and discourse. Accordingly, the author respectfully asks timely review and courtesy in reply.

EXHIBIT 6
4

Page Five
December 6, 2020

The author seeks to thank the Hunterdon County Clerk, Mary Melfi and Board of Election Administrator, Beth Thompson; their stellar reputations and consistency in upholding Constitutional principles provided an informed comparison as to the undertaking of this analysis project.

Thank you for your time in review of this submission.  I have included my contact information should you have reason or need to dialogue.  The integrity of our Constitutionally informed Republic in perpetuity will be impacted by the choice to confirm or dispel the analysis described herein when considered in combination with the extensive body of allegations regarding the 2020 election cycle.  I pray the body of query is fruitful in supplanting legal remedy reasonable in measure in assuring the protection of our Nation as we know it.

To God and County.

/s/ Mary B. Logan
Mary Basile Logan, M.P.P.


Attachments:

1. Philadelphia CTCL Grant (Amistad Project Exhibit), externally obtained.
2. Email Communication from Robert Giles, Director Division of Elections, NJ Department of State to Beth Thompson, Hunterdon County Board of Elections Administrator.
3. CTCL Grant Confirmation letter to the Hunterdon County Clerk, Mary Melfi.
4. CTCL Grant Confirmation letter to the Hunterdon County Board of Elections Administrator, Beth Thompson.

EXHIBIT 6
5

# References

Center for Tech and Civic Life. (2020, October 29). *Grant Award (Preliminary List)*. Retrieved from Center for Tech and Civic Life: https://docs.google.com/spreadsheets/d/1E7P3owIO6UlpMY1GaeE8nJVw2x6Ee-iI9d37hEEr5ZA/edit#gid=1993755695

Center for Tech and Civic Life. (2020, December 6). *Key Funders and Partners*. Retrieved from Center for Tech and Civic Life: https://www.techandciviclife.org/key-funders-and-partners/

Center for Tech and Civic Life. (2020, October 13). *Press Release: CTCL Receives Additional $100M Contribution to Support Critical Work of Elected Officials*. Retrieved from Center for Tech and Civic Life: https://www.techandciviclife.org/100m/

Center for Tech and Civic Life. (2020, September 1). *Press Release: Priscilla Chan and Mark Zuckerberg Commit $300 Million Donation to Promote Safe and Reliable Voting During COVID-19 Pandemic*. Retrieved from Center for Tech and Civic Life: https://www.techandciviclife.org/open-call/

May, W. (2020, September 11). CTCL COVID-19 Response Grant.

National Association of State Elected Directors. (2020, December 4). *2020 General Election Administrative Dates & Deadlines*. Retrieved from National Association of State Elected Directors: https://www.nased.org/2020dates

The Center for Tech and Civic Life. (2020, April 2). *Center for Tech and Civic Life Receives the 2020 Skoll Award for Social Entrepreneurship*. Retrieved from The Center for Tech and Civic Life: https://www.techandciviclife.org/2020-skoll-award/

WisPolitics.com. (2020, November 20). *Amistad Project: Challenges presidential election results with planned lawsuits in six swing states*. Retrieved from WisPolitics: https://www.wispolitics.com/2020/amistad-project-challenges-presidential-election-results-with-planned-lawsuits-in-six-swing-states/

EXHIBIT 6
6

https://www.influencewatch.org/non-profit/center-for-tech-and-civic-life/#:~:text=CTCL%20then%20donated%20the%20

Center for Tech and Civic Life (CTCL) - InfluenceWatch

(h) purpose o To support the safe administration of public elections during COVID-19 pandemic

('c)  IRC Secti county governmen

Center-for-Tech-and-Civic-Life-2020-Form-990.pdf (influencewatch.org)

| CTCL Feb 1, 2020 - Jan 31, 2021  From | | | | | | Resolution/Grant 1 | | |
|---|---|---|---|---|---|---|---|---|
| (a) Name and | (b) EIN | (D) amount of cash grant | Difference (CTCL Cash grant minus county grant amounts) | CTCL Grant Total per the county financials | No. of CTCL grants/c ounty | Resol. | Grant Amount 1 | Adopted |
| Atlantic | 21-6000049 | $553,365 | $0 | $553,365.00 | 1 | 545 | $553,365.00 | 11/10/2020 |
| Bergen | 21-6002426 | $2,065,628 | ($610,355) | $2,675,983.00 | 1 | 760-20 | $2,675,983.00 | 11/4/2020 |
| Burlington | 21-6000107 | $2,889,843 | ($49,476) | $2,939,318.97 | 1 | 2020-00514 (2020-00523) | $2,939,318.97 | 10/28/2020 |
| Camden | 21-6000504 | $2,415,645 | ($0) | $2,415,645.43 | 2 | 85,88 | $2,212,516.68 | 11/12/2020 |
| Cape May | 21-6000106 | $43,884 | ($36,000) | $79,884.00 | 2 | 651-20 (650-20) | $39,942.00 | 10/13/2020 |

EXHIBIT 6
7

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cumberland | 21-6000508 | $875,113 | ($94,195) | $969,307.50 | 1 | 2020-586 | $969,307.50 | 11/16/2020 |
| Essex | 22-6002433 | $2,944,803 | $0 | $2,944,803.00 | 1 | 41 | $2,944,803.00 | 11/9/2020 |
| Gloucester | 21-6000660 | $267,828 | $0 | $267,827.88 | 2 | 52751 | $153,044.50 | 10/21/2020 |
| Hudson (Note: looking for resolution | 22-6002443 | $688,657 | $0 | $688,656.99 | 1 | Agenda#18 | $688,656.99 | 10/21/2020 |
| Hunterdon | 22-6002450 | $83,011 | ($0) | $83,011.25 | 2 | 2020-619 | $35,576.25 | 10/20/2020 |
| Mercer | 21-6000856 | $1,003,600 | $0 | $1,003,600.00 | 1 | 2020-653 | $1,003,600.00 | 12/17/2020 |
| Middlesex | 21-6002454 | $959,860 | $0 | $959,860.00 | 1 | 20-1583-R (20-1584-R, 20-1585-R) | $959,860.00 | 12/17/2020 |
| Monmouth | 21-6000881 | $557,124 | $0 | $557,123.88 | 3 | 2020-0862 | $238,767.38 | 10/22/2020 |

EXHIBIT 6
8

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Morris | 22-6002462 | $369,931 | $0 | $369,930.75 | 2 | 2020-773 (2020-774) | $158,541.75 | 10/14/2020 |
| Ocean | 21-6000954 | $450,403 | ($1) | $450,404.00 | 2 | 2020001349 | $300,269.00 | 11/4/2020 |
| Passaic | 22-6002465 | $3,203,500 | $0 | $3,203,500.00 | 1 | R20200877 | $3,203,500.00 | 10/27/2021 |
| Salem | 21-6001147 | $67,683 | $0 | $67,683.00 | 2 | 2020-359 | $38,676.00 | 10/21/2020 |
| Somerset (Note: budget has 3 line items and need to | 22-6002472 | $305,988 | $9,604 | $296,384.00 | 3 | R20-1272 (R20-1273) | $134,442.00 | 11/10/2020 |
| Sussex | 22-6002477 | $114,682 | ($1,343) | $116,025.00 | 2 | 397-2020 | $49,725.00 | 10/15/2020 |
| Union (Note: Need second resolution) | 22-6002481 | $1,443,685 | ($1,065) | $1,444,750.00 | 2 | 2020-686 | $1,136,000.00 | 10/1/2020 |
| Warren (Note: Budget has 2 | 22-6002488 | $36,043 | ($36,043) | $72,085.50 | 2 | 399-20 | $36,042.75 | 10/14/2020 |
| Totals | | $21,340,276.00 | ($818,873.15) | $22,159,149.15 | 35 | | $20,471,937.77 | |

EXHIBIT 6
9

**Note**

Amounts in CTCL  Col map back to CTCL Revenue by County Tab

Amounts in CARES Col map back to Cares Act Election Related Tab

Amounts in HAVA Col map back to HAVA-CARES Specific Tab

Amounts in NJ DOS-Local-Other Col map back to NJ DOS-Local-Other tab

| | 2020 Election Related Grants | | | | |
|---|---|---|---|---|---|
| | CTCL | CARES | HAVA/CARE | NJ DOS-Local-Other | Total |
| Atlantic | $553,365.00 | | $589,453.68 | $724,108.58 | $1,866,927.26 |
| Bergen | $2,675,983.00 | $5,275,000.00 | | | $7,950,983.00 |
| Burlington | $2,939,318.97 | | | | $2,939,318.97 |
| Camden | $2,415,645.43 | | | | $2,415,645.43 |
| Cape May | $79,884.00 | $864,119.76 | | | $944,003.76 |
| Cumberland | $969,307.50 | $440,487.91 | | $244,000.00 | $1,653,795.41 |
| Essex | $2,944,803.00 | | | | $2,944,803.00 |
| Gloucester | $267,827.00 | | | | $267,827.00 |
| Hudson | $688,656.99 | | | | $688,656.99 |
| Hunterdon | $83,011.25 | | | | $83,011.25 |
| Mercer | $1,003,600.00 | | | | $1,003,600.00 |
| Middlesex | $959,860.00 | | | | $959,860.00 |
| Monmouth | $557,123.88 | | $1,269,982.28 | | $1,827,106.16 |
| Morris | $369,930.75 | $2,915,033.00 | $2,409,646.56 | | $5,694,610.31 |
| Ocean | $450,404.00 | | | | $450,404.00 |
| Passaic | $3,203,500.00 | $826,210.00 | | | $4,029,710.00 |
| Salem | $67,683.00 | | | | $67,683.00 |
| Somerset | $296,384.00 | | | | $296,384.00 |
| Sussex | $116,025.00 | | $201,645.97 | | $317,670.97 |
| Union | $1,444,750.00 | | $1,078,032.51 | | $2,522,782.51 |
| Warren | $72,085.50 | | | | $72,085.50 |
| **Total** | **$22,159,148.27** | **$10,320,850.67** | **$5,548,761.00** | **$968,108.58** | **$38,996,868.52** |

EXHIBIT 6

10